# Exhibit B



# THE ARAB REPUBLIC OF EGYPT

### U.S.$1,000,000,000 5.75% Notes due 2020
### Issue Price 100%

### U.S.$500,000,000 6.875% Notes due 2040
### Issue Price 99.059%

———————

The U.S.$1,000,000,000 5.75% Notes due 2020 (the "**2020 Notes**") and the U.S.$500,000,000 6.875% Notes due 2040 (the "**2040 Notes**" and, together with the 2020 Notes, the "**Notes**") to be issued by The Arab Republic of Egypt (the "**Issuer**", the "**Republic**" or "**Egypt**") will, unless previously redeemed or cancelled, be redeemed at their principal amount on April 29, 2020, in respect of the 2020 Notes, and April 30, 2040, in respect of the 2040 Notes.  See "Terms and Conditions of the Notes—5. Redemption and Purchase".

The 2020 Notes will bear interest from and including April 29, 2010 at the rate of 5.75% per annum payable semi-annually in arrear on April 29 and October 29 in each year. The first payment of interest will be made on October 29, 2010 for the period from and including April 29, 2010 to but excluding October 29, 2010. The 2040 Notes will bear interest from and including April 29, 2010 at the rate of 6.875% per annum payable semi-annually in arrear on April 30 and October 30 in each year. The first payment of interest will be made on October 30, 2010 for the period from and including April 29, 2010 to but excluding October 30, 2010.  Payments on the Notes will be made in U.S. Dollars without deduction for or on account of any Egyptian withholding taxes and the Issuer will pay additional amounts in respect of such taxes as described under "Terms and Conditions of the Notes—7. Taxation".

———————

**An investment in the Notes involves certain risks.**

**Prospective investors should consider the factors described under the section headed "Risk Factors" in this Prospectus.**

———————

Application has been made to the *Commission de Surveillance du Secteur Financier* ("**CSSF**") in its capacity as competent authority under the Luxembourg act dated 10 July 2005 on prospectuses for securities to approve this document as a prospectus within the meaning of Article 5.3 of Directive 2003/71/EC (the "**Prospectus Directive**").  Application has been made to the Luxembourg Stock Exchange for the Notes to be admitted to trading on the Luxembourg Stock Exchange's regulated market and to be listed on the official list of the Luxembourg Stock Exchange. The Luxembourg Stock Exchange's regulated market is a regulated market for purposes of the Investment Services Directive (Directive 93/22/EEC).

The Notes have not been, and will not be, registered under the U.S. Securities Act of 1933, as amended (the "**U.S. Securities Act**").  Unless they are registered, the Notes may be offered only in transactions that are exempt from registration under the U.S. Securities Act or the securities laws of any other jurisdiction. Accordingly, the Notes are being offered only to qualified institutional buyers in the United States in accordance with Rule 144A under the U.S. Securities Act and outside the United States in accordance with Regulation S under the U.S. Securities Act. For further details about eligible offerees and resale restrictions, see "Transfer Restrictions".

The Notes will be ready for delivery in book-entry form only through the facilities of The Depository Trust Company ("**DTC**"), Clearstream Banking, *société anonyme* ("**Clearstream Luxembourg**") or Euroclear Bank, S.A./N.V., as operator of the Euroclear System ("**Euroclear**"), as the case may be, on, or about April 29, 2010.

## Morgan Stanley
### Global Coordinator

**HSBC**
**Joint Lead Manager**

**Morgan Stanley**
**Joint Lead Manager**

**Banque Misr**
**Manager**

**National Bank of Egypt**
**Manager**

The date of this Prospectus is April 26, 2010.

# RESPONSIBILITY STATEMENT

The Republic accepts responsibility for the information contained in this Prospectus (the "**Prospectus**").  To the best of the knowledge and belief of the Republic (having taken all reasonable care to ensure that such is the case), the information contained in this Prospectus is in accordance with the facts and does not omit anything likely to affect the import of such information.

To the best of the knowledge and belief of the Republic the information contained in this Prospectus is true and accurate in every material respect and is not misleading in any material respect and this Prospectus, insofar as it concerns such matters, does not omit to state any material fact necessary to make such information not misleading.  The opinions, assumptions, intentions, projections and forecasts expressed in this Prospectus with regard to the Republic are honestly held by the Republic, have been reached after considering all relevant circumstances and are based on reasonable assumptions.  The Republic accepts responsibility for the information contained in this Prospectus.

# IMPORTANT NOTICE

No person has been authorized to give any information or to make any representation other than those contained in this document in connection with the offering of the Notes and, if given or made, such information or representations must not be relied upon as having been authorized by the Republic or the initial purchasers set forth under "Plan of Distribution" (the "**Initial Purchasers**").  Neither the delivery of this Prospectus nor any sale made hereunder shall, under any circumstances, constitute a representation or create any implication that there has been no change in the affairs of the Republic since the date hereof. This document may not be used for the purpose of an offer to, or a solicitation by, anyone in any jurisdiction or in any circumstances in which such an offer or solicitation is not authorized or is unlawful.

The Initial Purchasers have not separately verified the information contained herein. Accordingly, no representation, warranty or undertaking, express or implied, is made and no responsibility or liability is accepted by the Initial Purchasers or any of them as to the accuracy or completeness of the information contained in this Prospectus or any other information provided by the Republic in connection with the Notes or their distribution.

This Prospectus is not intended to provide the basis of any credit or other evaluation and should not be considered as a recommendation by the Republic or the Initial Purchasers that any recipient of this Prospectus should purchase any of the Notes. Each investor contemplating purchasing Notes should make its own independent investigation of the financial condition and affairs, and its own appraisal of the creditworthiness, of the Republic.

IN CONNECTION WITH THE ISSUE OF THE NOTES, MORGAN STANLEY & CO. INTERNATIONAL PLC ("**MORGAN STANLEY**"), AS THE STABILIZING MANAGER (THE "**STABILIZING MANAGER**") (OR PERSONS ACTING ON BEHALF OF THE STABILIZING MANAGER) MAY OVER-ALLOT NOTES OR EFFECT TRANSACTIONS WITH A VIEW TO SUPPORTING THE MARKET PRICE OF THE NOTES IN EACH SERIES AT A LEVEL HIGHER THAN THAT WHICH MIGHT OTHERWISE PREVAIL. HOWEVER, THERE IS NO ASSURANCE THAT THE STABILIZING MANAGER (OR PERSONS ACTING ON BEHALF OF THE STABILIZING MANAGER) WILL UNDERTAKE STABILIZATION ACTION. ANY STABILIZATION ACTION MAY BEGIN ON OR AFTER THE DATE ON WHICH ADEQUATE PUBLIC DISCLOSURE OF THE TERMS OF THE OFFER OF THE NOTES IN EACH SERIES IS MADE AND, IF BEGUN, MAY BE ENDED AT ANY TIME, BUT IT MUST END NO LATER THAN THE EARLIER OF 30 DAYS AFTER THE ISSUE DATE OF THE NOTES IN EACH SERIES AND 60 DAYS AFTER THE DATE OF THE ALLOTMENT OF THE NOTES IN EACH SERIES. ANY STABILIZATION ACTION OR OVER-ALLOTMENT SHALL BE CONDUCTED IN ACCORDANCE WITH ALL APPLICABLE LAWS AND RULES.

The Republic is relying on an exemption from registration under the U.S. Securities Act for offers and sales of securities that do not involve a public offering. By purchasing the Notes, each purchaser will be deemed to have made the acknowledgements, representations, warranties and agreements described under the heading "Transfer Restrictions" in this Prospectus. Each prospective investor should understand that it will be required to bear the financial risks of its investment for an indefinite period of time.

The Republic is not making any representation to any purchaser of Notes regarding the legality of an investment in the Notes by such purchaser under any legal investment or similar laws or regulations. The contents of this Prospectus are not to

i

be construed as legal, business or tax advice. Each prospective investor should consult with its own attorney, business advisor and tax advisor for legal, business and tax advice regarding an investment in the Notes.

The distribution of this Prospectus and the offer or sale of Notes may be restricted by law in certain jurisdictions. The Republic and the Initial Purchasers do not represent that this document may be lawfully distributed, or that any Notes may be lawfully offered, in compliance with any applicable registration or other requirements in any such jurisdiction, or pursuant to an exemption available thereunder, or assume any responsibility for facilitating any such distribution or offering. In particular, no action has been taken by the Republic or the Initial Purchasers (save for the approval of this document as listing particulars by the Luxembourg Stock Exchange) which would permit a public offering of any Notes or distribution of this document in any jurisdiction where action for that purpose is required. Accordingly, no Notes may be offered or sold, directly or indirectly, and neither this Prospectus nor any advertisement or other offering material may be distributed or published in any jurisdiction, except under circumstances that will result in compliance with any applicable laws and regulations, and the Initial Purchasers have represented that all offers and sales by them will be made on the same terms. Persons into whose possession this Prospectus or any Notes come must inform themselves about and observe any such restrictions. In particular, there are restrictions on the distribution of this Prospectus and the offer or sale of Notes in the United States. For a description of these and certain further restrictions on offers and sales of the Notes and distribution of this Prospectus, see "Subscription and Sale" and "Transfer Restrictions".

The Notes have not been registered with, recommended by or approved or disapproved by the United States Securities and Exchange Commission (the "**SEC**") or any other federal or state securities commission in the United States nor has the SEC or any other federal or state securities commission confirmed the accuracy or determined the adequacy of this Prospectus. Any representation to the contrary is a criminal offense in the United States. The Notes are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under applicable federal or state securities laws pursuant to a registration statement or an exemption from registration. See "Subscription and Sale" and "Transfer Restrictions". Investors should be aware that they may be required to bear the financial risks of this investment for an indefinite period of time.

## KINGDOM OF SAUDI ARABIA NOTICE

This document may not be distributed in the Kingdom of Saudi Arabia except to such persons as are permitted under the Offers of Securities Regulations issued by the Capital Market Authority of the Kingdom of Saudi Arabia (the "**Capital Market Authority**").

The Capital Market Authority does not make any representations as to the accuracy or completeness of this Prospectus, and expressly disclaims any liability whatsoever for any loss arising from, or incurred in reliance upon, any part of this Prospectus. Prospective purchasers of the securities offered hereby should conduct their own due diligence on the accuracy of the information relating to the securities. If a prospective purchaser does not understand the contents of this Prospectus, he or she should consult an authorised financial adviser.

## NOTICE TO NEW HAMPSHIRE RESIDENTS

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED, 1955, AS AMENDED ("**RSA**"), WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE OF NEW HAMPSHIRE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE OF NEW HAMPSHIRE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE OR CAUSE TO BE MADE TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

# PRESENTATION OF INFORMATION

Annual information presented in this Prospectus is based upon July 1 to June 30 periods (which is the fiscal year for the Republic), unless otherwise indicated. Certain figures included in this Prospectus have been subject to rounding adjustments; accordingly, figures shown for the same category presented in different tables may vary slightly and figures shown as totals in certain tables may not be an arithmetic aggregation of the figures which precede them. It should be noted that certain historic data set out herein may be subject to minor amendment as a result of more accurate and updated information becoming available. Statistical information reported herein has been derived from official publications of, and information supplied by, a number of agencies of the Republic, including the Central Agency for Public Mobilization and Statistics ("**CAPMAS**"), as well as the Central Bank of Egypt, Egypt's central bank (the "**CBE**"). Some statistical information has also been derived from information publicly made available by the International Monetary Fund (the "**IMF**"). Certain historical statistical information contained herein is based on estimates that the Republic or its agencies believe to be based on reasonable assumptions. The Republic's official financial and economic statistics are subject to review as part of a regular confirmation process. Accordingly, financial and economic information may differ from previously published figures and may be subsequently adjusted or revised. Certain of the information and data contained in this Prospectus for all or part of the fiscal year 2008/09 and 2009/10 are preliminary and subject to further adjustment or revision. While the government of the Republic (the "**Government**") does not expect revisions to be material, no assurance can be given that material changes will not be made.

## Data Dissemination

Egypt is a subscriber to the IMF's Special Data Dissemination Standard (the "**SDDS**"), which is designed to improve the timeliness and quality of information of subscribing member countries. The SDDS requires subscribing member countries to provide schedules indicating, in advance, the date on which data will be released, the so-called "Advance Release Calendar". For Egypt, precise dates or "no-later-than dates" for the release of data under the SDDS are disseminated no later than three months in advance through the Advance Release Calendar, which is published on the Internet under the IMF's Dissemination Standards Bulletin Board. Summary methodologies of all metadata to enhance transparency of statistical compilation are also provided on the Internet under the IMF's Dissemination Standard Bulletin Board. The website is http://dsbb.imf.org/Applications/web/sddscountrycategorylist/?strcode=EGY. The website and any information on it are not part of this Prospectus.

## Certain Conventions

The following terms have the following meanings for the purposes of this Prospectus:

- Gross domestic product, or "**GDP**", is a measure of the total value of final products and services produced in a country in a specific year. Nominal GDP measures the total value of final production in current prices. Real GDP measures the total value of final production in constant prices of a particular year, thus allowing historical GDP comparisons that exclude the effect of inflation. In this Prospectus, real GDP figures are based on constant 2001/02 prices for the years 2004/05 and constant 2006/07 prices thereafter.

- The inflation rate provides an aggregate measure of the rate of change in the prices of goods and services in the economy. The Republic measures the inflation rate by the percentage change between two periods in the consumer price index (the "**CPI**"), unless otherwise specified. The CPI is based on a basket of goods and services that reflects the pattern of consumption of Egyptian households. Starting in July 2004, the Republic has calculated the CPI on the basis of a basket and weights derived from the 1999/2000 income and expenditure survey conducted by CAPMAS. The Government is considering amending the methodology used to calculate the CPI, including, *inter alia*, the basket of goods and services used to calculate the CPI. If and when such amendments are made, CPI figures may not be comparable to those set forth in this Prospectus.

## Exchange Rates

All references in this Prospectus to "**Egyptian pounds**" and "**LE**" are to the currency of the Arab Republic of Egypt, and all references in this Prospectus to "**U.S. Dollars**", "**dollars**" and "**U.S.$**" are to the currency of the United States of America.

For ease of presentation, the Republic presents certain financial information as translated into U.S. Dollars. Unless otherwise indicated, such translations have been performed using the weighted average exchange rate for the year to which the translated amount relates. The CBE calculated this weighted average exchange rate for amounts prior to January 1, 2005 based on the official exchange rate and, since the introduction of the Egyptian interbank market for foreign currency in December 2004, based on spot transactions in the interbank market. These translations, including translations of Egyptian Pounds into U.S. Dollars, have been performed solely for your convenience and should not be construed as a representation that the amounts in question have been, could have been or could be, converted into any particular denomination at any particular rate or at all.

On April 22, 2010, the market exchange rate (buy rate) as published by the CBE was U.S.$1.00 = LE 5.5266. See "Monetary System—Foreign Exchange Rates".

# FORWARD-LOOKING STATEMENTS

This Prospectus contains forward-looking statements. These forward-looking statements can be identified by the use of forward-looking terminology, including the terms "believes", "estimates", "anticipates", "projects", "expects", "intends", "may", "will", "seeks" or "should" or, in each case, their negative or other variations or comparable terminology, or in relation to discussions of strategy, plans, objectives, goals, future events or intentions. Forward-looking statements are statements that are not historical facts, including statements about the Republic's beliefs and expectations. These statements are based on current plans, estimates and projections and, therefore, undue reliance should not be placed on them. Forward-looking statements speak only as of the date they are made. Although the Government believes that beliefs and expectations reflected in such forward-looking statements are reasonable, no assurance can be given that such beliefs and expectations will prove to have been correct.

Forward-looking statements involve inherent risks and uncertainties. A number of important factors could cause actual results to differ materially from those expressed in any forward-looking statement. The information contained in this Prospectus identifies important factors that could cause such differences, including, but not limited to:

- Adverse external factors, such as the global financial crisis, changes in international commodity prices, high international interest rates and recession, international terrorism, low economic growth in the Republic's trading partners, changes in policies of international institutions, credit downgrades or changes in foreign aid policies. Changes in international commodity prices and high international interest rates could increase the Republic's current account deficit and budgetary expenditures. Recession, international terrorism or low economic growth in the Republic's trading partners could decrease exports, tourism receipts, induce a contraction of the Republic's economy and, indirectly, reduce tax revenues and other public sector revenues and adversely affect the Republic's fiscal accounts. Changes in the policies of international institutions, such as the International Monetary Fund or the World Bank, or countries' foreign aid policies could affect the Republic's future access to funding.

- Adverse domestic factors, such as a decline in foreign direct investment, increases in domestic inflation, high domestic interest rates and exchange rate volatility, which could lead to lower economic growth or a decrease in the Republic's international reserves.

- Other adverse factors that may affect the Middle East.

# ENFORCEMENT OF CIVIL LIABILITIES

The Republic is a foreign sovereign state. Consequently, it may be difficult for investors to obtain or realize upon judgments of courts in the United States against the Republic. The Republic will irrevocably appoint Ambassador Sameh Shoukry, Washington, D.C., and each of his successors, as its authorized agent in the United States on whom process may be served in any action arising out of or based on the Notes, with the exception of any actions arising out of or based on United States federal or state securities law. The Republic will irrevocably submit to, and accept the non-exclusive jurisdiction of, any United States federal or New York State court located in the Borough of Manhattan, the City of New York, with respect to any suit, action or proceeding arising out of or based on the Notes and will irrevocably and unconditionally waive, to the

fullest extent permitted by law, any objection which the Republic may have based on improper venue or *forum non conveniens* to the conduct of any such suit, action or proceeding in any such court.

To the extent that the Republic may in any jurisdiction claim or acquire for itself or its assets immunity (sovereign or otherwise) from suit, execution, attachment or other legal process (whether through service or notice or otherwise), the Republic irrevocably agrees for the benefit of holders of Notes not to claim, and irrevocably waives such immunity, to the fullest extent permitted by the laws of such jurisdiction (other than immunity from pre-judgment attachment or any action arising out of or based on United States federal or state securities law, which is expressly not waived). The waiver of immunity, to the extent contemplated herein, will have the fullest scope permitted under the Foreign Sovereign Immunities Act of 1976 of the United States and is intended to be irrevocable for the purposes of such act, but such waiver shall otherwise constitute a limited and specific waiver for the purposes of the Fiscal Agency Agreement (as defined herein) and the Notes and under no circumstances shall such waiver be interpreted as a general waiver by the Republic or a waiver of immunity in respect of (a) property used by a diplomatic or consular mission of the Republic, (b) property of a military character and under the control of a military authority or defense agency of the Republic or (c) property located in the Republic and dedicated to a public or governmental use (as distinct from property dedicated to a commercial use) by the Republic.

Enforcement of foreign court judgments in the Republic is subject to the following conditions:

- the foreign courts rendering the relevant judgment must offer reciprocal treatment to judgments obtained in the courts of the Republic; if such reciprocal treatment is not offered by the foreign court where the judgment is obtained, the Republic's courts will re-examine the merits of the case;

- the courts of the Republic are not exclusively competent to hear the dispute the subject of the foreign judgment, and the foreign courts are shown to have been competent to hear the dispute in accordance with their own respective laws;

- the parties to the dispute were duly notified and properly represented in the proceedings;

- the foreign judgment is final, non-appealable and conclusive in accordance with relevant law; and

- the foreign judgment does not conflict with a prior Egyptian judgment on the same subject matter and is not contrary to public order in the Republic.

Egyptian counsel to the Republic have advised that there is no treaty between the Republic and the United States or between the Republic and the United Kingdom, nor are they aware of any Egyptian court decision that was enforced by the courts of the United States or the United Kingdom which would satisfy the first criterion above.

# TABLE OF CONTENTS

**Page**

RESPONSIBILITY STATEMENT......................................................................................................................i
IMPORTANT NOTICE ...................................................................................................................................i
KINGDOM OF SAUDI ARABIA NOTICE .......................................................................................................ii
NOTICE TO NEW HAMPSHIRE RESIDENTS .............................................................................................. ii
PRESENTATION OF INFORMATION.......................................................................................................... iii
FORWARD-LOOKING STATEMENTS ..........................................................................................................iv
ENFORCEMENT OF CIVIL LIABILITIES .....................................................................................................iv
SUMMARY......................................................................................................................................................1
RISK FACTORS ..............................................................................................................................................6
USE OF PROCEEDS .....................................................................................................................................10
THE ARAB REPUBLIC OF EGYPT .............................................................................................................11
THE ECONOMY ...........................................................................................................................................20
EXTERNAL SECTOR...................................................................................................................................42
MONETARY SYSTEM..................................................................................................................................49
PUBLIC FINANCE........................................................................................................................................61
PUBLIC SECTOR DEBT ..............................................................................................................................72
TERMS AND CONDITIONS OF THE NOTES .............................................................................................80
FORMS OF THE NOTES ..............................................................................................................................90
GLOBAL CLEARANCE AND SETTLEMENT .............................................................................................93
TAXATION....................................................................................................................................................97
PLAN OF DISTRIBUTION .........................................................................................................................100
TRANSFER RESTRICTIONS......................................................................................................................103
GENERAL INFORMATION .......................................................................................................................105

# SUMMARY

*This summary must be read as an introduction to this Prospectus and the exhibits hereto, and any decision to invest in the Notes should be based on a consideration of this Prospectus and the exhibits hereto, as a whole. Where a claim relating to the information contained in this Prospectus is brought before a court in a Member State, the plaintiff may, under the national legislation of the Member State where the claim is brought, be required to bear the costs of translating this Prospectus before the legal proceedings are initiated.*

**Overview of the Republic**

Egypt is located in North Africa, bordering the Mediterranean Sea, the Red Sea, Libya, the Gaza Strip, Israel and Sudan. With a population of 72.6 million according to the latest census conducted in 2006 (the "**2006 Census**"), Egypt is the most populous country in the Middle East and the second most populous country on the African continent.

The Republic's current constitution, which was approved by referendum in 1971 and most recently amended in 2007, states that Egypt is a democratic state based on citizenship, guaranteeing the equality of all citizens before the law. The constitution provides for three independent branches of government: an executive branch headed by the President, a bicameral legislative branch consisting of the People's Assembly (the lower house) and the Shoura Council (the upper house) and the judicial branch comprising of the Courts of Justice.

The Government has undertaken an ambitious structural reform program, which includes measures to liberalize foreign trade, encourage domestic and foreign investment, privatize state-owned entities, strengthen the balance sheets of state-owned banks, enhance private sector development and maintain macroeconomic stability. Such reforms have contributed to an improvement in the fiscal performance of the Republic, including a decline of the gross domestic budget sector debt from 101% of GDP as at June 30, 2005 to 65.9% as at December 31, 2009.

During the past five years, the Egyptian economy has grown significantly. The annual real GDP growth rate increased by 4.5% in 2004/05, 6.8% in 2005/06, 7.1% in 2006/07, 7.2% in 2007/08 and 4.7% in 2008/09. For the period from June to December 2009, real GDP grew by 4.8%, as compared to the corresponding period in 2008.

Between 1991 and 2003, the exchange rate of the Egyptian Pound was pegged to the U.S. Dollar. In January 2003, the CBE abandoned the U.S. Dollar peg and the Egyptian Pound now floats freely against foreign currencies. In the period from June 2003 to March 2010, the value of the Egyptian Pound, calculated on a monthly average basis, has appreciated against the U.S. Dollar from U.S.$1.00 = LE 6.03 to U.S.$1.00 = LE 5.47, or 9.3%.

Net Foreign Direct Investment ("**Net FDI**") increased from U.S.$6.1 billion in 2005/06 to U.S.$13.2 billion in 2007/08, primarily as a result of investments in oil and gas sectors. Net FDI decreased to U.S.$8.1 billion in 2008/09, primarily as a result of the global financial crisis.

**Selected Economic Information**

| | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09[1] |
|---|---|---|---|---|---|
| **Domestic Economy:** | | | | | |
| Nominal GDP (*LE billions*) | 538.5 | 617.7 | 744.8 | 895.5 | 1,038.6 |
| Real GDP (*LE billions*)[2] | 425.2 | 454.3 | 744.8 | 798.1 | 835.4 |
| Real GDP Growth Rate (*%*)[2][3] | 4.5 | 6.8 | 7.1 | 7.2 | 4.7 |
| Consumer Price Index (*%*)[4] | 11.4 | 4.2 | 11.0 | 11.7 | 16.2 |
| | | | | | |
| **Balance of Payments (in U.S.$ millions):** | | | | | |
| Exports of Goods (FOB) | 13,833 | 18,455 | 22,018 | 29,356 | 25,169 |
| Imports of Goods (CIF) | (24,193) | (30,441) | (38,308) | (52,771) | (50,342) |
| Current Account Balance[5] | 2,911 | 1,752 | 2,269 | 888 | (4,424) |
| Overall Balance[5] | 4,478 | 3,253 | 5,282 | 5,420 | (3,378) |
| Net International Reserves[5] | 19,302 | 22,931 | 28,559 | 34,572 | 31,310 |
| Months of Import Coverage[6] | 9.6 | 9.0 | 8.9 | 7.9 | 7.5 |
| Gross External Debt/GDP (*%*)[7] | 31.1 | 27.6 | 22.8 | 20.1 | 17.0 |
| Gross External Government Debt/GDP (*%*) | 19.6 | 17.6 | 14.9 | 12.9 | 13.9 |
| | | | | | |
| **Public Finance (LE billions):** | | | | | |
| Total Revenues | 110,864 | 151,266 | 180,215 | 221,404 | 282,505 |
| Total Expenditure | 161,611 | 207,811 | 222,029 | 282,290 | 351,500 |
| Overall Balance | (51,643) | (50,385) | (54,697) | (61,122) | (71,826) |
| Overall Deficit (*% of GDP*) | 9.6 | 8.2 | 7.3 | 6.8 | 6.9 |
| Primary Deficit (*% of GDP*) | 3.5 | 2.2 | 0.9 | 1.2 | 1.8 |

_____

**Notes:**

(1) Preliminary data.
(2) Real GDP is calculated using constant prices using the 2001/02 as the base year for the years 2004/05 and 2005/06 and 2006/07 as the base year thereafter.
(3) Percentage from previous years.
(4) Annual rate of change.
(5) As at June 30 of the relevant year.
(6) Imports of goods.
(7) Includes external debt of public and private sectors.

## Summary of the Offering

*The following is a summary of certain information contained elsewhere in this Prospectus. It does not purport to be complete and is qualified in its entirety by the more detailed information appearing elsewhere in this Prospectus. Prospective investors should also carefully consider the information set forth in "Risk Factors" below prior to making an investment decision. Capitalized terms not otherwise defined in this summary have the same meaning as in the terms and conditions of the Notes (the "**Conditions**"). See "Terms and Conditions of the Notes" for a more detailed description of the Notes.*

**Issuer** ..................................................... The Arab Republic of Egypt.

**2020 Notes**

*2020 Notes*................................... U.S.$1,000,000,000 principal amount of 5.75% Notes due 2020.

*2020 Notes Maturity Date*............ April 29, 2020.

*2020 Notes Interest* ...................... 5.75% per year, computed on the basis of a 360-day year of twelve 30-day months.

*2020 Notes Interest Payment Dates*............................................. The Republic will pay interest semi-annually in arrear on April 29 and October 29 of each year, commencing on October 29, 2010.

See "Terms and Conditions of the Notes—4. Interest."

*2020 Notes Offer Price* ................ 100% of the principal amount.

**2040 Notes**

*2040 Notes*................................... U.S.$500,000,000 principal amount of 6.875% Notes due 2040.

*2040 Notes Maturity Date*............ April 30, 2040.

*2040 Notes Interest* ...................... 6.875% per year, computed on the basis of a 360-day year of twelve 30-day months.

*2040 Notes Interest Payment Dates*............................................. The Republic will pay interest semi-annually in arrear on April 30 and October 30 of each year, commencing on October 30, 2010.

See "Terms and Conditions of the Notes—4. Interest."

*2040 Notes Offer Price* ................ 99.059% of the principal amount.

**Redemption** ......................................... The Republic may not redeem the Notes before maturity. At maturity, the Republic will redeem the Notes at par.

See "Terms and Conditions of the Notes—5. Redemption, Purchase and Cancellation".

**Denominations** .................................... The Notes will be offered and sold, and may only be transferred, in minimum principal amounts of U.S.$100,000 and integral multiples of U.S.$1,000.

**Status** .................................................. The Notes will be direct, unconditional, unsecured (subject to a negative pledge undertaking) and unsubordinated obligations of the Republic. The Notes will rank equally among themselves and with all other unsecured and unsubordinated External Indebtedness (as defined in the Conditions) of the Republic.

See "Terms and Conditions of the Notes—2. Status."

**Negative Pledge**...................................

So long as any of the Notes remains outstanding (as defined in the Fiscal Agency Agreement), the Republic will not create or permit to subsist any lien, pledge, mortgage, security interest, deed of trust, charge or other encumbrance or arrangement having a similar effect (any of the foregoing, a "**Lien**") (other than Permitted Liens, as defined in the Conditions) upon the whole or any part of its existing or future assets or revenues to secure any Public External Indebtedness of the Republic or any other Person or any Guarantee thereof unless, at the same time or prior thereto, the obligations of the Republic under the Notes are secured equally and rateably therewith or have the benefit of such other arrangements as may be approved by an Extraordinary Resolution (as defined in the Fiscal Agency Agreement) of the Noteholders.

See "Terms and Conditions of the Notes—3. Negative Pledge".

**Events of Default** ...............................

The Conditions will permit the acceleration of the Notes following the occurrence of certain events of default.

See "Terms and Conditions of the Notes—8. Events of Default".

**Form of Notes**.....................................

The Republic will issue the Notes in the form of one or more book-entry securities in fully registered form, without coupons. The Republic will not issue the Notes in bearer form.

Notes sold in offshore transactions in reliance on Regulation S will initially be in the form of Regulation S global notes in registered form, which will be deposited outside the United States with a common depositary for Euroclear and Clearstream Luxembourg and registered in the name of a nominee for such common depositary.

Notes sold to qualified institutional buyers in reliance on Rule 144A will be issued initially in the form of 144A global notes in registered form, which will be deposited with DTC, or a custodian of DTC, and registered in the name of a nominee of DTC.

**Withholding Tax and Additional Amounts** ...........................

Under Tax Law No. 91 of 2005, interest payable on the Notes is subject to a 20% withholding tax. Accordingly, subject to certain customary exceptions, the Republic will pay the Noteholders the additional amounts required to ensure that they receive the same amount as they would have received without this withholding tax.

See "Terms and Conditions of the Notes—7. Taxation" and "Taxation".

**Modification and Amendment**...........

The terms and conditions of the Notes may be modified with the consent of 66⅔% of the relevant Noteholders, provided that certain material changes (including changes relating to principal amount and interest) require the consent of 75% of such Noteholders. Any such modification will be binding on all Noteholders.

See "Terms and Conditions of the Notes—11. Meeting of Noteholders, Modification and Waiver".

**Use of Proceeds**...................................

The net proceeds of the Notes will be U.S.$1,492,970,000, after deduction of the Initial Purchasers' discounts and commissions and certain expenses payable by the Republic. The Republic will use the net proceeds to finance a portion of the budget deficit.

See "Use of Proceeds".

**Listing and Admission to Trading**.....

Application has been made to the Luxembourg Stock Exchange for the Notes to be admitted to trading on the Luxembourg Stock Exchange's regulated market and to be listed on the official list of the Luxembourg Stock Exchange.

**Governing Law** ...................................

The Notes will be governed by the laws of the State of New York.

| | |
|---|---|
| **Risk Factors** ........................................ | There are certain risks relating to the Notes, which investors should ensure they fully understand. These include the fact that the Notes may not be suitable investments for all investors, and risks relating to the Republic and to the market. |
| | See "Risk Factors". |
| **Transfer Restrictions**........................... | The Notes have not been registered under the U.S. Securities Act or any state securities law. Unless they are registered, the Notes may not be offered or sold in the United States except pursuant to an exemption from or in a transaction not subject to the registration requirement of the U.S. Securities Act and applicable state securities laws. |
| | See "Transfer Restrictions". |
| **Listing Agent**....................................... | The Bank of New York Mellon (Luxembourg) S.A. |
| **Principal Paying Agent and Fiscal Agent**.................................................... | The Bank of New York Mellon acting through its London branch. |
| **Fiscal Agent and Registrar** ................ | The Bank of New York Mellon acting through its New York branch. |
| **Luxembourg Paying Agent, Transfer Agent and Registrar** ........................... | The Bank of New York Mellon (Luxembourg) S.A. |
| **2020 Notes** | |
| *ISIN (Regulation S Note)*............... | XS0505265859. |
| *Common Code (Regulation S Note)* ................................................ | 050526585. |
| *ISIN (Rule 144A Note)*................... | US038461AE97. |
| *CUSIP (Rule 144A Note)* ............... | 038461AE9. |
| *Common Code (Rule 144A Note)*... | 050540324. |
| **2040 Notes** | |
| *ISIN (Regulation S Note)*............... | XS0505478684. |
| *Common Code (Regulation S Note)* ................................................ | 050547868. |
| *ISIN (Rule 144A Note)*................... | US038461AF62. |
| *CUSIP (Rule 144A Note)* ............... | 038461AF6. |
| *Common Code (Rule 144A Note)*... | 050575713. |

# RISK FACTORS

*The purchase of Notes involves substantial risks and is suitable only for, and should be made only by, investors that are fully familiar with the Republic in general and that have such other knowledge and experience in financial and business matters as may enable them to evaluate the risks and the merits of an investment in the Notes.  Prior to making an investment decision, prospective investors should consider carefully, in light of their own financial circumstances and investment objectives, all the information set forth herein and, in particular, the risk factors set forth below.  Prospective purchasers of Notes should make such inquiries as they think appropriate regarding the Notes and the Republic without relying on the Republic or the Initial Purchasers.*

**Risk Factors Relating to the Notes**

***The Notes may not be suitable as an investment for all investors.***

Prospective investors must determine the suitability of investment in the Notes in each series in the light of their own circumstances.  In particular, prospective investors should:

- have sufficient knowledge and experience to make a meaningful evaluation of the Notes in each series and the merits and risks of investing in such Notes;

- have access to, and knowledge of, appropriate analytical tools to evaluate, in the context of such investor's particular financial situation, an investment in the Notes in each series and the impact that such Notes will have on such investor's overall investment portfolio;

- have sufficient financial resources and liquidity to bear all of the risks of an investment in the Notes, including where the currency for principal or interest payments is different from such investor's currency;

- understand thoroughly the terms of the Notes in each series and be familiar with the behavior of any relevant indices and financial markets; and

- be able to evaluate (either alone or with the help of a financial adviser) possible scenarios for currency, economic, interest rate and other factors (including an analysis of the impact of the global financial crisis) that may affect such investor's investment and ability to bear the applicable risks.

***The trading market may be volatile.***

The market for the Notes in each series is influenced by economic and market conditions in the Republic and, to varying degrees, interest rates, currency exchange rates and inflation rates in other countries, such as the United States, European Union Member States and elsewhere.  There can be no assurance that an active trading market for the Notes will develop, or, if one does develop, that events in Egypt, the Middle East or elsewhere will not cause market volatility or that such volatility will not adversely affect the liquidity or the price of the Notes in each series or that economic and market conditions will not have any other adverse effect.  If the Notes in each series are traded after their initial issuance, they may trade at a discount to their offering price, depending upon prevailing interest rates, the market for similar securities, the occurrence of events of default or changes in the perceived risk of potential defaults among sovereign issuers (particularly in Europe and the Gulf region) and general economic, social and financial conditions of the Republic.

***The Notes in each series contain provisions that permit the Republic to amend the Conditions without the consent of all holders.***

The Notes in each series contain provisions regarding acceleration and voting on amendments, modifications, changes and waivers, which are commonly referred to as "collective action clauses".  Under these provisions, certain key provisions of the Notes in each series may be amended, including the maturity date, interest rate and other payment terms, with the consent of the holders of $66^2/_3$% or, in the case of certain matters, 75% of the aggregate principal amount of the outstanding notes.  See "Terms and Conditions of the Notes—11. Meetings of Noteholders, Modification and Waiver".

***Payments made in certain European Union Member States may be subject to withholding tax under the European Union Savings Directive.***

On June 3, 2003, the European Council of Economics and Finance Ministers adopted Directive 2003/48/EC on the taxation of savings income in the form of interest payments (the "**EU Savings Directive**").  Under the EU Savings Directive, European Union Member States are (and equivalent measures have been introduced by certain non-European Union countries) required to provide to the tax authorities of other Member States details of payments of interest (or similar income) paid by a person within its jurisdiction to an individual resident in that other Member State.  However, for a transitional period, Belgium, Luxembourg and Austria will instead be required (unless during that period they elect otherwise) to operate a withholding system in relation to such payments (the ending of such transitional period being dependent upon the conclusion of certain other agreements relating to information exchange with certain other countries).

If a payment is made or collected through a Member State which has opted for a withholding system and an amount of, or in respect of, tax were to be withheld from that payment, neither the Republic nor any Paying Agent nor any other person is obliged to pay additional amounts with respect to any Note as a result of the imposition of such withholding tax.  If any such withholding tax is imposed on payment made by a Paying Agent, the Republic would be required to maintain a Paying Agent in a Member State that would not be obliged to withhold or deduct tax pursuant to the Directive.

***There is no limitation on the Republic's ability to issue securities that rank equally in right of payment with the Notes in each series.***

There is no restriction on the amount of securities which the Republic may issue and which rank equally in right of payment with the Notes in each series, which may or may not be consolidated with such Notes.  Such further issuances may affect the Republic's ability to make payments on the Notes in each series and may reduce the amount investors could recover in respect of such Notes.

***The Notes are unsecured.***

The Notes constitute unsecured obligations of the Republic.

***The laws of the State of New York in effect as at the date of this Prospectus could be modified.***

The terms and conditions of the Notes are based on the laws of the State of New York in effect as at the date of this Prospectus.  There can be no assurance as to the impact of any possible judicial decision or change to law of the State of New York or administrative practice after the date of this Prospectus.

***The minimum denomination of the Notes may, in certain circumstances, make the Notes difficult to trade.***

The Notes in each series will be issued in the denomination of U.S.$100,000 and integral multiples of U.S.$1,000 in excess thereof. Accordingly, Notes may be traded in amounts in excess of U.S.$100,000 that are not integral multiples of U.S.$100,000. In such a case, a holder who, as a result of trading such amounts, holds a principal amount of less than U.S.$100,000 in his account with the relevant clearing system at the relevant time may not receive a definitive Note in respect of such holding (should definitive Notes be printed) and would need to purchase a principal amount of Notes such that its holding amounts to at least U.S.$100,000 in order to receive a definitive Note. If definitive Notes are issued, holders should be aware that definitive Notes that have a denomination that is not an integral multiple of U.S.$100,000 may be illiquid and difficult to trade.

**Risk Factors Relating to Egypt**

***Investing in securities involving emerging markets generally involves a higher degree of risk.***

Investing in securities involving emerging markets countries, such as Egypt, generally involves a higher degree of risk than investments in securities of issuers from more developed countries.  These higher risks include, but are not limited to, higher volatility, limited liquidity and changes in the economic and political environment.  The Egyptian economy is susceptible to future adverse effects similar to those suffered by other emerging market countries.  In any event, there can be no assurance that the market for securities bearing emerging market risk, such as the Notes, will not be affected negatively by events elsewhere, especially in emerging markets.

***The global financial crisis has had and may continue to have an impact on the financial condition of the Republic.***

The global financial crisis, which commenced in 2007, has affected global markets. Financial markets in the United States, Europe and Asia experienced, and in some cases continue to experience, a period of unprecedented turmoil and upheaval characterized by extreme volatility and declines in security prices, severely diminished liquidity and credit availability, inability to access capital markets, the bankruptcy, default, failure, collapse or sale of various financial institutions and an unprecedented level of intervention from the United States federal government and other governments. Unemployment has risen while business, economic activity and consumer confidence have declined resulting in a severe global recession. In addition, the global financial crisis, the need for many governments to finance large and growing budget deficits and other factors have negatively affected the financial standing and the credit ratings of other sovereign and quasi-sovereign issuers, particularly in Europe and the Gulf region.  Partially as a result of the foregoing, economic growth in the Republic has slowed and unemployment has risen in recent quarters.  In addition, Egypt's economy may be vulnerable to external shocks, including the continuing impact of the global financial crisis and those that could be caused by future significant economic difficulties of its major regional trading partners or by more general "contagion" effects, which could have a material adverse effect on Egypt's economic growth.

***Egypt is located in a region that has been subject to ongoing political and security concerns.***

Egypt is located in a region that has been subject to ongoing political and security concerns, especially in recent years. Political instability in the Middle East has increased since the terrorist attacks of September 11, 2001, the U.S. intervention in Iraq and issues concerning Iran's nuclear program.  Some Middle Eastern and North African countries have experienced in the recent past or are currently experiencing political, social and economic instability, extremism, terrorism, armed conflicts and war.  Within Egypt, extremists have engaged in a campaign, sometimes violent, against the state in recent years, and terrorists have struck civilian targets.  See "—Egypt has experienced occasional terrorist events".

Egypt borders the Gaza Strip.  Following tensions between Israel and the Palestinian group Hamas, Israel closed the crossing between the Gaza Strip and Israel on January 17, 2008.  As a result, commencing on January 23, 2008, in light of the humanitarian situation in the Gaza Strip, the Republic opened the Rafah crossing, and it is estimated that tens of thousands of inhabitants of Gaza crossed between the Gaza Strip and Egypt over the course of several days.  Egypt restored control and resealed the border on February 3, 2008, although attempts at breaching it continued.  Although the Government is building an underground wall and has stepped up its surveillance efforts, militants and smugglers continue to use a tunnel system under the border.

There can be no assurance that similar incidents will not occur in the future.  Political, economic and military conditions in the Middle Eastern and North African regions could negatively affect tourism and the general economy in Egypt.

***The Egyptian economy is subject to the risk of inflation.***

Inflation, as measured by the CPI, has increased from 3.1% in December 2005 to 13.2% in December 2009 and 13.6% in January 2010.  Inflation was 12.8% in February 2010 and 12.2% in March 2010.  The recent increases are due primarily to significant price increases in several food and beverage items, including poultry, red meat and sugar, as well as to increased domestic consumption.  In past years, most recently in 2008, price increases have led to riots.  Although price stability is at the center of the CBE's monetary policy, there can be no guarantee that the CBE will be able to achieve or maintain price stability and thus control inflation.  See "Monetary System—Inflation and Interest Rates".

***Egypt has experienced occasional terrorist events.***

In common with other countries in the region, Egypt has experienced occasional terrorist attacks in recent years.  For example, there was a violent incident in Luxor in 1997, attacks in Sharm el-Sheikh and Cairo in 2005, and an attack in the Sinai resort city of Dahab in April 2006 in which 23 people were killed.  There can be no assurance that extremists or terrorist groups will not escalate or continue occasional violent activities in Egypt or that the Government will continue to be generally successful in maintaining the prevailing levels of domestic order and stability.

***Presidential elections are expected in 2011.***

The President of the Republic, Hosni Mubarak, has been in office since 1981.  Presidential elections are expected to take place in 2011.  To date, no candidates have declared their intention to participate in the presidential elections.  With the exception of candidates representing established political parties with certain minimum representation, candidates for

president must meet strict eligibility criteria set forth in the Constitution.  No assurance can be given that, as a result of such elections, the Government's current economic and fiscal policies and outlook will continue.

***The Government's failure to implement economic reforms may have a negative effect on the performance of the Egyptian economy.***

The Government is implementing an economic reform program including a privatization program, although the Government continues to exercise significant influence over many aspects of the economy through direct public ownership of enterprises and regulation of market conditions.  Disagreements among political parties and the political situation in the region could potentially delay the implementation of this program and this may have a negative effect on the performance of the Egyptian economy.  Plans for continued privatization may be affected by political interference and disagreements within the executive branch of the Government.  Although the Government intends to proceed with its economic reforms and privatization, there can be no assurance that these reforms will be successful.  The Republic's privatization program has been delayed in the past and may be delayed or otherwise adversely affected because of political disputes.  See "The Economy—Privatization Program".

***The Republic's foreign currency credit rating is sub-investment grade.***

Egypt's long-term foreign currency debt rating has been assigned a rating of "BB+" with a stable outlook by Standard & Poor's, a rating of "BB+" with a stable outlook by Fitch and a rating of "Ba1" with a stable outlook by Moody's.  The Notes are expected to be assigned the same ratings.  These ratings are sub-investment grade.  A rating is not a recommendation to buy, sell or hold securities and may be subject to revision, suspension or withdrawal at any time by the assigning rating organisation.  Any change in the rating of the Notes could adversely affect the price that a purchaser will be willing to pay for the Notes, cause trading in the Notes to be volatile and adversely affect the trading price of the Notes.

In addition, the Republic cannot be certain that a credit rating will remain for any given period of time or that a credit rating will not be downgraded or withdrawn entirely by the relevant rating agency if, in its judgment, circumstances in the future so warrant. The Republic has no obligation to inform the holders of Notes of any such revision, downgrade or withdrawal. A suspension, downgrade or withdrawal at any time of the credit rating assigned to the Republic may adversely affect the market price of the Notes.

***It may be difficult for investors to obtain or realize upon judgments of courts in the United States against the Republic.***

The Republic is a foreign sovereign state.  Consequently, it may be difficult for investors to obtain or realize upon judgments of courts in the United States or any other country against the Republic, as described in "Enforcement of Civil Liabilities."  The Republic's waiver of sovereign immunity constitutes a limited and specific waiver for the purposes of the Fiscal Agency Agreement (as set forth as Exhibit B) and the Notes.  Investors should not under any circumstances interpret the Republic's waiver as a general waiver by the Republic or a waiver of immunity in respect of legal actions arising out of or based on United States federal or state securities law, or, in respect of the Republic's property that is (a) used by a diplomatic or consular mission of the Republic, (b) of a military character and under the control of a military authority or defense agency of the Republic or (c) located in the Republic and dedicated to a public or governmental use (as distinct to property dedicated to a commercial use) by the Republic.

***The statistics published by the Republic may differ from those produced by other sources.***

A range of Ministries, public statistic agencies and the CBE produce statistics relating the Republic and its economy, including those in relation to GDP, balance of payments, revenues and expenditure of the Government and the indebtedness of the Republic.  The statistical data appearing in this Prospectus has been obtained from public sources and documents.  Investors may be able to obtain similar statistics from other sources, but the underlying assumptions, methodology and, consequently, the resulting data may vary from source to source.

Additionally, the statistics produced by the Republic may have certain weaknesses that could impede an analysis of the Republic's economy.  The Republic subscribed to the IMF's Special Data Dissemination Standard in January 2005, but data improvements in certain areas are still required.  In its 2010 Article IV Consultation Mission Concluding Statement dated February 16, 2010, the IMF has noted that the Republic's national accounts data have a number of shortcomings, including "a need for more robust CPI and GDP deflators and for publishing higher-frequency aggregate financial soundness indicators (as planned)".  The IMF also noted that the "need for greater transparency and higher frequency data was underscored by the global financial crisis."  These and other statistical weaknesses may impede the ability to accurately assess the level of indebtedness and the general economic condition of the Republic.

9

## USE OF PROCEEDS

The net proceeds of the sale of the Notes will be approximately U.S.$1,492,970,000, after deduction of the Initial Purchasers' discounts, commissions and certain expenses payable by the Republic.  In accordance with State Budget Law 73 of 2009, published on May 28, 2009 in the *Official Gazette* ("**Law 73**"), the Republic will use the net proceeds to finance a portion of the budget deficit.

# THE ARAB REPUBLIC OF EGYPT

## Introduction

During the past five years, the Egyptian economy has grown significantly.  The annual real GDP growth rate was 4.5% in 2004/05, 6.8% in 2005/06, 7.1% in 2006/07, 7.2% in 2007/08 and 4.7% in 2008/09.  For the period from June to December 2009, real GDP grew by 4.8%, as compared to the corresponding period in 2008.  See "The Economy—Gross Domestic Product".

Inflation, as measured by the CPI, has increased from 3.1% in December 2005 to 13.2% in December 2009.  In March 2010, inflation was 12.2%, as compared to 12.8% in February 2010 and 13.6% in January 2010.  The recent increases are due primarily to significant price increases in several food and beverage items, including poultry, red meat and sugar, primarily as a result of increased domestic consumption.  See "Monetary System—Inflation and Interest Rates".

The Government has undertaken an ambitious structural reform program, which includes measures to liberalize foreign trade, encourage domestic and foreign investment, privatize state-owned entities, strengthen the balance sheets of state-owned banks, enhance private sector development and maintain macroeconomic stability.  Such reforms have contributed to an improvement in the fiscal performance of the Republic, including a decline of the gross domestic budget sector debt from 101% of GDP as at June 30, 2005 to 65.9% as at December 31, 2009.

The Government has acknowledged the importance of maintaining high levels of investment in infrastructure, legal and social programs in order to reduce unemployment and poverty and foster further economic growth.  The 2009/10 budget allocates substantial resources to these ends, and the Government has passed two economic stimulus packages totaling LE 25 billion in response to the global financial crisis in 2008/09.

The external sector strengthened during the past five years with net international reserves increasing from U.S.$19.3 billion as at June 30, 2005 to U.S.$31.3 billion as at June 30, 2009.  As at December 31, 2009, international reserves increased to U.S.$34.2 billion and U.S.$34.5 billion at the end of March 2010.

Between 1991 and 2003, the exchange rate of the Egyptian Pound was pegged to the U.S. Dollar.  In January 2003, the CBE abandoned the U.S. Dollar peg and the Egyptian Pound now floats freely against foreign currencies.  In the period from June 2003 to March 2010, the value of the Egyptian Pound, calculated on a monthly average basis, has appreciated against the U.S. Dollar from U.S.$1.00 = LE 6.03 to U.S.$1.00 = LE 5.47, or 9.3%.

Net FDI increased from U.S.$6.1 billion in 2005/06 to U.S.$13.2 billion in 2007/08, primarily as a result of investments in the oil and gas, technology, real estate and manufacturing sectors.  Net FDI decreased to U.S.$8.1 billion in 2008/09, primarily as a result of the global financial crisis.

## Area and Population

Egypt occupies 386,700 square miles (1,001,550 square kilometers) of North Africa, bordering the Mediterranean Sea, the Red Sea, Libya, the Gaza Strip, Israel and Sudan.  The terrain is mostly vast desert plateau interrupted by the Nile valley and Delta.  The Western Desert accounts for approximately two thirds of Egypt's land area.  Approximately 3% of the land is arable and approximately 3.2% of the total land area is under irrigation.  Agricultural land is currently being lost due to urbanization and windblown sands, although some land is being reclaimed through irrigation.  There are limited fresh water resources other than the Nile, which is the only perennial water source in Egypt.  The climate is hot and dry, with the temperature in Cairo during the mid-winter months ranging from 46°F to 64°F (8°C to 18°C), rising to an average maximum temperature of 97°F (36°C) in July, the hottest month.  Even in the wettest months, such as December, January and February, an average of only one-fifth of an inch (five millimeters) of rainfall is recorded.  Egypt's natural resources include petroleum, natural gas, coal, iron ore, phosphates, manganese, limestone, gypsum, talc, lead and zinc.

Egypt is the most populous country in the Arab world and the second-most populous country on the African continent, with a total population in Egypt of 72.6 million, according to the 2006 Census by CAPMAS, as compared with 59.3 million in 1996.  CAPMAS estimates Egypt's current population at 77.7 million.  In 2006, the population was 51.2% male and 48.8% female, the birth rate declined to 25.8 per 1,000 persons in 2006 from 28.3 per 1,000 persons in 1996, and the death rate declined to 6.3 per 1,000 persons from 6.5 per 1,000 persons in 1996.

Major cities in Egypt include Cairo, the capital of the Republic, Alexandria, Aswan, Asyut, Port Said, Suez and Ismailia. According to the 2006 Census, the overwhelming majority of Egypt's population live along the Nile River, the Nile delta and the Suez Canal, particularly in Cairo and Alexandria with populations of 7.8 million (18.2 million, including Giza and Kalyoubeya) and 4.1 million, respectively, making these areas among the most densely populated areas in the world. There are small communities throughout the desert regions of Egypt, which are clustered around oases and historic trade and transportation routes. The number of Egyptians living in rural areas of Egypt continues to decrease as people move to the cities in search of employment and higher living standards.

Egyptians are fairly homogeneous, with 99% of the population coming from an Eastern Hamitic origin (Egyptians, Bedouins and Berbers). Approximately 90% of the Egyptian population is made up of Sunni Muslims, and the remaining 10% is made up mostly of Coptic Christians. Arabic is the official and dominant language; however, English and French are widely understood by the educated classes. According to the 2006 Census, adult literacy rate was 66.4%, the female adult literacy was 57.8%; and the male adult literacy rate was 74.6%.

Egypt is generally classified as a lower-middle-income developing country. The following table sets forth selected comparative statistics published by the Population Reference Bureau of the World Bank.

**Selected Demographic Data by Country**

| Country | Population mid-2009 | Rate of Natural Increase | Projected Population | | Infant Mortality Rate | Life Expectancy at Birth | | | GNI PPP per capita 2008[1] |
|---------|------|------|-----------|-----------|-------|-------|------|--------|--------|
| | | | *mid-2025* | *mid-2050* | | *Total* | *Male* | *Female* | |
| | (millions) | (%) | (millions) | | (per '000) | (years) | | | (U.S.$) |
| Egypt .............. | 78.6 | 1.9 | 99.1 | 122.3 | 19 | 72 | 70 | 74 | 5,460 |
| China .............. | 1,331.4 | 0.5 | 1,476.0 | 1,437.0 | 21 | 73 | 71 | 75 | 6,020 |
| India............... | 1,171.0 | 1.6 | 1,444.5 | 1,748.0 | 55 | 64 | 63 | 65 | 2,960 |
| Morocco ......... | 31.5 | 1.4 | 36.6 | 42.4 | 31 | 71 | 69 | 73 | 4,330 |
| Philippines...... | 92.2 | 2.1 | 120.2 | 150.1 | 23 | 69 | 66 | 72 | 3,900 |
| South Africa ... | 50.7 | 0.8 | 54.5 | 57.4 | 45 | 52 | 50 | 54 | 9,780 |
| Tunisia............ | 10.4 | 1.2 | 12.2 | 13.9 | 19 | 74 | 72 | 76 | 7,070 |
| United States .. | 306.8 | 0.6 | 357.5 | 439.0 | 7 | 78 | 75 | 80 | 46,970 |

*Source:    2009 World Population Data Sheet, Population Reference Bureau of the World Bank.*

_____
Note:
(1)     Gross national income in purchasing power parity divided by the mid-year population.

## History

Egypt has endured as a unified state for over 5,000 years, despite approximately 2,500 years of occupation by Persian, Greek, Roman, Turkish, Mameluke, French and British troops. Egypt's location has made it a natural hub for trade routes: westward along the coast of North Africa, northwest to Europe, northeast to the Levant, south along the Nile to Africa and southeast to the Indian Ocean and Far East. The opening of the Suez Canal in 1869 enhanced this natural advantage, connecting the Mediterranean to the Red Sea, and had an immediate and dramatic effect on world trade. The strategic and commercial value of the Suez Canal to European powers (primarily the French and British) made it one of the most important factors influencing the history of Egypt in the nineteenth century.

The Ottomans, French and British struggled for financial and political control of Egypt throughout the nineteenth century. Napoleon Bonaparte's Egypt campaign ended in 1801, following which Anglo-Ottoman forces controlled Egypt until 1882, which led to complete occupation and virtual inclusion of Egypt within the British Empire. Britain declared an official protectorate over Egypt in 1914 in order to secure its interests during World War I. The British protectorate lasted until February 1922 when, in deference to increasing nationalism, Britain unilaterally declared Egypt's independence. In 1936, the Anglo-Egyptian Treaty was signed requiring the withdrawal of British troops from Egypt, except those necessary to protect the Suez Canal and its environs. The Wafd government unilaterally abrogated the treaty in 1951. Three years later, Britain agreed to withdraw its troops. The withdrawal was finalized in July 1956, which Egyptians view as the date of full independence.

The Kingdom of Egypt, which lasted until the revolution of 1952, was a constitutional monarchy.  During this post-independence period, three political forces competed with one another: the King, the Wafd (a broadly based nationalist political party opposed to British influence) and the British, who were determined to maintain control over the Suez Canal.

Following the creation of the State of Israel in 1948, Egypt, together with Iraq, Jordan, Lebanon and Syria, engaged in the first of four wars that it has fought with Israel.

Following World War II and the first Arab-Israeli War in 1948, Egypt was in an unstable condition, the King was highly unpopular among the Egyptian population, and anti-British sentiment grew.  In July 1952, a group of army officers led by Colonel Gamal Abdel Nasser, known as the "Free Officers Movement", toppled the monarchy in a coup, and, in 1953, Egypt was declared a republic.  Nasser became president in 1954 and over time, became a charismatic leader of Egypt and of the Arab world as a whole. Nasser is regarded as one of the most important political figures in both modern Arab history and Third World politics in the 20th century.

On July 26, 1956, in retaliation for the loss of funding and to help pay for the Aswan High Dam project pursuant to the United States and the World Bank's withdrawal of their respective offers to help finance the Aswan High Dam, Nasser nationalized the privately owned Suez Canal Company, which provoked the Suez Canal Crisis, in which Britain, France and Israel invaded the Sinai Peninsula in order to assume control of the Suez Canal.  The crisis ended in November 1956 after a ceasefire was agreed.

Egypt, under Nasser, fought two major wars: the Suez War in 1956 following the joint British, French and Israeli invasion, and the war with Israel in 1967, the latter resulting in Israeli occupation of the Gaza Strip and Sinai Peninsula (which has since been returned to Egypt), in addition to the Golan Heights and the West Bank (which remain under Israeli control).

Nasser died on September 28, 1970 and was succeeded by his vice president, Anwar el-Sadat.  In the October 1973 war with Israel, the Egyptian army succeeded in crossing the Suez Canal, partially liberating territories occupied by Israel.  In 1977, Sadat became the first Arab leader to visit Israel, and in 1978 made history by signing the Camp David Accords, which in turn led to the 1979 signing of the Egypt-Israel peace treaty, as a result of which, he won the Nobel Peace Prize.  Following the peace treaty, all occupied territories were returned to Egypt.

Domestically, Sadat relaxed government controls over the economy and encouraged private investment.  Groups such as the Muslim Brotherhood, a banned political organization having an Islamic ideological agenda, became more vocal in their criticism of Sadat's policies and the Camp David Accords.  Sadat was assassinated on October 6, 1981 by Islamic extremists.  Hosni Mubarak succeeded him as president.  President Mubarak has proved to be a moderate leader who was able to repair Egypt's relationships with the Arab nations and lead the process of modernization and liberalization of the Egyptian economy.

During his first year as president, Mubarak struck a moderate note, neither backing away from the peace with Israel nor loosening ties with the United States.  By pursuing that steady course, he was able to prevent any delay in the return of the occupied Sinai Peninsula to Egyptian sovereignty in April 1982.  At the same time, Mubarak tried to contain the disaffections that had surfaced in the last year of Sadat's era, released Sadat's political and religious prisoners, while prosecuting vigorously the Islamic militants who had plotted the late president's assassination.  Unfortunately, Egypt's worsening economic problems could not be solved quickly.

President Mubarak's reforms have focused on improving the democratic process and civil liberties in Egypt.  His policies have also sought to bring about economic growth through further liberalization of the economy with an emphasis on development of the private sector and to improve the economic conditions of low-income Egyptians. General economic conditions in the Republic have recently improved due to the adoption of liberal economic policies by the Government, such as decreased taxes and tariffs, which have resulted in increased Government revenues, as well as significant increases in international reserves and foreign direct investment.

The first government headed by Ahmed Nazif, the current Prime Minister, was formed in June 2004. In September 2005, President Mubarak was re-elected with 88% of the vote.  His two principal challengers together received approximately 10% of the vote.  Following President Mubarak's re-election, Prime Minister Nazif was reappointed.  The President and the Government have continued to promote peace and stability in the region and a peaceful resolution to the Israeli-Palestinian conflict and have regularly participated in international peace conferences.  The Government considers the Palestinian issue to be central not only to its national security, but also to regional stability.

In June 2007, elections were held for the upper house of the legislature, and the NDP retained its majority.

The rise in international commodity prices during 2008 affected the Egyptian economy. The CPI rose to its highest rate in recent years, reaching 23.6% in August 2008, before declining to 13.2%, as at December 31, 2009. The rise in prices for some imported commodities, such as wheat, edible oil and sugar led to increases in food prices. During 2008, the price of bread increased fivefold in private bakeries. This created unexpected demand in state-owned bakeries, which provide subsidized bread leading to queues at times, which have occasionally turned into violent clashes.

During April 2008, there were violent clashes between demonstrators and the police and security forces in a northern Nile Delta town where a state-owned textile factory is located. Worker protests demanding higher wages to meet rising food prices and the increasing cost of living led to riots in which two people were killed and more than 112 injured, including 45 police officers.

In order to meet the increased demand and to keep inflation in check, the Government ordered state-owned bakeries to produce additional subsidized bread and suspended rice exports until October 2008 in an attempt to meet increased domestic demand. It also lifted certain customs duties from a number of imported goods, including butter and other dairy products, cooking oil, powdered baby milk, cement and iron. At the same time, the Government also increased the number of Egyptians eligible to receive subsidized food and, on May 1, 2008, the President increased public sector employees' salaries by 30%. In order to reduce the effect of such increase on the budget deficit and pursuant to Law 114 of 2008, the Government increased certain gasoline, tobacco and car registration taxes and subjected interest payable on Government bills to withholding tax.

## Constitutional System

Prior to the 1952 revolution, Egypt was a constitutional monarchy. The first Egyptian constitution of 1923, which followed the declaration of the end of the British protectorate, stated that Egypt was an independent sovereign Islamic state with Arabic as its language and provided for a representative parliament. This constitution was abolished and political parties were dissolved in 1953, and a new constitution was proclaimed in 1956. The 1956 constitution granted the President extensive executive and legislative powers. In 1958, the constitution of the United Arab Republic was enacted, following the political union of Egypt and Syria. The union was dissolved in 1961.

In 1964, a new constitution was enacted. It emphasized the socialist nature of the government, proclaiming Egypt an Arab Democratic State with a socialist economy.

### *1971 Constitution*

The current constitution was approved by referendum in September 1971 (the "**1971 Constitution**"). The 1971 Constitution, which was amended in March 2007 (see below), states that Egypt is a democratic state based on citizenship, with Islam as its state religion and Arabic as its national language. The 1971 Constitution recognizes three types of ownership: public, cooperative and private. The 1971 Constitution guarantees the equality of all citizens before the law, affirms the rights to peaceful assembly, education, health and social security, and the right to organize into associations or unions. It also made suffrage universal and compulsory at the age of 18. The 1971 Constitution has been amended three times, in May 1980, May 2005 and March 2007.

In 2005, following President Mubarak's call to allow multi-candidate presidential elections, the People's Assembly amended Article 76 of the Constitution which was approved by the Egyptian people in a referendum on May 25, 2005. Under this amendment, the President was, for the first time in Egypt's history, to be elected through direct multi-candidate, elections.

Following a referendum on March 26, 2007, 34 articles of the 1971 Constitution were amended to provide for greater democracy and guarantee public freedom, the rule of law and equality based on the principal of citizenship. These amendments are intended to ensure a separation of powers between the legislative and the executive branches and strengthen the Parliament's role in overseeing the Government's activities and ensuring its accountability. Opposition parties opposed the amendments to the Constitution and called for a boycott of the referendum because, among other reasons, the amendments did not introduce a limit on the number of terms an individual may serve as President.

The 1971 Constitution provides for three branches of government: the legislative branch, the executive branch and the judicial branch.

*Legislative Branch*

The 1971 Constitution provides for a bicameral parliament consisting of (i) the *Majlis al-Shaab*, the lower house (the "**People's Assembly**"), which must be comprised of no less than 350 directly-elected members and up to 10 members appointed by the President, and (ii) the *Majlis al-Shoura*, the upper house (the "**Shoura Council**"), which comprises 264 members, two-thirds of whom are elected and one-third appointed by the President. The 1971 Constitution provides that at least half of the Shoura Council elected must be "workers and farmers" (as such terms are defined by law). The principal role of the People's Assembly is to propose and approve laws, which, in turn, are promulgated by the President, and to discuss and approve the national budget and the budgets of the economic authorities. However, any amendment to the budget proposal as submitted to Parliament may not be adopted without the approval of the Government. The People's Assembly also monitors the Government's performance and has the power to pass motions of no confidence with respect to the Council of Ministers (*i.e.*, the cabinet) or particular Ministers. It also approves the program of each newly appointed cabinet. Should the People's Assembly withdraw its confidence from the cabinet or any of its members, the cabinet or that member must resign. The President cannot dissolve the People's Assembly except under special circumstances and after a vote of approval by a referendum. The Shoura Council offers advice and consultation, and provides comments on proposed laws and regulations to the People's Assembly. Members of the Shoura Council serve for six years.

*Executive Branch*

The 1971 Constitution granted vast powers to the President. The President is the Head of State, and the President and the Council of Ministers comprise the executive branch. The President is elected by direct public election. Pursuant to Article 76 of the Constitution, a Presidential candidate (other than candidates representing established political parties with certain minimum representation) must be nominated by at least 250 elected officials of the People's Assembly, the Shoura Council and municipalities, no fewer than 65 of whom must be from the People's Assembly and 25 of whom must be from the Shoura Council, as well as 10 from each municipality at least 14 governorates. In addition, pursuant to Article 76, before a political party can nominate a candidate for President, it must have, *inter alia*, existed for at least five continuous years and obtained at least 3% of the total seats in the People's Assembly and Shoura Council. There is no limitation on the number of terms that the President may serve.

Presidential powers include:

- in conjunction with the Council of Ministers, the formulation of the general policy of the state and supervision of its implementation;

- the appointment and dismissal of one or more vice presidents, the prime minister and the ministers;

- the calling of elections and referenda;

- the adoption of regulations to implement laws;

- the right to declare a state of emergency in the manner provided in the 1971 Constitution; and

- the conclusion of treaties, subject to the approval of the People's Assembly of certain material treaties (including peace treaties, alliance pacts, tax treaties, commercial and maritime treaties and all treaties involving modification of the territory of the Republic).

The President acts as Supreme Commander of the armed forces.

The Prime Minister supervises the work of the Government, and each Minister is responsible for the performance of his Ministry before the People's Assembly. The responsibilities of the Council of Ministers include the preparation of draft laws and decrees, as well as the preparation of the national budget. Under the Constitution, if the President is unable to temporarily carry out his functions, the Vice President or the Prime Minister will temporarily assume the presidency.

*Judicial Branch*

The 1971 Constitution provides for a judicial branch which is to be independent from other branches. This branch is comprised of three categories of courts of justice: (i) the Supreme Constitutional Court, the highest judicial body whose main function is to review the constitutionality of laws and regulations, (ii) the State Council, responsible for adjudicating

administrative matters, and (iii) the ordinary court system, comprised of civil and criminal courts, the highest level of which being the Court of Cassation (*Cour de Cassation*).

In order to improve the Republic's economic and investment landscape, in 2008, the Government enacted Law 120 of 2008 establishing the Economic Court, which specializes in bankruptcies, consumer protection, capital markets and intellectual property disputes. The Economic Court is divided into two bodies, a body handling disputes between the state and private citizens, and another handling disputes among private citizens. The law stipulates that the Economic Court must issue decisions within 60 days.

**Local Government and Administration**

Until 1960, government administration was highly centralized.  However, in 1979, a local government administrative system was established to promote decentralization and greater citizen participation in the local government.

The 1960 Local Administration Law provides for three levels of local administration: governorates (*muhafazat*), districts or counties (*markaz*) and the villages (*karya*).  There are two councils at each administrative level: a mostly elected council and an appointed executive council.  These councils exercise broad legislative powers but are controlled by the central government.

In April 2008, local elections were held for approximately 52,000 municipalities in 4,500 towns and cities throughout Egypt.  The National Democratic Party won 80% of the seats. Parties affiliated with the Muslim Brotherhood boycotted the elections.

Egypt is divided into 29 governorates.  Local councils perform a wide variety of functions in education, health, public utilities, housing, agriculture and communications.  These local councils obtain their funds from national revenues, taxes on real estate and agricultural land, miscellaneous local taxes and fees, profits from public utilities and commercial enterprises, national subsidies, grants and loans.

**Government and Political Parties**

After a long history of one-party rule, Egypt currently enjoys a multi-party political system.  There are currently over 24 political parties.  The ruling party, which is led by President Mubarak, is the National Democratic Party ("**NDP**").  The formation of political parties must be approved by the Advisory Council and the formation of parties based on religion or race is prohibited.  Despite this prohibition, the Muslim Brotherhood constitutes the NDP's potentially most significant political opposition.  Periodically, there have been arrests and trials of members of the Muslim Brotherhood and other factions due to their illegal activities.  In April 2008, Egypt's higher military court sentenced 25 people associated with the Muslim Brotherhood to imprisonment for terms of between three and 10 years in a case focused on illegal funding, money laundering and terrorism.

Elections for the People's Assembly were last held in October and November 2005 for a five-year term.  The NDP and its allies won 329 of the 442 contested seats in the People's Assembly and hold an additional ten seats whose members are chosen by the President.  The breakdown of the remaining seats is as follows: Independents (107), of which 88 seats have been won by persons believed to be affiliated with the Muslim Brotherhood; the New Wafd Party (5); the New Tagammu Party (1) and other parties (13).  The 2005 elections were held for the first time in three stages (by geographical location) under judicial supervision.  The next elections for the People's Assembly are expected to be held in late 2010.

Elections for 50% of the 176 contested seats of the Shoura Council were held in June 2004 and resulted in majority control of the Shoura Council by the NDP.  The election of the other 50% of the Shoura Council took place on June 11, 2007 with 70 of the 88 seats up for election being won by the NDP, one seat won by an independent candidate, one seat won by the National Progressive Unionist Party and 16 seats going to a run-off election.  The run-off election was held on June 18, 2007, at which the NDP won an additional 14 seats and independent candidates won two seats.  The next elections for the Shoura Council are expected be held in Summer 2010.

Presidential elections were last held in September 2005, in which President Mubarak was re-elected for his fifth consecutive six-year term which expires in 2011.  To date, no candidates have declared their intention to participate in the upcoming presidential elections.

**National Security**

Egypt's armed forces, which are among the largest in the region, include the Republic's army, air force, air defense and navy.  The armed forces inventory includes equipment from the United States, the United Kingdom, Russia, France and China.

U.S. and European military cooperation has helped Egypt to modernize and upgrade its armed forces and strengthen regional security and stability.  The United States and Europe have also provided Egypt with F-4, F-16 and Mirage jet aircraft, Apache helicopters, C-130 transport aircraft, guided missile launchers, E-2C aerial surveillance aircraft, mine hunters and patrol boats.  In addition, after the first Gulf War, the Republic began to assemble the U.S.-made M1-A1 tank, which is also the main battle tank of the United States.

In 1981, the United States and Egypt, near the Egyptian coastal city of Alexandria, conducted the first "Bright Star" joint military exercises for infantry, airborne, artillery and armored forces.  In October 2009, the Bright Star exercises, conducted with 15 other countries (including France, Greece, Kuwait, Pakistan and the United Arab Emirates) included a computer-simulated command post exercise and tactical airborne and amphibious training.

Partially as a result of smuggling activity through man-made tunnels under Egypt's border with the Gaza Strip, the Government has increased its surveillance of the border and constructed a six-mile (ten-kilometer) iron wall to counter such smuggling activities and the threat it poses to the Republic's national security.

**Legal System**

Egypt's legal system is based on Islamic law (*Shari'ah*) and Napoleonic codes, including the French *Code Civil*, upon which the Egyptian civil code is largely based.  Under President Mubarak's successive governments, the courts have demonstrated increasing independence, asserting principles of due process and judicial review, which have gained greater respect.  Marriage and family law are primarily based on the religious law of the individual concerned, which for most Egyptians is Islamic law.  Islamic law is not forced upon non-Muslims, and non-Muslims have their own courts to settle marriage and family matters.  While there have been moves to consolidate the influence of the Shari'ah, commercial law remains based on modern commercial practice.

Egypt's Arbitration Law 27 of 1994, as amended, serves as a framework for arbitration of domestic and international commercial disputes, as well as disputes between public enterprises and the private sector.  Egypt acceded to the International Convention for the Settlement of Investment Disputes in 1972 and is a member of the International Center for the Settlement of Investment Disputes.  Egypt adheres to the 1958 New York Convention on Enforcement of Arbitration Awards; the 1965 Washington Convention on the Settlement of Investment Disputes between States and the Nationals of Other States.

**Foreign Relations and International Organizations**

The Republic's foreign policy is not formally aligned with or against any major bloc. In addition, factors such as population size, historical events, military strength, diplomatic expertise and a strategic geographical position give the Republic extensive political influence in the Middle East, Africa and within the Non-Aligned Movement. In addition, Cairo has been at the crossroads of Arab commerce and culture for generations, and its intellectual and religious institutions are at the center of the region's social and cultural development.

Egypt maintains diplomatic relations with substantially all of the countries that are members of the United Nations, and its international participation includes: the African Development Bank; the Arab Fund for Economic and Social Development; the Arab League; the Arab Monetary Fund; Arab Petroleum Investment Corporation, the Council of Arab Economic Unity; the World Bank, the IMF and related organizations; the Non-aligned Movement; the Organization of Arab Petroleum Exporting Countries; the Organization of African Unity; the United Nations and related organizations; and the World Trade Organization (the "**WTO**").

In June 1998, Egypt joined the 21 member Common Market for Eastern and Southern Africa ("**COMESA**") and reduced tariffs with other COMESA countries by 90%, with a view to the implementation of a common external tariff by 2008 based on a four band tariff structure of capital goods, raw materials, intermediate goods and final goods, respectively.  In addition, the members are committed to establishing a monetary union by 2025.

In July 1999, Egypt and the United States signed a trade and investment free agreement ("**TIFA**").  TIFA's objective is to enhance trade co-operation between the two countries, by facilitating greater reciprocal access to the respective markets of both countries through the removal of non-tariff barriers and other impediments to trade and investment flows.

In June 2001, Egypt signed an Association Agreement with the Member States of the European Union (the "**EU**") establishing the Euro-Mediterranean Partnership (also known as the Barcelona Process), a wide framework of political, economic and social relations between the EU member states and countries of the Southern Mediterranean, including Egypt (the "**Association Agreement**").  The Association Agreement, which was approved by the Egyptian Parliament in March 2003, provides for immediate duty free access for certain Egyptian products into EU markets, while customs duties and charges payable on EU products imported into Egypt are to be phased out over a twelve-year period.  In January 2004, the trade component of the Association Agreement entered into force.  In December 2004, an adjustment protocol was signed granting additional preferential treatment on market access of Egyptian agricultural and processed agricultural exports to EU markets.

During 2004, the Republic entered into a framework agreement for the establishment of a free trade area with the *Mercado Común del Sur*, or MERCOSUR, which is comprised of Argentina, Brazil, Paraguay and Uruguay. The framework agreement aims (i) to promote the expansion of trade between the Republic and MERCOSUR and (ii) to provide the conditions and mechanisms to negotiate a free trade area between the Republic and MERCOSUR in conformity with the rules of the World Trade Organization.

In December 2004, Egypt, the United States and Israel entered into a "Qualified Industrial Zones" protocol pursuant to which companies manufacturing certain products in specified zones in Egypt (the Greater Cairo Zone, the Alexandria Zone, the Suez Canal Zone and the Central Delta Zone) can export products to the United States duty free under the same terms as those governing trade under the U.S.-Israel Free Trade Area Agreement, provided that certain requirements as to Egyptian and Israeli content are met.  The agreement entered into force in February 2005.

With effect from January 2005, the Government has committed to observing the obligations of Article VIII, Sections 2, 3 and 4 of the IMF's Articles of Agreement.  Pursuant to these sections, IMF members undertake not to impose restrictions on the making of payments and transfers for current international transactions and from engaging in any discriminatory currency arrangements or multiple currency practices without IMF approval.

In December 2005, Egypt signed a free trade agreement with Turkey, which provides that imports of Egyptian products into Turkey (excluding agricultural goods) are free of duties and those duties and trade restrictions for Turkish products imported to Egypt will be eliminated in four stages by 2021.  The first stage includes raw materials and machinery, followed by intermediary goods, then finished goods and finally other products.

In March 2006, negotiations began between countries in the Euro-Mediterranean region concerning liberalization of services and right of establishment and a dispute settlement mechanism for trade between members.

In January 2007, Egypt entered into a free trade agreement with the European Free Trade Association ("**EFTA**").  The agreement aims to liberalize trade in industrial products and processed agricultural products between Egypt and the four EFTA members: Switzerland, Iceland, Liechtenstein and Norway.  The agreement also contains provisions on protection of intellectual property rights as well as competition and technical cooperation.

In March 2007, the Egyptian European Action Plan under the European Political Neighborhood framework was ratified.  Under this action plan, Egypt and the EU have agreed to enter into political, security, economic, trade, investment, scientific, technological and cultural relations, with shared responsibility for establishing an area of peace and stability, including the prevention and settlement of conflicts in the region and reinvigorating regional and sub-regional cooperation.

In July 2007, Egypt became the fortieth country to adhere to the Organization for Economic Cooperation and Development (the "**OECD**") Declaration on International Investment and Multinational Enterprises.  Under this Declaration, Egypt is committed to improve its investment climate, ensuring equal treatment for foreign and domestic investors and promote responsible international business conduct.

On October 2008, members of the International Monetary and Financial Committee, the policy steering committee of the IMF, selected Dr. Youssef Boutros-Ghali, the Republic's Minister of Finance, as Chairman.

*Regional Security*

The Republic is a key partner in the search for peace in the Middle East and a peaceful resolution to the Israeli-Palestinian conflict. Egypt played an important role in the negotiations leading to the Madrid Peace Conference in 1991, which, under U.S. and Russian sponsorship, brought together all parties in the region to discuss peace in the region.

This support for peace has continued, with President Mubarak often intervening personally to promote peace negotiations. In 1996, he hosted the Sharm El-Sheikh "Summit of the Peacemakers" attended by President Bill Clinton and other world leaders.

In 2000, Egypt hosted two summits at Sharm El-Sheikh and one at Taba in an effort to resume the Camp David negotiations suspended in July 2000. In June 2003, President Mubarak hosted President George W. Bush for another summit on the Middle East peace process. A further summit was convened in Sharm El Sheik in early 2005, which was attended by Egypt, Israel, the Palestinian Authority and Jordan. In addition, Egypt continues to play a substantial role in negotiations between the Israeli and Palestinian sides.

In November 2007, Egypt attended the international peace conference held at Annapolis, Maryland and continues to be a major regional player by attending major peace conferences and organizing bilateral and multilateral meetings in order to work to resolve the Palestinian-Israeli conflict, as well as the conflicts in Darfur, Sudan, the Republic's southern neighbor.

During the 1991 Gulf War, Egypt formed part of the international coalition which opposed Iraq's invasion of Kuwait. Egypt deployed 35,000 troops as part of the United Nations coalition forces to liberate Kuwait, making Egypt the third largest coalition force, after the United States and the United Kingdom.

Egypt and the United States share interests in regional security and stability and the peaceful resolution of international disputes.  An important aspect of the bilateral relationship is U.S. military and economic assistance to Egypt, which expanded following the signing of the Camp David Egyptian-Israeli peace treaty in 1979 and Egypt's participation in the Gulf War.

U.S. economic and military assistance to Egypt has totaled approximately U.S.$62 billion since 1979.  U.S. economic assistance to Egypt has concentrated on health, economic growth, education, improvements to economic policy and the business environment.  Following the 2003 Iraq war, the U.S. Congress, under the Emergency Wartime Supplemental Appropriation Act, 2003 (Public Law 108-11), approved U.S.$300 million in Economic Support Funds and U.S.$2 billion in loan guarantees, as a result of which, in 2005, the Republic issued U.S.$1.25 billion 4.45% Guaranteed Notes due 2015, guaranteed by the United States.  In 2008 and 2009, Egypt received U.S.$415 million (0.22% of GDP) and U.S.$250 million (0.13% of GDP), respectively, in economic assistance and U.S.$1.3 billion (0.69% of GDP) in annual military assistance.

# THE ECONOMY

## Background

Successive governments appointed by President Nasser between 1954 and 1970 adopted socialist and inward-looking policies aimed at reducing foreign influence, which was held to be responsible for the enormous inequalities in Egyptian society.  The upper class and wealthy land owners did not support Nasser's plans, and capital flight was pervasive.  Consequently, the Government became primarily responsible for industrial development in Egypt.  As the Government's role in the economy grew, inefficiencies accumulated, quality and innovation suffered, and enterprises became overstaffed.

President Sadat's "Open-Door Policy" in 1974 took steps towards economic liberalization and developing a closer relationship with Europe and the United States.  His policy encouraged private sector activity and sought foreign investment through the passage of new laws, including the adoption of Law 43 which provided guarantees against nationalization, legalized foreign investments in most economic sectors, granted tax incentives and created free trade zones.

Since 1981, President Mubarak has embarked on a major economic reform program in order to improve the Egyptian economy by increasing exports, reducing unemployment and poverty and increasing the private sector's role in the economy.  His policies have encouraged private sector activity in the Egyptian economy and attracted investment through legalizing foreign investment in most sectors of the economy.

According to the *International Investment Report 2008*, published by the, Egypt ranked first in North Africa and second in Africa in attracting foreign direct investment.  Egypt ranks twentieth (out of 141) in the most recent Inward FDI Performance Index published by the United Nations Conference on Trade and Development in 2008 for the period 2005-07.

## Recent developments and reforms

Egypt possesses one of the more developed and diversified economies in the Middle East, with sectors such as tourism, agriculture, industry and services at almost equal rates in national production. Consequently, the Egyptian economy is rapidly developing, due in part to legislation aimed at luring investments, coupled with both internal and political stability, along with recent trade and market liberalization.

Between 2000/01 and 2002/03, the Egyptian economy grew relatively slowly, at an average rate of 3.2%, due to a then-difficult global economic environment, caused in part by the global stock market crash in 2000 as a result of the burst of the dot com bubble, the economic slowdown following the September 11, 2001 attacks and other factors.  In response, the Government began to reform the Egyptian economy, which has resulted in its general improvement, increased exports and foreign direct investment, as well as increased tourism receipts.  Additionally, increased revenues from the Suez Canal have contributed to the growth of the Egyptian economy.

In July 2004, the Government introduced an ambitious reform program which built on the economic policies introduced by previous governments.  The current Government's reform program includes:

- facilitating trade and investment in Egypt;

- enhancing the role of the private sector in the development process;

- modernizing the banking sector;

- promoting a competitive economy that offers quality goods and services at affordable prices;

- modernizing state-owned enterprises;

- maintaining macroeconomic stability;

- improving government services; and

- reducing the persistent social, economic and cultural gaps among the population.

Growth in the Republic's GDP has increased from 3.1% in 2002/03, before the beginning of the Government's reform program, to 7.1% in 2006/07 and 7.2% in 2007/08, which the Government believes is a result of both a favorable external environment and the benefits of its economic reform program.  In part because of these two factors, the private sector is responsible for approximately two-thirds of the GDP growth over the period, especially in sectors such as manufacturing, agriculture, construction, tourism and transportation.  Growth in the Republic's GDP decreased to 4.7% in 2008/09, which is primarily due to the global financial crisis, in general, and lower tax and non-tax revenues (such as Suez Canal receipts, tourism, FDI and export duties), in particular.

For the period July-December 2009, GDP grew 4.8%, as compared to the corresponding period in 2008, which is a result of both an improving domestic economic environment and the effects of the Government's LE 15 billion (U.S.$2.7 billion) economic stimulus package, which was approved in March 2009 and is designed principally to finance infrastructure projects, such as water supply and sanitation infrastructure projects and roads, highways and bridges.  In addition to the stimulus package, the Government has taken measures to improve the domestic economic climate by: (i) reducing tariffs on certain capital goods and manufacturing components; (ii) permitting the rescheduling of certain outstanding debt owed to the Government and providing new financing for tourism projects; (iii) waiving sales tax on certain machinery, equipment and capital goods for one year; and (iv) capping natural gas and energy prices for all operating plants until December 31, 2009.  On December 15, 2009, the Parliament  approved a second stimulus package of LE 10 billion (U.S.$1.7 billion) to be financed by various Economic Authorities through bond issuances. See "Public Debt".

The Government had been gradually reducing the ratio of its budget deficit to GDP from 8.2% in 2005/06 to 6.9% in 2008/09; however, the ratio is projected to be 8.4% in 2009/10.  The Government has stated its intention to reduce this ratio to 3.0% by 2015, rather than 2010, as previously stated, due to the impact of the global financial crisis.

Currently, the Government is focusing on the following objectives:

- sustaining economic growth in order to  reduce poverty and unemployment;

- implementing reforms to support domestic demand and promote private investment;

- optimizing public expenditures in key areas, including health, education and infrastructure; and

- reforming, streamlining and improving social policies to ensure the best use of resources to better assist low income families.

In order to accomplish these objectives, the Government intends to pursue further reforms to the Egyptian economy by: (i) improving and modernizing the taxation system in Egypt through the reform of the sales and property tax regimes and income tax administration in order to expand the income tax base and further improve income tax collection rates; (ii) containing the cost of wages; (iii) further reducing, over time, energy subsidies; (iv) improving the efficiency of public spending; and (v) opening new markets for exports by entering into new trade agreements with, among others, south-east Asian countries

In June 2008, Parliament enacted Property Tax Law 196, reducing the tax rate from 46% to a maximum of 10%, applied on the net annual rental value of a property after certain deductions. Each property will be appraised by an "assessment committee" every five years, with any increase in the assessed value of the property capped at 35% of the previous assessment. The law exempts any property with a market value of LE 500,000 or less. Initially, 75% of the proceeds will be allocated to the Egyptian Treasury and 25% to municipalities.

**Privatization Program and Role of the State in the Economy**

The role of the private sector in the economy has increased considerably since 2001.  Government ownership was  reduced through privatization and the private sector has grown.  The privatization program was launched through the promulgation of  the Public Enterprise Law 203 ("**Law 203**") in 1991 governing the privatization of 314 public sector companies.  Law 203 governed the transfer of Government ownership  of public sector companies   to holding companies pending their privatization. A number of additional laws set the regulatory framework for the sale of non-Law 203 companies, which includes the sale of wholly-owned public enterprises such as Bank of Alexandria and Telecom Egypt. In 2004, the Government adopted an Asset Management Program ("**AMP**") to address the status of state-owned enterprises, including public enterprises (150 as at December 31, 2009) and public sector holdings in joint venture entities (620 as at December 31, 2009).

The key AMP components are:

- sale of assets and shareholdings in public sector enterprises and joint venture entities;

- restructuring of certain public sector enterprises as a prelude to their eventual sale; and

- introducing and adopting principles of corporate governance, new management and enhancing disclosure to improve the performance of public sector enterprises.

The role of the Government in the Egyptian economy is undergoing significant transformation.  The Government is also actively promoting public-private-partnerships in areas that have traditionally been dominated by government investment, such as infrastructure and utilities.

The Government plans to establish an asset management agency responsible for supervising the nine public enterprise holding companies and implementing various aspects of the AMP, including, *inter alia*, restructuring, managing investments, ensuring good governance, and privatization.  It also plans to establish a "Future Generations Fund" to manage an allocated percentage of the shares of public enterprises to be privatized via the stock market, with the aim of investing these assets for the benefit of future generations.

### *Sales of Companies, Assets and Shareholdings*

The following table sets out information in respect of the privatization and other transactions with respect to Law 203 sales and non-Law 203 public sector enterprises.

#### Sale of Assets and Shareholdings in Public Sector Enterprises

| Fiscal year | Total Law 203 Sales (companies/assets/land) | | Other Public Sector Sales (non-Law 203) | | Joint Ventures | | Total | |
|---|---|---|---|---|---|---|---|---|
| | (Number of Sales) | (LE millions) | (Number of Sales) | (LE millions) | (Number of Sales) | (LE millions) | (Number of Sales) | (LE millions) |
| 2000/01............. | 11 | 252 | 0 | 0 | 7 | 118 | 18 | 370 |
| 2001/02............. | 7 | 73 | 0 | 0 | 3 | 879 | 10 | 952 |
| 2002/03............. | 6 | 49 | 0 | 0 | 1 | 64 | 7 | 113 |
| 2003/04............. | 9 | 428 | 0 | 0 | 4 | 115 | 13 | 543 |
| 2004/05............. | 16 | 824 | 0 | 0 | 12 | 4,819 | 28 | 5,643 |
| 2005/06............. | 47 | 1,843 | 1 | 5,122 | 17 | 7,647 | 65 | 14,612 |
| 2006/07............. | 45 | 2,774 | 1 | 9,274 | 7 | 1,559 | 53 | 13,607 |
| 2007/08............. | 20 | 745 | 0 | 0 | 16 | 3,238 | 36 | 3,983 |
| 2008/09............. | 16 | 1,590 | 0 | 0 | 1 | 63 | 17 | 1,653 |

*Source:  Ministry of Investment*

Since 2004, the Government has accelerated its privatization program, although it has slowed recently due to the global financial crisis.  The principal developments since 2004 have included:

- an increase in the sale of public sector shareholdings in joint venture entities, with approximately LE 17.2 billion of proceeds generated since July 2004, as compared to LE 1.2 billion for the period 2000-2004;

- the use of initial public offerings ("**IPO**") and other stock market transactions as a method for privatization, including, most notably, Sidi Kerir Petrochemicals Company, Alexandria Mineral Oils and Telecom Egypt; and

- the sale of 80% of Bank of Alexandria to Intesa Sanpaolo for LE 9.2 billion.

In addition, the sale of the third mobile phone license to Dubai-based Etisalat generated LE 16.7 billion.  Since 2004, the FDI component of privatizations has been approximately 64%.  The leading sectors for FDI have been banking, real estate, chemicals, department stores, cement, telecommunications, fertilizers and textiles.

*Restructuring Plans*

The Government's decision to restructure a public sector enterprise is influenced by a number of considerations, including the outlook for a particular enterprise and its eligibility for privatization or disposal in the medium term.  Some public sector enterprises, such as textile and steel companies, require extensive restructuring and cash injection from the Government. The Government also seeks to consolidate interests within particular sectors where such consolidation may lead to better economies of scale.

*Principles of Corporate Governance, Good Management and Disclosure*

The Government is encouraging the modernization of public sector enterprise management through the introduction and adoption of best practice corporate governance and improved disclosure.  The Egyptian Institute of Directors, established in 2003 by the Ministry of Investment, is in charge of the adoption  of corporate governance principles by  both public and private sector companies in Egypt and provides workshops and training courses to acquaint the management with these principles.

Furthermore, the Government has taken other measures with the appointment of new management teams at  public sector companies, setting a ceiling for the maximum tenor for high-level management of six years, encouraging management rotation within public sector companies, and appointing second line high level management via hiring two deputy chairmen at each public sector company with the relevant experience.

*Use of Privatization and Asset Sale Proceeds*

The proceeds of companies privatized pursuant to Law 203 are applied in accordance with the provisions of a ministerial decree which requires that not less than 50% of the proceeds from such privatizations be paid to the Restructuring Fund.

In accordance with Law 203, a minimum of 50% of privatization proceeds must be directed to the Restructuring Fund. The Restructuring Fund is a special purpose fund to restructure public sector enterprises with a view to their ultimate sale or privatization.  Proceeds of privatizations that are not paid into the Restructuring Fund are transferred to the Treasury as general revenues.

Proceeds from the sale of non-Law 203  government assets, such as the sale of stakes in Bank of Alexandria and Telecom Egypt and the award of the third mobile phone license, are not required to be directed to the Restructuring Fund and are paid to the Ministry of Finance to be used for broader infrastructure and social purposes.  Privatization and asset sale proceeds have also been used to reduce the non-performing loans of state-owned enterprises from LE 32.5 billion to less than LE 4.0 billion.  It is expected that no such non-performing loans will remain by the end of the 2009/10.

The Government proposes to use the proceeds of future privatizations and asset sales to restructure the remaining state enterprises, reduce domestic debt, finance infrastructure projects and upgrade Egypt's railway system.

**Gross Domestic Product**

During the last five years, the Egyptian economy has grown significantly.  The annual real GDP growth rate was 4.5% in 2004/05, 6.8% in 2005/06, 7.1% in 2006/07, 7.2% in 2007/08 and 4.7% in 2008/09.  For the period from June to December 2009, real GDP grew by 4.8%, as compared to the corresponding period in 2008.

The following factors, resulting principally from the global financial crisis, contributed to the decline in the rate of growth in 2008/09:

- a reduction in net FDI;

- a decline in Suez Canal receipts; and

- a decline in manufacturing output, exports and tourist receipts.

These factors were partially offset by strong domestic demand, the effects of the Government's reform program and stimulus package, the strong balance sheet of the Egyptian banking sector and the resilience of the Egyptian tourism sector despite the global financial crisis.

The commodity sector of the Egyptian economy contributed LE 508.0 billion to GDP in 2008/09 or 51.3%, making it the largest contributor to GDP.  The commodity sector includes agriculture, forestry and fishing, extractive industry, manufacturing, electricity, water and construction and building.  In 2008/09, the commodity sector grew by a nominal 16.3%, compared to 21.1% in 2007/08.  This growth was led by large increases in the rate of growth of the construction and building industries, which grew by 19.7% and 21.9% for 2008/09 and 2007/08, respectively, and the manufacturing industry, which grew by 18.3% and 21.4% for 2008/09 and 2007/08, respectively.  The commodity sector contributed LE 298.8 billion to GDP in the period from July to December 2009, or 51.7%.

The production services sector contributed LE 319.2 billion to GDP, or 32.2% in 2008/09.  Production services include transport and warehousing, telecommunications, financial intermediation, insurance and tourism.  In 2008/09, the production services sector contributed 32.2% to GDP and grew by a nominal 14.2% in 2008/09 compared to a nominal 20.0% in 2007/09.  Growth was strong across the production services sector, in particular in wholesale and retail trade, which grew by 21.7% and 20.2% in 2008/09 and 2007/08.  The production services sector contributed LE 188.6 billion to GDP for the period from July to December 2009, or 32.6%.

The social services sector contributed LE 163.0 billion to GDP, or 16.5%, in 2008/09.  Social services include general government services, education, health and personal services.  General government expenditures represent 57.7% of this sector, or LE 94.1 billion and grew by 18.1% and 24.1% in 2008/09 and 2007/08, respectively.  The social services sector contributed LE 90.2 billion to GDP for the period from July to December 2009, or 15.6%.

The following table set forth the composition of Egypt's GDP at market prices (including net indirect taxes) for the periods indicated.

### Nominal Gross Domestic Product

| | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09[1] | Jul-Dec 2008 | Jul-Dec 2009[1] |
|---|---|---|---|---|---|---|---|
| | | | | (LE billions) | | | |
| **Nominal GDP**.......................... | **538.5** | **617.7** | **744.8** | **895.5** | **1,038.6** | **525.6** | **603.3** |
| **Domestic Demand**................................. | **550.7** | **632.8** | **778.9** | **945.6** | **1,109.5** | **568.6** | **630.8** |
| Final Consumption ................................ | 453.9 | 517.1 | 623.6 | 745.1 | 909.5 | 471.6 | 528.8 |
| Private Consumption ........................ | 385.3 | 441.2 | 539.2 | 647.6 | 791.2 | 413.1 | 462.1 |
| Public Consumption ........................... | 68.6 | 75.9 | 84.4 | 97.5 | 118.3 | 58.5 | 66.7 |
| Investment[2] .......................................... | 96.8 | 115.7 | 155.3 | 200.5 | 200.0 | 97.0 | 102.0 |
| **Net Exports** ...................................... | **(12.2)** | **(15.1)** | **(34.1)** | **(50.1)** | **(70.9)** | **(43.0)** | **(27.5)** |
| Exports of Goods and Services[3]........... | 163.4 | 193.2 | 225.3 | 295.9 | 260.1 | 140.6 | 128.2 |
| Imports of Goods and Services.............. | 175.6 | 208.3 | 259.4 | 346.0 | 331.0 | 183.6 | 155.7 |
| Final Consumption *(% of GDP)* .............. | 84.3 | 83.7 | 83.7 | 83.2 | 87.6 | 89.7 | 87.7 |
| Investment *(% of GDP)*[2] ........................ | 18.0 | 18.7 | 20.9 | 22.4 | 19.3 | 18.5 | 16.9 |
| Exports of Goods and Services *(% of GDP)*[3] ................................................ | 30.3 | 31.3 | 30.2 | 33.0 | 25.0 | 26.8 | 21.2 |
| Imports of Goods and Services *(% of GDP)* ........................................................ | 32.6 | 33.7 | 34.8 | 38.6 | 31.9 | 34.9 | 25.8 |

*Source:  Ministry of Economic Development.*

_____

**Notes:**
(1)    Preliminary data.
(2)    Includes fixed capital formation and change in inventory.
(3)    Includes shares of foreign partners in the oil sector.

The following table sets forth the composition of Egypt's real GDP at market prices (including net indirect taxes) for the periods indicated.

**Real Gross Domestic Product**

| | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09[1] | Jul-Dec 2008 | Jul-Dec 2009[1] |
|---|---|---|---|---|---|---|---|
| | | | | (LE billions) | | | |
| **Real GDP[2]**.......................................... | **425.2** | **454.3** | **744.8** | **798.1** | **835.4** | **414.6** | **434.5** |
| Growth Rate (%) ................................. | 4.5 | 6.8 | 7.1 | 7.2 | 4.7 | 4.1 | 4.8 |
| **Domestic Demand**............................ | **432.5** | **463.8** | **778.9** | **835.6** | **851.9** | **431.4** | **447.3** |
| Final Consumption ........................... | 357.5 | 378.8 | 623.6 | 656.3 | 688.9 | 354.7 | 371.5 |
| Household Consumption ................ | 306.1 | 325.8 | 539.2 | 570.1 | 595.9 | 309.6 | 324.4 |
| Public Consumption ...................... | 51.4 | 53.0 | 84.4 | 86.2 | 93.0 | 45.1 | 47.1 |
| Investment ........................................ | 75.0 | 85.0 | 155.3 | 179.3 | 163.0 | 76.7 | 75.8 |
| Fixed Capital Formation[3].............. | 74.7 | 85.0 | 155.3 | 178.3 | 160.1 | 74.5 | 72.3 |
| Change in Inventory ...................... | 0.3 | 0.0 | 0.0 | 1.0 | 2.9 | 2.2 | 3.5 |
| **Net Exports** ...................................... | **(21.8)** | **(9.5)** | **(34.1)** | **(37.5)** | **(16.5)** | **(16.8)** | **(12.8)** |
| Exports of Goods and Services......... | 119.0 | 144.3 | 225.3 | 290.1 | 253.0 | 138.2 | 124.7 |
| Imports of Goods and Services......... | 140.8 | 153.8 | 259.4 | 327.6 | 269.5 | 155.0 | 137.5 |

*Source:  Ministry of Economic Development.*

_____

Notes:
(1)   Preliminary data,
(2)   Real GDP is calculated using constant prices using the 2001/02 as the base year for the years 2004/05 and 2005/06 and 2006/07 as the base year thereafter.
(3)   Beginning in 2005/06, includes change in inventory.

**Principal Sectors of the Economy**

The following table sets forth the composition of Egypt's nominal GDP at factor cost (excluding net indirect taxes) by economic activity at current prices for the periods indicated.

**Gross Domestic Product by Sector (at Factor Cost)[1]**

| | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09[2] | Jul-Dec 2008 | Jul-Dec 2009[2] |
|---|---|---|---|---|---|---|---|
| | | | | (LE millions) | | | |
| **GDP** | **506,511** | **581,144** | **710,388** | **855,302** | **990,212** | **498,376** | **577,633** |
| *Nominal GDP Growth Rate (%)* | *11.0* | *14.7* | *22.2* | *20.4* | *15.8* | *17.8* | *15.9* |
| **Total Commodity Sector** | **259,182** | **305,094** | **360,530** | **436,727** | **508,001** | **253,894** | **298,830** |
| *Total Commodity Sector Growth Rate(%)* | *9.1* | *17.7* | *18.2* | *21.1* | *16.3* | *18.1* | *17.7* |
| Agriculture, Forestry and Fishing | 75,291 | 81,766 | 99,953 | 113,104 | 135,465 | 72,616 | 87,168 |
| Extractive Industry | 64,026 | 89,834 | 103,656 | 133,674 | 147,966 | 73,349 | 82,303 |
| Petroleum | 35,623 | 40,586 | 44,059 | 56,722 | 61,759 | 31,310 | 34,190 |
| Natural Gas | 27,555 | 48,311 | 56,590 | 73,495 | 82,206 | 40,080 | 45,825 |
| Other | 848 | 937 | 3,007 | 3,457 | 4,001 | 1,959 | 2,288 |
| Manufacturing Industry | 89,981 | 98,693 | 114,475 | 139,003 | 164,523 | 79,383 | 94,963 |
| Petroleum Refining | 4,965 | 5,601 | 6,055 | 7,922 | 10,257 | 5,389 | 6,429 |
| Other | 85,016 | 93,092 | 108,420 | 131,081 | 154,266 | 73,994 | 88,534 |
| Electricity | 7,838 | 8,880 | 9,880 | 11,507 | 13,043 | 6,317 | 7,190 |
| Water | 1,941 | 2,158 | 2,390 | 2,659 | 2,977 | 1,468 | 1,692 |
| Construction and Building | 20,106 | 23,763 | 30,175 | 36,780 | 44,026 | 20,760 | 25,514 |
| **Total Production Services** | **162,877** | **183,567** | **233,052** | **279,606** | **319,184** | **166,749.4** | **188,554** |
| *Total Production Services Growth Rate(%)* | *14.1* | *12.7* | *27.0* | *20.0* | *14.2* | *18.1* | *13.1* |
| Transport and Warehousing | 21,579 | 24,519 | 29,549 | 34,790 | 40,962 | 20,191 | 23,346 |
| Telecommunications | 10,182 | 11,974 | 23,062 | 27,151 | 31,185 | 14,787 | 16,684 |
| Suez Canal | 20,154 | 23,399 | 24,084 | 28,729 | 26,826 | 15,250 | 13,093 |
| Wholesale and Retail Trade | 56,366 | 63,583 | 77,675 | 93,382 | 113,730 | 61,768 | 73,120 |
| Financial Intermediation | 26,428 | 28,798 | 27,531 | 31,756 | 36,125 | 18,791 | 21,179 |
| Insurance and Social Insurance | 11,455 | 12,497 | 26,372 | 31,375 | 35,975 | 17,938 | 20,509 |
| Tourism (Hotels and Restaurants) | 16,713 | 18,798 | 24,778 | 32,424 | 34,382 | 18,024 | 20,623 |
| **Total Social Services** | **84,452** | **92,483** | **116,806** | **138,970** | **163,027** | **77,733** | **90,249** |
| *Total Social Services Growth Rate(%)* | *11.0* | *9.5* | *26.3* | *19.0* | *17.3* | *16.2* | *16.1* |
| Real Estate | 17,580 | 19,056 | 20,943 | 23,334 | 26,575 | 12,504 | 14,138 |
| General Government | 51,755 | 56,930 | 64,220 | 79,737 | 94,120 | 43,994 | 51,806 |
| Education | 3,190 | 3,496 | 8,376 | 9,492 | 11,133 | 5,444 | 6,222 |
| Health | 6,021 | 6,563 | 9,908 | 10,961 | 12,971 | 6,508 | 7,491 |
| Personal Services | 5,907 | 6,439 | 13,359 | 15,446 | 18,228 | 9,283 | 10,592 |

*Source: Ministry of Economic Development.*

**Notes:**
(1)    In current prices.
(2)    Preliminary data.

*Investment by sector*

The single largest contributor to investment in the Egyptian economy is the private business sector, which invested LE 113.5 billion in the Egyptian economy (or 57.6%) in 2008/09.  Public sector entities, including the Government, Economic Authorities and Public Businesses invested LE 83.6 billion (or 42.4%) in the Egyptian economy in the same

period. The commodity, production services and social services received 51.9%, 21.7% and 24.9% of total investment, respectively. These sectors represent 51.3%, 32.2 and 16.4% of the Egyptian economy, respectively.

The following table sets forth the distribution of total investments in the Egyptian economy during 2008/09.

### Distribution of Investment in the Egyptian Economy[1]

| | Government | Economic Authorities | Public Business Sector | Private Business Sector | Total | of Total Investments |
|---|---|---|---|---|---|---|
| | | | (in LE millions) | | | (%) |
| **Total Investments** ............................................. | **42,138** | **13,292** | **28,163** | **113,527** | **197,119** | **100.0** |
| | | | | | | |
| **Total Commodity Sector** ................................... | **10,905** | **4,654** | **23,453** | **63,334** | **102,346** | **51.9** |
| Agriculture, Irrigation and Fishing ................... | 2,456 | 112 | 1 | 4,119 | 6,689 | 3.4 |
| Crude Oil and Mining........................................ | 5 | 238 | 4,157 | 33,560 | 37,959 | 19.3 |
| Manufacturing Industries and Petroleum Products .......................................................... | 327 | 46 | 6,522 | 22,755 | 29,649 | 15.0 |
| Electricity, Water and Natural Gas ................... | 8,046 | 4,259 | 11,904 | — | 24,209 | 12.3 |
| Construction and Building................................. | 71 | — | 870 | 2,900 | 3,841 | 1.9 |
| | | | | | | |
| **Total Production Services** ................................ | **7,188** | **6,166** | **4,635** | **27,833** | **45,821** | **23.2** |
| Transportation and Communication[2] .............. | 7,167 | 5,843 | 3,577 | 19,088 | 35,674 | 18.1 |
| Wholesale and Retail Trade.............................. | 0 | 216 | 132 | 4,150 | 4,498 | 2.3 |
| Financial Services............................................. | 15 | 82 | 341 | — | 439 | 0.2 |
| Tourism ............................................................. | 5 | 25 | 586 | 4,595 | 5,211 | 2.6 |
| | | | | | | |
| **Total Social Services** ....................................... | **24,046** | **2,472** | **74** | **22,360** | **48,952** | **24.8** |
| Housing and Real Estate Activities .................. | 104 | 283 | — | 12,500 | 12,886 | 6.5 |
| Educational Services ........................................ | 3,553 | 12 | — | 3,600 | 7,165 | 3.6 |
| Health Services................................................. | 2,261 | 274 | 15 | 2,400 | 4,950 | 2.5 |
| Other Services .................................................. | 18,128 | 1,904 | 59 | 3,860 | 23,950 | 12.2 |

*Source: Ministry of Finance.*

Note:
(1)   Preliminary data.
(2)   Includes Suez Canal.

### Commodity sector

Egypt's commodity sector is well diversified and represented 51.3% of GDP in 2008/09. The commodity sector includes agriculture, forestry and fishing, extractive industry, manufacturing, electricity, water and construction and building.

#### *Agriculture, forestry and fishing*

The agricultural, forestry and fishing sector accounted for 13.9% of Egypt's GDP in 2008/09. Approximately 96% of Egypt's total area is desert. Lack of forests, permanent meadows or pastures places a heavy burden on the available arable land, which constitutes only about 3% of the total area. This limited area, which sustains, on average, eight persons per acre (20 per hectare), is, however, highly fertile and is cropped more than once a year.

The following table sets forth Egypt's agricultural productivity per acre compared to the world average.

**Agricultural Productivity**

| Crop | Egypt | World Average |
|---|---|---|
| Corn (*irdabb*[1] *per acre*) | 25.7 | 3.8 |
| Wheat (*irdabb per acre*) | 18.0 | 8.1 |
| Potatoes (*irdabb per acre*) | 12.0 | 7.3 |
| Beans (*irdabb per acre*) | 9.1 | 2.0 |
| Tomatoes (*ton per acre*) | 16.4 | 11.3 |
| Sugar Beets (*ton per acre*) | 18.9 | 18.4 |
| Lentils (*irdabb per acre*) | 5.1 | 2.7 |
| Barley (*irdabb per acre*) | 10.7 | 7.5 |
| Rice (*ton per acre*) | 4.1 | 4.2 |
| Sugar cane (*ton per acre*) | 50.0 | 27.0 |

*Source: Ministry of Investment.*

_____
**Note:**
(1)     One irdabb is approximately 154 lbs. (70 kg.).

Agricultural land in the Republic is primarily located in the Nile valley and the Delta. The total area under cultivation is approximately 7.4 million acres (3.0 million hectares), representing approximately 3% of the total land area of the Republic and of which 0.9 million acres (0.4 million hectares) is reclaimed land. Other than along the Mediterranean coast, all agricultural land in Egypt is irrigated. Agricultural landholdings are fragmented, with an average farm size of 2.6 acres (1.1 hectares). Land under cultivation in Egypt is generally productive, with some land able to be cropped two or three times per year, however increasing salinity affects up to 35% of land under cultivation. Among other principal field crops are corn, rice, wheat, sugar, sorghum, and fava (broad) beans (ful). Despite a considerable output, the cereal production in Egypt falls short of total consumption needs; a proportion of foreign exchange is spent annually on the import of cereals and milling products. Other important crops include sugar cane, tomatoes, sugar beets, potatoes and onions. Many varieties of fruit are grown, and some, such as citrus, are exported.

Agricultural policy is a key component of the Government's development plans for the economy. Its objectives include improving Egypt's food self-sufficiency, expanding the area of land under cultivation through irrigation and reclamation projects and expanding the use of horticultural and agricultural technologies to increase the productivity in, and income from, the agriculture sector.

Although Egypt is the world's largest wheat-importing country, wheat occupies about 35% of the total winter crop area and is the major staple crop. Egypt has one of the highest per capita wheat consumption levels in the world (approximately 400 pounds per person per year); consumed mainly as bread. In 2006, over 400,000 acres of crop area produced approximately 8.2 million tons of wheat. Despite increases in wheat output, Egypt continues to import more than 50% of its wheat requirements from the United States, Canada, France, Ukraine, Russia and Argentina. Total consumption of wheat in 2009 is estimated at 16 million tons, including eight million tons of imported wheat. The Government provides subsidies for wheat, sugar and cooking oil. In 2008/09, the Government spent LE 19.9 billion on wheat subsidies, LE 1.3 billion on sugar subsidies and LE 2.0 billion on cooking oil subsidies. The Government has budgeted LE 10.6 billion on wheat subsidies, LE 2.0 billion on sugar subsidies and LE 1.0 billion on cooking oil subsidies in the 2009/10 budget. See "Public Finance—Subsidies."

Egypt has one of the highest per capita consumption rates of sugar in the world at 75 lbs. (34kg.) per person a year. According to the U.N. Food and Agricultural Organization, the global average sugar consumption per capita is 51 lbs. (23 kg.) per year. Egypt consumed 2.6 million tons of sugar in 2008, according to the Sugar Crop Research Institute, with approximately one million tons imported from sugar-producing nations, such as France, Brazil and India. Both sugarcane and sugar beet are grown on approximately 588,000 acres, mainly in Upper Egypt and the Delta. The Government plans to invest LE 600 million in the sugar industry over the next three years in order to reduce Egypt's reliance on sugar imports by 60% in 2013. In February 2010, the Government awarded a license to Cargill, the agricultural conglomerate, to build a U.S.$120 million sugar refinery to help meet domestic demand, The plant is expected to produce 600,000 tonnes of sugar per year by 2012.

Rice is a major summer crop in Egypt, occupying approximately 10% of Egypt's land under cultivation. The entire Egyptian rice crop is irrigated and cultivation is largely located to the northern part of the Nile Delta. Egypt is a net exporter of rice, exporting 750,000 tons in 2007/08.

The Toshka Project is a plan to significantly increase the Republic's arable and inhabitable land by creating a "new" 195-mile (310 kilometer) river valley by redirecting 10% of the Republic's allotment of water from Lake Nasser, creating approximately 202,300 hectares of arable land. The main irrigation canal to transport water to the project was completed in 2000, and the main pumping station and its 21 pumping units were installed in 2003. Construction of the four branch canals, each 17 miles in length, is ongoing. As and when the project is completed (which is expected in 2020), the Government expects an increase of arable land by 10% and of inhabitable land by 5-25%. Saudi Arabia's Agriculture Development Corporation owns 48,562 hectares of land, which forms part of the Toshka project and aims to grow fresh fruit and vegetables for export to Europe during the winter months.

### Manufacturing

The manufacturing sector, which includes petroleum refining, accounted for 16.6% of Egypt's GDP in 2008/09. Egypt's largest manufacturing industries are food processing and textiles, which benefit from Egypt's competitive advantage in these sectors. Other major manufacturing industries include metallurgy, fertilizers, automotive assembly, pharmaceuticals, and cement.

Petroleum refining contributed LE 10.3 billion (1.0%) to Egypt's GDP in 2008/09. Egypt is a major oil refining center in Africa with nine refineries. The Egyptian General Petroleum Corporation ("**EGPC**") wholly owns and operates six refinery companies and has a 98% direct and indirect shareholding in the Middle East Oil Refinery. EGPC's refineries produce a full range of refined petroleum products, including liquefied petroleum gas ("**LPG**"), naphtha, gasoline, gas oil (also known as diesel) and fuel oil.

Since 2001/02, international cement companies, such as Italcementi, Cemex, Holcim, Lafarge and Cimpor, have been major investors in the Egyptian cement industry. In December 2007, international building materials manufacturer Lafarge agreed to purchase the cement unit of an Egyptian company, Orascom Construction Industries ("**OCI**") for €8.8 billion thus making Lafarge the largest cement producer in the Middle East. As part of the transaction, OCI acquired an 11.4% stake in Lafarge.

In the automotive sector, locally-assembled cars represented 42% of the Egyptian automotive sales markets. International manufacturers, such as General Motors, Mercedes, BMW, Hyundai and Jeep, have assembly operations in Egypt, with approximately 50% of components sourced locally. In the personal care sector, major household names, such as Procter and Gamble, Johnson & Johnson and Unilever, have had an established presence in Egypt since 1982.

### Extractive Industry

Petroleum and related products comprise one of Egypt's key economic sectors. Petroleum and natural gas (excluding petroleum refining) accounted for 14.5% of GDP in 2008/09.

Fluctuations in world oil prices impact the contribution of this sector to GDP. In addition to petroleum and natural gas, Egypt's natural resources include iron ore, phosphates, manganese, limestone, gypsum, coal, lead, talc and zinc. Iron ore is mined in the western desert and near Aswan in southern Egypt. Phosphate is mined in the Sinai Peninsula.

Multinational companies, such as Apache, ENI, Dana Gas, GDF, Total, British Gas and BP, have operated both upstream and downstream activities in Egypt's petroleum and natural gas industry for many years, helping to achieve significant developments in the sector and the discovery of further reserves. The Government encourages foreign entities to conduct exploration for new oil and gas fields throughout the Republic. Once a new field has been identified, the foreign entity and EGPC enter into a joint venture agreement and establish a company to develop the new field. EGPC is currently a party to approximately 60 joint venture agreements with 26 foreign partners.

As at December 31, 2009 total estimated proven crude oil, condensate and natural gas reserves on an oil equivalent basis are estimated at 17.0 billions of barrels of oil equivalent ("**BBE**") as compared to 14.2 BBE and 15.6 BBE as at the end of 2002/03 and 2006/07, respectively. Over the last 12 years, Egypt's reserves of crude oil and condensate have remained fairly constant, while Egypt's reserves of natural gas have steadily increased. As at June 30, 2009 Egypt had reserves of approximately 4.4 billion barrels of crude oil and condensate as compared to approximately 4.2 billion barrels as at June 30,

2008. Egypt's reserves of natural gas increased to approximately 77.2 trillion cubic feet ("**TCF**") as at June 30, 2009 from approximately 13.0 TCF as at June 30, 1993 due to significant natural gas exploration during the period.

The Gulf of Suez area currently accounts for approximately 43% of Egypt's total crude oil and condensate reserves. The fields in the Gulf of Suez are considered to be mature, and approximately 80% of these fields have already been the subject of extensive exploration. The Western Desert is Egypt's second largest area of crude oil and condensate reserves, with approximately 40% of crude oil and condensate reserves. The Mediterranean Sea currently accounts for the largest amount of natural gas reserves, with approximately 78% of total natural gas reserves, followed by the Western Desert, with approximately 11% of total natural gas reserves. Approximately 60% of the fields in the Mediterranean Sea have been the subject of extensive exploration.

Oil fields in Egypt are considered mature as they have been producing oil since the 1960s. As Egypt's current oil fields continue to mature, production from these fields has fallen. However, the decline in crude oil production has been, to a large extent, offset by increased production of natural gas and condensates.

The following table sets forth the value of petroleum and product production and consumption for the periods indicated.

**Petroleum and Product Production and Consumption**

|  | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09 |
|---|---|---|---|---|---|
|  | | | (millions of tons) | | |
| **Production:** | | | | | |
| Crude Oil, LPG and Condensates | 33.4 | 32.5 | 32.0 | 32.9 | 34.9 |
| Natural Gas | 25.5 | 38.4 | 41.3 | 42.9 | 45.8 |
| **Total Production** | **58.9** | **70.9** | **73.3** | **75.8** | **80.7** |
| **Processing:** | | | | | |
| Refinery Output | 26.7 | 27.4 | 26.5 | 27.9 | 28.9 |
| **Domestic Consumption:** | | | | | |
| Petroleum and Petrochemical Products | 26.5 | 26.7 | 27.7 | 29.8 | 31.4 |
| Natural Gas | 23.0 | 25.0 | 27.0 | 29.7 | 31.3 |
| **Total Consumption** | **49.5** | **51.7** | **54.7** | **59.5** | **62.7** |

*Sources: Information & Decision Support Center, Ministry of Petroleum.*

*Petroleum*

EGPC is the Economic Authority responsible for the development and exploitation of Egypt's petroleum resources and for ensuring the supply of various petroleum products within Egypt. In recent years, the Government has sought to enhance activities in these areas by establishing two companies which operate alongside EGPC, Egyptian Natural Gas Holding Company ("**EGAS**") and Egyptian Petrochemical Holding Company ("**ECHEM**"), to focus specifically on the natural gas and petrochemicals businesses, respectively. The Government has also established Ganoub El-Wady Petroleum Holding Company ("**GANOPE**") to develop oil and gas activities in Southern Egypt. EGAS, ECHEM and GANOPE are wholly-owned subsidiaries of EGPC.

*Natural gas*

As at June 30, 2009, the Ministry of Petroleum estimated Egypt's proven gas reserves to total 77.2 TCF. Egypt produces 2.0 TCF per year and, in 2009, exported 0.6 TCF. Natural gas production accounted for 8.3% of GDP in 2008/09. In order to exploit fully its gas reserves, the Government established EGAS in 2001 to concentrate on gas activities.

In recent years, the number of natural gas production facilities has increased as exploration activities continue to discover untapped resources. As a result, production of natural gas has increased. Currently, natural gas production satisfies the growing local market demand; as production increases, natural gas can be expected to gradually substitute for conventional petroleum products. Natural gas already accounts for a greater proportion of energy production in Egypt than crude oil. Accordingly, the Government has encouraged the use of natural gas domestically, especially in power stations and industrial areas.

Domestic gas consumption is dominated by electricity generation (56%), followed by industrial activities (30%) and petrochemical producers (9%). The Government has developed a number of gas export projects, including two projects based on the Mediterranean coast and one natural gas processing plant.  In 2001, Egypt agreed to supply Jordan with 2.3 billion cubic meters of natural gas a year for 15 years through the Arab Gas Pipeline, which commenced in 2003.  Since 2005, liquefied natural gas ("**LNG**") has also been exported through the Spanish Egyptian Gas Company (SEGAS) terminal located in Damietta and exported mainly to the Spanish market via a new receiving terminal at Sagunto port in Spain, of which 3.2 million tons of LNG per year is taken by Unión Fenosa and the IDKU LNG terminal located to the east of Alexandria and developed by a consortium led by British Gas and Petronas.

A natural gas pipeline, the Arish-Ashkelon pipeline, which supplies the Israel Electric Company with approximately 2.5 billion cubic meters of natural gas per year, became operational in 2009.

*Electricity*

Electricity generation accounted for 1.3% of GDP in 2008/09.  The following table sets forth electricity generation and consumption for the periods indicated.

### Electricity Generation and Consumption

|  | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09 |
|---|---|---|---|---|---|
|  | (millions of megawatt hours) | | | | |
| **Domestic Electricity Consumption** | | | | | |
| Industrial | 30.3 | 32.7 | 34.6 | 37.0 | 37.3 |
| Commercial and Household | 33.3 | 36.3 | 39.2 | 43.1 | 43.9 |
| Other | 38.6 | 41.1 | 41.2 | 44.4 | 47.9 |
| **Total Electricity consumed Domestically** | 100.3 | 107.6 | 115.0 | 124.5 | 129.1 |
| Electricity Generated, but not consumed Domestically | 0.7 | 0.8 | 0.4 | 0.6 | 0.9 |
| **Total Electricity Generated** | 101.3 | 108.7 | 115.4 | 125.1 | 130.0 |

*Source:  Ministry of Electricity and Energy.*

*Electricity Generation*

The Government views the electric power sector as a key contributor to growth in the productive sectors of the economy. Egypt has significant electricity generating capabilities.  Notably, the Aswan Dam serves as a source of hydroelectric power.  Total installed capacity is approximately 2.1 gigawatts (including hydroelectric, thermal and wind generating capacities).  With demand for electricity growing at approximately 8.5% per year, there are several new power plants being constructed in the Republic, and the Government expects that the total installed capacity will reach 2.6 gigawatts. Accordingly, the Government's energy policy focuses on increasing supply through improving the efficiency of existing electricity plants and networks, building new plants and diversifying sources of primary power for production of electricity.

Electricity in Egypt is produced by five public production companies and nine distribution companies located in North Cairo, South Cairo, Alexandria, North Delta, South Delta, Suez Canal, El-Behera, Middle Egypt and Upper Egypt.  Both production and distribution companies are wholly-owned by the Egyptian Electricity Holding Company.

Hydroelectric power is also generated at Esna and the Nagah Hamadi hydroelectric power station has a maximum generation capacity of 64 megawatts.  Overall, hydroelectric power provides 11.2% of Egypt's total generated power.

*Wind and Solar Power Projects*

The Government is also developing wind energy and solar energy stations with the aim of generating 12% of its power from wind and 20% from renewable sources overall by 2012.  The largest wind farm in Africa and the Middle East is located at Al-Zaafarana by the Gulf of Suez due to high wind speeds, which range from 25 -33 feet per second (8-10 meters per second) on average, and the availability of large uninhabited desert areas in this location. The Al-Zaafarana wind farm has an installed capacity of 305 MW and is connected to the national grid. In addition, the Ministry of Electricity and Energy has implemented several experimental wind farm projects, which have resulted in the establishment of a program for the

construction of large wind farms to be connected to the national grid, with an expected total installed capacity of 965 MW by 2012.

In February 2009, the World Bank approved a U.S.$600 million loan to build a 1,300 MW power plant in Ain-Sokhna on the Red Sea. The U.S.$2.2 billion project is also expected to be funded by the African Development Bank (U.S.$550 million), the Arab Fund for Economic and Social Development (U.S.$208.5 million) and the Government's (U.S.$831 million).

In March 2010, the Republic was awarded a U.S.$430 million loan from Japan to fund a 220-megawatt wind farm to boost its renewable energy output. The loan will be used to build a wind farm in Gebel el Zeit on the Gulf of Suez.

*Nuclear Power Projects*

In September 2007, the Government confirmed its intention to building four 1,200 MW nuclear power stations by 2020. The first station is expected to be built at El-Daba'a on the Mediterranean coast to meet the expected increase in demand for electricity.  Egypt is coordinating this initiative with the International Atomic Energy Agency.  The plan has been well received both within the country and by the international community, with several members of the international community stating that they do not see an Egyptian nuclear power plant as giving rise to a threat of nuclear proliferation.

In June 2009, the Egyptian Nuclear Power Plant Authority signed a consultancy services contract with the Australian engineering company Worley Parsons for technical assistance with site selection and evaluation, as well as with certain pre-construction activities, such as project specification, quality assurance, preparation of key contracts and a financial assessment.  A law to regulate the nuclear industry was adopted in March 2010.  The construction of the first nuclear power plant is expected to take approximately ten years and cost approximately U.S.$2 billion.

*Consumption*

Oil and gas consumed by the electricity sector has risen to more than 21 million tons of oil equivalent, of which natural gas represented approximately 18.7 million tons, or 89% of total fuel consumed by the electricity sector.

*Electricity subsidies*

Historically, the electricity sector has benefited from significant subsidies from the Government.  In the budget for 2007/08, electricity subsidies were budgeted at LE 2 billion; in the budget for 2008/09, such subsidies were increased to LE 3 billion. In the budget for 2009/10, electricity subsidies were discontinued.  See "Public Finance—Subsidies".

**Construction and Building**

The construction sector's share in Egypt's GDP was 4.5% in 2008/09, which represents an increase of 3.5% as compared to 2007/08.  Since 2004/05, the construction sector has been one of the fastest growing sectors of the Egyptian economy, growing by 8.7% in 2004/05, 18.2% in 2005/06, 27.0% in 2006/07, 21.9% in 2007/08 and 19.7% in 2008/09.  The construction sector employs 7.9% of the Egyptian workforce.

The construction sector is likely to experience additional growth due to major public projects, such as airport expansion, healthcare facilities and infrastructure projects, such as electricity and water, as well new residential developments encouraged by Government policy to increase access to housing finance.  Major construction projects include a U.S.$9.5 billion refining and petrochemical plant at Kafr-El Sheikh, a container terminal at eastern Port Said and the development of major roads, highways, bridges, sewage systems and major public projects.

*Housing*

Since January 2006, the Ministry of Housing adopted an auction system selling a total of 2,760 hectares for integrated developments and commercial use with total proceeds of approximately LE 21 billion.  Local and international investors from Qatar, Libya and Saudi Arabia purchased commercial land. The Government used part of the sale proceeds, approximately LE 15 billion, to fund various infrastructure projects.

Certain property markets, including in certain some areas in Cairo, along the Mediterranean Coast and in the Red Sea region experienced significant increases in value during the period 2005-2008 before declining, in particular in 2009, mainly as a result of the global financial crisis.

**Production Services Sector**

The production services sector, which includes production and social services, represented 33.7% of GDP in 2008/09. Production services include transport and warehousing, telecommunications, financial intermediation, insurance and tourism.  The largest components of Egypt's production services sector are: (i) finance intermediation; (ii) transportation and warehousing; and (iii) tourism.

*Finance*

There are 39 banks registered with the Central Bank of Egypt, including six public sector banks, 27 private and joint venture banks and seven branches of foreign-owned banks.  The financial sector contributed 3.6% to GDP in 2008/09.

In 2004/05, the total number of banks declined from 61 to 52 following the closure of several branches of foreign banks.  In 2005/06, the number was reduced further to 43 following several mergers and acquisitions in line with the CBE's banking reform policy for the sector.  There are three wholly state-owned commercial banks.  The size of public-sector banks relative to the rest of the sector has been declining over the past decade.  In addition, the financial sector also includes non-bank financial institutions such as brokerage firms, investment banks and mutual funds.  See "Monetary System".

*Transport and Warehousing*

Transport and warehousing, including the Suez Canal, contributed 4.1% to GDP in 2008/09.

*Suez Canal*

A primary source of revenue in this sector is the Suez Canal.  Suez Canal revenues decreased by 6.6% in 2008/09 to LE 26.8 billion in 2008/09 from LE 28.7 billion in 2007/08.  Suez Canal revenues were LE 24.1 billion in 2006/07.

Factors affecting canal revenues include decreased shipping due to the global financial crisis and piracy off the eastern coast of Africa, as a result of which some shipping companies chose alternative routes.  In 2009, the Suez Canal Authority completed its project to deepen the width of the canal from an actual 53-foot draft to an actual 66-foot draft, allowing passage of fully-laden supertankers.  The Government is also working on the East Port Said development project, an initiative that includes the development of a deep-water port (to be financed through a Build Operate Transfer concession), a free trade zone, and an industrial city to capitalize on the strategic location of the Suez Canal.

The following table provides information relating to Suez Canal traffic for the periods indicated.

**Suez Canal Traffic**

|  | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| Number of vessels[1] | 18,224 | 18,664 | 20,384 | 21,415 | 17,228 |
| Vessels (*millions of tons*) | 672 | 743 | 848 | 910 | 734 |
| Receipts (*LE billions*)[2] | 20.2 | 23.4 | 24.1 | 28.7 | 26.8 |

_____
**Notes:**
(1)   Includes oil tankers and other vessels.
(2)   Receipts are for the fiscal year.

*Ports*

Egypt's navigable waterways total approximately 2,200 miles (excluding the Suez Canal).  Approximately 85% to 90% of Egypt's international trade travels through its ports.  Alexandria is the main port, with annual traffic of approximately 32.6 million tons.  Significant other major ports are Damietta, Port Said and Suez.  Total cargo handling capacity for all Egyptian ports is estimated at 97.5 million tons.

In 2002, Sokhna Port, which is located 25 miles south of Suez, opened. The port is operated by the privately-owned company Sokhna Port Development Company under a 25-year concession agreement with the Republic.

In November 2007, the Dubai port operator, DP World, acquired a 90% stake in Egyptian Container Handling Company for U.S.$670 million. Egyptian Container Handling Company is located at Sokhna port near the mouth of the Suez Canal and is expected to have a capacity of 1.2 million 20-foot-equivalent units by the end of 2010.

The Government is encouraging shippers to increase their reliance on the Nile River, with the aim of increasing cargo traffic from the current 2.5 million tons per year to 40 million tons in the next five years. This is a part of the Government's plan to encourage low-carbon shipping alternatives to reach a goal of 20% of the cargo transported in the Republic by Nile or rail by 2015. Private sector investors opened the Tanash river port in northern Cairo for use in the transport of imported wheat from Alexandria to silos in Cairo and various governorates. The 27,500 square meter Tanash port can receive up to 2 million tonnes of grain and goods, and 110,000 containers. Its quay wall is 3,200 meters in length. In addition to Tanash, a second port in southern Cairo and a third in Alexandria are being developed.

*Air transportation*

Egypt has six main international airports, which are located at Cairo, Borg-El-Arab (Alexandria), Hurghada, Luxor, Sharm El Sheikh and Aswan.

Cairo International Airport is Egypt's largest airport, and, as the second busiest airport in Africa, after Johannesburg's Tambo International Airport, in 2009 it served 14.3 million passengers and 65 passenger and 9 cargo airlines. In April 2008, the new Terminal 3 opened to commercial activity with the capacity to handle six million international and five million domestic passengers annually. Terminal 2, which was opened in 1986, is currently being upgraded to modernize the terminal and increase its passenger-handling capacity to 7.5 million per year. It is expected that this project will be completed in 2013.

EgyptAir, the national carrier and operates the largest number of flights out of the Cairo International Airport, was established in 1932 and started operation in 1933. Its fleet of 64 aircraft carries approximately 7.8 million passengers each year on a fleet that includes Airbus (A320, A330 and A340), Boeing (737 and 777) and Embraer (E-170 and E-300) aircraft, with an average age of 7.6 years, making it one of the industry's youngest fleets. It serves 70 destinations in 44 countries. In June 2007, a new subsidiary of EgyptAir, EgyptAir Express, began a low-cost, short-haul service from Cairo to Sharm El Sheikh, Hurgada, Luxor and Alexandria. EgyptAir joined the Star Alliance on July 17, 2008.

In 2008, EgyptAir's passenger traffic increased by 6% to 8.2 million passengers. The Government owns EgyptAir, but it is self-financed and receives no subsidy from the Government.

*Railways and the Cairo Metro*

The railway sector plays a significant role in the Egyptian economy and is an essential mode of transport for low-income citizens. The 3,200-mile-long network, 60% percent of which is concentrated in the Nile Delta and along the Nile Valley, serves the main activities and population centers in Egypt. Total traffic (passenger and freight) in 2005 amounted to 57 billion traffic units, which exceeded the combined traffic of railways in Algeria, Iran, Morocco and Turkey. Train fares in commuter trains and third class passenger trains are subsidized by the Government. See "Public Finance—Subsidies". The vast majority of engines are diesel-driven. While engines and rails are imported, passenger wagons are built and refurbished domestically.

In August 2006, two trains collided in the town of Qualioub, north of Cairo, killing 57 people. In September 2006, a passenger train collided with a freight train killing five people and injuring 30. In October 2009, two trains collided in the town of Al-Ayyat in the 6th of October Governorate, killing 18 people and injuring 36. Following these accidents, the Ministry of Transportation is in the process of upgrading Egypt's railway system with a projected budget of LE 5 billion of Government funds and LE 3.5 billion in bank loans. Proposed improvements include track renewal, upgrades to the signaling system, including the incorporation of GPS technology, and the purchase of new locomotives to replace its ageing fleet of 350 operational engines. In 2007, General Electric won a tender to supply Egyptian National Railways with 40 locomotives valued at U.S.$120 million, which is financed by a grant from the Qatari government. All of the new locomotives were delivered by August 2009.

The Cairo Metro, the first metro in Africa and the Middle East, opened in 1987 and currently operates two lines, Line 1 (27 miles (43 km) from Helwan to El Marg) with 33 stations and Line 2 (12 miles (19 km) from Shoubra El Kheima to Cairo University, with an extension to Giza) with 20 stations.  In October 2007, construction started on the first of four phases of a new Line 3, the total length of which will be 21 miles (38 km).  Upon completion of the first phase, Line 3 will link Attaba to Abbassiya, to be later followed by a second phase linking Abbassiya to Heliopolis.  Line 3 will ultimately extend from Imbaba in the northwest of Greater Cairo to the northeast at Heliopolis and will also serve Cairo International Airport.

*Roadways*

The Egyptian road network consists of approximately 27,000 miles of roadways.  As part of its scheme to improve the country's infrastructure, the Government continues to invest in highway and bridge systems.  A network of roads has been constructed to link Sinai to the Nile valley.  In addition, Upper Egypt and Lower Egypt have been connected through three vertical axial roads parallel to the Nile.  The Nile valley is also joined to the Red Sea coast through seven transversal roads. Ten bridges were constructed to connect the road network across the Nile at Beni Suef, Minya, Dessouk, Benha, Mansoura, Faraskour, Luxor, Asyut, Sherbeen and Meet Ghamr.

**Tourism**

Tourism contributed 3.5% to GDP in 2008/09 and is one of Egypt's principal sources of foreign exchange, generating approximately LE 34.4 billion in 2008/09, an increase of 6.3% compared to LE 32.4 billion for 2007/08.  Tourism benefits from historic sites which have been famous for centuries, including the Giza Pyramid Complex and its Great Sphinx, the southern city of Luxor and its Valley of the Kings and Karnak Temple as well as Egypt's warm climate.  The Red Sea is a popular tourist destination for diving, fishing and beach resorts, particularly in locations such as Ein-Sokhna, Taba, Hurgada, El-Gouna, Sharm El Sheikh and Marsa Allam.

Tourism has traditionally been an important source of foreign exchange, with 10 millions visits to Egypt each year, although the number of tourists and volume of tourism revenues have fallen in times of political instability.  In general, however, the number of tourists per year and the amount they spend in Egypt have risen.  Most foreign visitors come from Western Europe and from other Arab countries.  The Government is encouraging private sector development on the Mediterranean coast, especially at Sidi-Abdel Raham and Al-Alamein.

The following table sets forth information regarding tourism activities for the periods indicated.

**Tourism Activities**

|  | 2004/05 | 2005/06 | 2006/07 | 2007/08 |
|---|---|---|---|---|
| Total Arrivals *(in thousands)*........................................... | 8,650 | 8,693 | 9,788 | 10,706 |
| Total Number of Tourist Nights *(in thousands)*............... | 85,730 | 85,113 | 96,270 | 110,968 |
| Average Number of Nights *(per tourist)* ........................ | 12.2 | 10.4 | 9.8 | 10.4 |
| Tourism Income *(U.S.$ millions)* .................................... | 6,430 | 7,235 | 8,183 | 10,827 |
| Tourism Income per Night *(U.S.$)* .................................. | 75 | 85 | 85 | 98 |

*Source:  Ministry of Tourism.*

Notes:
(1)       Total number of tourist nights divided by total departures.

The total number of tourist nights during 2007/08 was approximately 111.0 million, as compared to 96.3 million during 2006/07, and increase of 15.3%.  Tourism income was U.S.$10.8 billion in 2007/08, as compared to U.S.$8.2 billion in 2006/07, an increase of U.S.$2.6 billion, or 32.3%

Tourism in Egypt is affected by tensions in the Middle East.  For example, tourism declined following a violent incident in Luxor in 1997, the attacks in Sharm el-Sheikh and Cairo in 2005, the attack in the Sinai resort city of Dahab in April 2006 in which 23 people were killed and the February 2009 killing of a French holidaymaker in Al Azhar.  Following such attacks, the tourism sector has typically recovered quickly.  The Ministry of Interior is taking measures to prevent the recurrence of attacks of this kind, such as upgrading its surveillance infrastructure and increasing its security presence in and around major tourist areas, hotels, airports and museums.

*Insurance*

The insurance sector is dominated by the state. Total insurance premiums represent 1.1% of GDP, as compared to 2.3% of GDP in other middle-income countries. The Government believes that it has growth potential, considering the low insurance density (premium per capita) and low penetration rate (premiums per gross domestic product). Insurance density in Egypt increased by 25.7% in 2008, reaching U.S.$18.1, compared to U.S.$14.4 in 2007.

For the period July-September 2009, insurance premium volumes amounted to LE 1,716 billion, representing an increase of 27.7% from the comparable period, during which insurance premiums amounted to LE 1,344 billion for the quarter ended September 30, 2008. In addition, LE 888.8 million were generated by life insurance business and LE 827.5 million by non-life business.

The following table sets forth information regarding the insurance market for the periods indicated.

**Premiums and Market Shares**

| | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09 |
|---|---|---|---|---|---|
| | | | (LE millions) | | |
| Public Sector Companies............................................ | 3,016 | 2,993 | 3,145 | 3,633 | 3,857 |
| Egyptian Private Sector Companies ............................. | 433 | 505 | 398 | 1,039 | 865 |
| Foreign Private Sector Companies ............................... | 840 | 1,093 | 2,086 | 2,777 | 2,717 |
| **Total**............................................................................ | 4,289 | 4,591 | 5,629 | 7,449 | 7,439 |

*Source: Egyptian Insurance Supervisory Authority.*

A total of 29 insurance and re-insurance companies operate in Egypt, including five companies offering life, property and casualty insurance, nine companies offering property and casualty insurance, six companies offering life insurance, four companies offering property and casualty cooperation insurance, a single cooperative insurance association and a single export insurance company, as well as 638 private insurance funds.

*Insurance company consolidation*

In August 2007, the Government approved a plan to merge three of the four public insurance companies. Accordingly, El-Chark Insurance and Egypt-Re will be merged into Misr Insurance. (It is expected that Al-Ahlia Insurance will remain independent of Misr Insurance and state-owned.) The merger process began in December 2007 and was completed in 2008. The merger resulted in the creation of one of the five largest insurers in the region, with a combined book value of LE 2 billion and assets of LE 45 billion.

*Foreign insurance companies*

Since 1998, restrictions on foreign ownership have been abolished. Many foreign insurers, such as ACE, AIG, Allianz, BUPA and Sogecap have entered the Egyptian insurance market and currently there are four companies in the process of being licensed to offer Islamic (*Takaful*) insurance. Two of these companies have already obtained the initial license and have started up.

*Insurance regulation reform*

In order to increase competition in the market, stimulate demand and provide customers with high quality insurance products, rate regulation by the supervisory authority was abolished in 2000. There has also been a gradual reduction in compulsory reinsurance cessions up to 2003.

In addition, an internal control committee has been set up in each insurance and reinsurance company to adopt principles of corporate governance which comply with international standards.

The Government and the Ministry of Investment have made efforts to implement measures aimed at developing the insurance sector.  The reform project has four main pillars:

- updating the insurance regulatory and supervisory regime;

- upgrading the private pension regulatory and supervisory regime, including outsourcing to professional managers;

- moving towards a more liberalized insurance market; and

- reforming policy for third-party liability insurance

The Government's non-bank financial sector reform program focuses on insurance products aimed at small- and medium-sized enterprises ("**SMEs**"), micro-insurance in cooperation with international institutions, new legislation to promote private and optional pension funds and health care regulation.

*The Egyptian Financial Supervisory Authority*

The Egyptian Financial Supervisory Authority (the "**EFSA**") was established during 2009 to enhance supervision of non-bank financial institutions, including insurance companies, develop regulatory coordination and increase efficiency and competition among existing institutions.  See "Monetary System—The Establishment of the Egyptian Financial Services Authority".

### Telecommunications

*Fixed-line telephony*

Telecom Egypt is 80%-owned by the state and is the exclusive provider of fixed-line telephone services in Egypt.  Telecom Egypt conducted an IPO in 2005, selling 20% of its shares to domestic and international investors.

As at December 31, 2009, there were 10.5 million fixed line subscribers in Egypt, up from 4.9 million in 1999 and 10.4 million in 2005, but down from 11.4 million in 2008, which makes it the largest fixed line provider in the Middle East and Africa.  Although in recent years, the number of fixed line subscribers has remained relatively stagnant, the number of ADSL subscribers has been increasing rapidly, from 1,400 subscribers in 2003 to 424,400 subscribers in 2008 and 1,028,000 subscribers as at December 31, 2009.

*Mobile telephony*

As at December 2009, Egypt had three mobile phone operators, Mobinil, Vodafone Egypt and Etisalat.  Mobinil, which was established in 1998, was the first mobile phone operator in Egypt.  As at December 31, 2009, Mobinil had 25.4 million subscribers, Vodafone Egypt had 22.0 million subscribers and Etisalat had 11.0 million subscribers.  In March 2008, mobile number portability was introduced between the three mobile operators Mobinil, Vodafone, and Etisalat.

Mobinil is 71.3% owned by FT Orange Group and 28.8% owned by Orascom Telecom Holding SAE.  Vodafone Egypt is 54.9% owned by Vodafone, the UK-based mobile phone operator, and 44.7% owned by Telecom Egypt.  Etisalat Egypt is 66% owned by Etisalat UAE, 20% by Egypt Post and 10% by National Bank of Egypt

*Internet*

As at December 2009, there were 16.6 million internet users in Egypt, an increase of 232% since 2005. The internet penetration ratio reached 21.6% as at December 31, 2009, as compared to 18.0% in December 31, 2008. The Government sees the expansion of broadband access as a key driver for sustained growth and development in the telecommunications sector, in particular, and the economy, in general.

The following table sets forth information on the telecommunications sector in Egypt for the periods indicated.

### Telecommunications

| | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| **Fixed Services** | | | | | |
| Exchange capacity *(millions)* | 12.7 | 13.2 | 13.7 | 14.3 | 14.4 |
| Number of fixed line subscribers *(millions)* | 10.4 | 10.8 | 11.2 | 11.9 | 10.3 |
| Number of international connection circuits and links | 21,200 | 25,748 | 31,133 | 43,100 | 54,300 |
| **Mobile Phone** | | | | | |
| Number of mobile phone subscribers *(millions)* | 14.0 | 18.0 | 30.0 | 41.3 | 55.4 |
| Mobile service companies | 2 | 3 | 3 | 3 | 3 |
| **Internet Penetration** | | | | | |
| Internet capacity *(GB per second)* | 4.3 | 9.9 | 14.9 | 27.1 | 84.6 |
| Number of Internet users *(millions)* | 5.0 | 6.0 | 8.6 | 12.6 | 14.0 |

*Source: Ministry of Communications and Information Technology.*

### Environment

There has been a heightened level of interest and concern by the Government and the Egyptian population over environmental issues in recent years. This is due to increasing awareness of the value of Egypt's natural resources and the Government's desire to provide for the general welfare of the population. Law 4 of 1994 and its related regulations ("**Law 4**") provide for comprehensive regulation of land, air and water pollution, including the discharge of contaminants that may be emitted into the air or discharged into the waterways and the disposal of solid and hazardous waste. Law 4 provides incentives for compliance as well as penalties for non-compliance. The Agency for Environmental Affairs is responsible for the enforcement of Law 4. The Republic has also entered into 16 international conventions and treaties relating to environmental protection.

The Government is also promoting a national program to encourage water re-use and tree planting in order to increase forested areas by 27%. This program has been implemented in 16 governorates, and 5.7 million acres of trees have been planted to date.

In an effort to reduce air pollution in the urban areas, the Government has introduced emission control standards, zoning restrictions, controls on the use of pesticides, noise limits and standards for the maintenance of acceptable levels of radiation.

#### Nile River

The Government has identified the protection of the Nile River as an important priority and has taken various measures to reduce pollution in the Nile River such as establishing five stations to receive and treat waste from boats in Aswan, Asyut, Sohag, Menia and Cairo. Law 4 also regulates pollution of the marine environment generally, including coastal areas of the Red Sea, discharges of oil and hazardous materials and the disposal of sewage waste and rubbish.

### Employment and Labor

Egypt has the largest labor force in the Arab world. According to the 2006 Census, the portion of the population between the ages of 15 and 60 was 45 million and 31.8% of the population was under the age of 15. Approximately 26.7% of Egypt's labor force works in the agricultural sector, 50% in services and 23.3% in industry. The labor force was 25.3 million people as at December 31, 2009, as compared to 25.0 million people as at December 31, 2008. Approximately one-third of the population participates in the labor force. The labor force is 72.5% male and 27.5% female.

Because of the abundance of labor, wages in Egypt are generally low. The average wage for public and private sector employees is approximately U.S.$240 (LE 1,316) a month for a 6-day, 42-hour working week.

Workers are not required to join trade unions but may, if they wish. All workers belonging to a trade union are required to belong to the Egyptian Trade Union Federation, the only legally recognized labor federation.

The following table sets out trends in the labor force for the periods indicated.

## Employment

|  | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09 |
|---|---|---|---|---|---|
| Labor force *(millions)* | 21.8 | 21.8 | 23.4 | 24.6 | 25.0 |
| Employed *(millions)* | 19.3 | 19.7 | 21.3 | 22.6 | 22.7 |
| Unemployed *(millions)* | 2.5 | 2.1 | 2.1 | 2.1 | 2.4 |
| Unemployment rate *(%)* | 11.2 | 10.0 | 8.9 | 8.4 | 9.4 |

*Source: CAPMAS.*

The following table sets forth the number of workers by sector for the periods indicated.

## Number of Workers by Sector

|  | 2004/05 | 2005/06 | 2006/07 | 2007/08 |
|---|---|---|---|---|
|  | **(thousands of people)** | | | |
| Agriculture, irrigation & fishing | 5,243.0 | 5,333.0 | 5,427.0 | 5,545.0 |
| Mining and extractive industries | 76.5 | 90.4 | 105.5 | 121.0 |
| *Crude oil & Natural gas* | 48.0 | 60.5 | 75.0 | 90.0 |
| *Other mining* | 28.5 | 29.9 | 30.5 | 31.0 |
| Manufacturing | 2,435.0 | 2,537.5 | 2,652.5 | 2,799.8 |
| *Oil Products* | 35.0 | 37.5 | 40.5 | 43.8 |
| *Other manufacturing* | 2,400.0 | 2,500.0 | 2,612.0 | 2,756.0 |
| Electricity | 146.8 | 149.1 | 152.0 | 156.3 |
| Water | 126.3 | 128.0 | 130.0 | 135.8 |
| Construction & building | 1,475.0 | 1,525.0 | 1,580.0 | 1,640.0 |
| Transportation & communication | 893.4 | 926.4 | 971.8 | 1,020.0 |
| Suez Canal | 16.6 | 16.6 | 16.2 | 16.7 |
| Internal trade | 1,692.0 | 1,757.0 | 1,825.0 | 1,909.4 |
| Financial intermediaries & supporting services | 143.4 | 147.0 | 152.0 | 163.0 |
| Insurance & social security | 62.0 | 66.0 | 70.0 | 77.0 |
| Restaurants & hotels | 285.0 | 315.0 | 345.0 | 380.0 |
| Real estate activities | 632.0 | 647.0 | 664.0 | 692.0 |
| *Rent* | 262.0 | 270.0 | 279.0 | 292.0 |
| *Business services* | 370.0 | 377.0 | 385.0 | 400.0 |
| Government services | 4,636.0 | 4,685.0 | 4,726.0 | 4,756.0 |
| Education, health & other services | 1,140.0 | 1,217.0 | 1,303.0 | 1,398.0 |
| **Total** | **19,003.0** | **19,540.0** | **20,120.0** | **20,810.0** |

*Source: Ministry of Economic Development*

The following table sets forth weekly average wages for the periods indicated.

## Weekly Average Wages

|  | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
|  | **(LE)** | | | | |
| Public Sector | 232.0 | 257.0 | 303.0 | 308.0 | 406.0 |
| Private Sector | 175.0 | 168.0 | 172.0 | 214.0 | 275.0 |
| Overall | 190.0 | 207.0 | 229.0 | 252.0 | 329.0 |

*Source: CAPMAS.*

The following table sets forth labor force participation according to age and gender as at March 31, 2009.

**Labor Force Participation according to Age and Gender**

| Age Group | Gender | Labor Force | Out of Labor | Total |
|-----------|--------|-------------|--------------|-------|
| | | (%) | | (millions) |
| 15-19 | *Male* | 29.3 | 70.7 | 4,956 |
| | Female | 8.1 | 91.9 | 4,411 |
| 20-24 | *Male* | 67.2 | 32.8 | 4,890 |
| | Female | 32.1 | 67.9 | 3,490 |
| 25-29 | *Male* | 96.5 | 3.5 | 2,948 |
| | Female | 30.6 | 69.4 | 2,976 |
| 30-39 | *Male* | 99.3 | 0.7 | 4,344 |
| | Female | 28.3 | 71.7 | 5,210 |
| 40-49 | *Male* | 98.1 | 1.9 | 4,501 |
| | Female | 29.3 | 70.7 | 4,967 |
| 50-49 | *Male* | 91.3 | 8.7 | 3,624 |
| | Female | 24.9 | 75.1 | 3,540 |
| 60+ | *Male* | 62.0 | 38.0 | 1,719 |
| | Female | 10.9 | 89.1 | 1,312 |

*Source: CAPMAS.*

Statistics relating to employment and unemployment in Egypt are inherently unreliable for a variety of reasons. The definition of "employed" and "unemployed" are not comparable to international standards. Persons that are considered to be employed for purposes of unemployment statistics may nevertheless be underemployed, spending only a few hours a week at their job. Only a small proportion of unemployed workers actually register as being unemployed. Nevertheless, the statistical information in this Prospectus is included to illustrate in broad terms the dynamics of the unemployment situation in Egypt.

*Labor Law*

To comply with the standards of the International Labor Organization and other treaties, Egypt has enacted Labor Law No. 12 of 2003 (the "**Labor Law**"). The Labor Law is of general application to private, public sector and public business sector companies. This includes workers in mines and quarries and construction. However, it does not apply to government employees. Under the Labor Law, Egyptian workers are legally allowed to strike. During 2008, "dispute committees" were introduced to allow employers and employees to attempt to settle disputes amicably before further action is taken. The Labor Law has expanded the role of labor unions and collective agreements, and created certain bodies to carry out specific functions, including the:

- High Commission for Labor Planning, which sets general labor policies;

- National Commission for Wages, which sets minimum wages, with a minimum 7% annual increase of "basic salary" for social insurance purposes;

- High Commission for Human Resource Development, which sets the national policy for human resources development;

- High Advisory Commission for Safety and Occupational Health; and

- Labor Advisory Commission, which advises on labor-related laws, international treaties and to co-ordinate between relevant parties.

**Competition Law**

On January 17, 2005, the Parliament passed Law No. 3 of 2005 known as "the Protection of Competition and Anti-Monopoly Law" ("**Law 3**").  Law 3 was the first piece of legislation enacted in Egypt governing the competitive conduct of market participants.  Law 3 provides that economic activities may not be carried out in a manner "preventing, restricting or damaging free competition."  Certain practices are prohibited and sanctioned under Law 3.

**Poverty**

Poverty is prevalent in Egypt.  One of the Government's highest priorities is to reduce poverty by 15% by 2012 through the increase of expenditure on education, healthcare and social programs and to improve its existing subsidy system to more efficiently target its subsidies at low-income Egyptians.

# EXTERNAL SECTOR

**General**

Egypt's balance of payments declined from 2007/08 to 2008/09, registering a surplus of U.S.$5.4 billion in 2007/08, as compared to a deficit of U.S.$3.4 billion in 2008/09, principally due to the effects of the global financial crisis. The balance of payments recorded a surplus of U.S.$2.7 billion for the period from July to December 2009, as compared to an overall deficit of U.S.$0.5 billion for the period from July to December 2008.

The current account decreased from a U.S.$0.9 billion surplus in 2007/08 to a U.S.$4.4 billion deficit in 2008/09. The main contributors to this deficit were a U.S.$4.2 billion decrease in export proceeds, a U.S.$0.4 billion decrease of Suez Canal tolls and a U.S.$1.4 billion decrease in investment income.  There was a current account deficit of U.S.$1.3 billion for the period from July to December 2009, as compared to a deficit of U.S.$2.5 billion for the period from July to December 2008, representing a 48.9% reduction in the deficit over the period.

The capital and financial account resulted in a net inflow of U.S.$7.6 billion for 2007/08, as compared to U.S.$1.4 billion in 2008/09.  Foreign direct investment declined by U.S.$5.1 billion over the period and portfolio investment recorded a net outflow of U.S.$9.2 billion.  The capital and financial account recorded a net inflow of U.S.$3.3  billion for the period from July to December 2009, as compared to a net inflow of U.S.$2.0 billion for the period from July to December 2008.

Net international reserves decreased by U.S.$3.3 billion during 2008/09 to U.S.$31.3 billion at June 30, 2009, which represents 7.5 months of merchandise imports.  As at December 31, 2009, net international reserves increased to U.S.$34.2 billion, which represents 7.9 months of merchandise imports. Net international reserves were U.S.$34.5 billion as at the end of March 2010. For more information about net international reserves, see "Monetary System—Net International Reserves".

Net foreign assets held by Egyptian banks decreased by LE 49.6 billion, from LE 303.7 billion as at June 30, 2008 to LE 254.1 billion, as at June 30, 2009. On December 31, 2009, net foreign assets were LE 255.8 billion. Foreign currency deposits at Egyptian banks increased from U.S.$27.0 billion, as at June 30, 2007 to U.S.$29.8 billion and U.S.$30.5 billion, as at June 30, 2008 and June 30, 2009, respectively. As a result of the strengthening of the Egyptian Pound relative to the U.S. Dollar and the widening of the interest rate differential between the Egyptian Pound and the U.S. Dollar, foreign currency deposits as a percentage of total deposits decreased from 26.7% as at June 30, 2007, to 20.7% and 24.1%, as at June 30, 2008 and 2009, respectively.  For more information about banks in Egypt and the Egyptian monetary system, see "Monetary System".

 Egypt's gross external debt (public and private) as at December 31, 2009, was U.S.$33.3 billion, as compared to U.S.$32.1 billion, as at December 31, 2008, an increase of 3.7%.

The public sector is the major source of external debt, with an 81.9% share of such debt. Egypt's external debt (public and private) to GDP ratio declined to 17.0% at June 30, 2009, as compared to 20.1% at June 30, 2008.  For more information about the Republic's external debt, see "Public Sector Debt".

## Balance of Payments

The following table sets forth data on Egypt's balance of payments for the periods indicated.

### Balance of Payments[1]

| | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09[1] | Jul-Dec 2008 | Jul-Dec 2009[1] |
|---|---|---|---|---|---|---|---|
| | | | | (U.S.$ millions) | | | |
| Exports[2] | 13,833.4 | 18,455.1 | 22,017.5 | 29,355.8 | 25,168.9 | 13,596.3 | 11,516.7 |
| Imports | (24,192.8) | (30,441.0) | (38,308.1) | (52,771.2) | (50,342.2) | (28,223.8) | (23,445.9) |
| **Trade Balance** | **(10,359.4)** | **(11,985.9)** | **(16,290.6)** | **(23,415.4)** | **(25,173.3)** | **(14,627.5)** | **(11,929.2)** |
| **Services (net)[3]** | **7,842.2** | **8,190.7** | **11,498.3** | **14,966.1** | **12,502.4** | **7,466.2** | **6,284.3** |
| **Balance of Goods and Services** | **(2,517.2)** | **(3,795.2)** | **(4,792.3)** | **(8,449.3)** | **(12,670.9)** | **(7,161.3)** | **(5,644.9)** |
| Official Transfers (net) | 1,056.1 | 571.7 | 800.3 | 960.5 | 614.3 | 505.3 | 902.2 |
| Private Transfers (net) | 4,371.7 | 4,975.4 | 6,261.0 | 8,377.1 | 7,632.3 | 4,143.4 | 3,459.7 |
| **Total Transfers** | **5,427.8** | **5,547.1** | **7,061.3** | **9,337.6** | **8,246.6** | **4,648.7** | **4,361.9** |
| **Balance of Current Account** | **2,910.6** | **1,751.9** | **2,695.6** | **888.3** | **(4,424.3)** | **(2,512.6)** | **(1,283.0)** |
| Foreign Direct Investment (net)[4] | 3,901.8 | 6,111.4 | 11,053.2 | 13,236.5 | 8,133.4 | 4,027.6 | 2,625.8 |
| Portfolio Investment in Egypt (net)[5] | 831.1 | 2,764.0 | (936.7) | (1,373.6) | (9,210.7) | (7,387.3) | 1,563.7 |
| Net Borrowing | 1,000.6 | 1,425.8 | 2,039.1 | 1,178.0 | 348.2 | (180.8) | 1,587.1 |
| Medium and Long-Term Loans | (783.8) | (927.5) | (234.3) | (657.5) | (754.6) | (611.5) | (558.4) |
| Drawings | 727.0 | 795.6 | 1,780.4 | 1,008.6 | 1,095.2 | 299.3 | 323.0 |
| Repayments | (1,511.7) | (1,723.1) | (2,014.7) | (1,666.1) | (1,849.8) | (910.8) | (881.4) |
| Medium Term Suppliers' Credits | (525.8) | (101.2) | (191.5) | (143.6) | (456.5) | (447.3) | (3.5) |
| Drawings | 86.2 | 625.4 | 89.0 | 20.4 | 32.2 | 0.8 | 42.0 |
| Repayments | (612.0) | (726.6) | (280.5) | (164.0) | (488.7) | (448.1) | (45.5) |
| Short Term Suppliers' Credits (net) | 2,310.2 | 2,454.5 | 2,464.9 | 1,979.1 | 1,559.3 | 878.0 | 2,149.0 |
| Other Assets | (3,180.0) | (5,102.8) | (10,941.6) | (4,402.5) | 3,744.0 | 6,342.8 | (3,279.9) |
| Other Liabilities | 322.6 | (775.1) | 771.1 | 989.0 | 140.3 | 503.3 | 1,171.6 |
| **Capital and Financial Account** | **3,377.7** | **3,511.3** | **853.0** | **7,557.5** | **1,381.3** | **2,026.8** | **3,286.0** |
| Net Errors and Omissions | (1,810.6) | (2,009.8) | 2,160.3 | (3,025.4) | (334.6) | (61.0) | 648.3 |
| **Overall Balance** | **4,477.7** | **3,253.4** | **5,282.3** | **5,420.4** | **(3,377.6)** | **(546.8)** | **2,651.3** |
| Current Account/GDP (%) | 3.3 | 1.6 | 1.7 | 0.5 | (2.3) | (1.3) | (0.6) |
| Balance of Payments/GDP (%) | 5.0 | 3.0 | 4.1 | 3.3 | (1.8) | (0.3) | 1.2 |
| NIR[6] as Months of Imports (%) | 9.6 | 9.0 | 8.9 | 7.9 | 7.5 | 7.3 | 8.7 |

*Source: CBE.*

Notes:
(1) Preliminary data.
(2) Including petroleum and other exports.
(3) Includes transportation, travel, investment income, government expenditure and other receipts and payments.
(4) Includes foreign direct investment in the petroleum quarter.
(5) Fiscal year 2007/08 includes Egyptian-pound denominated Eurobonds (inflows), net foreign transactions in respect of Egyptian t-bills (inflows) and net foreign transactions in respect of certificates of deposit (outflows). Securities issued by the Government held by Egyptian institutions are excluded.
(6) Net International Reserves. See "Monetary System—Net International Reserves".

### *Current Account*

Although exports from Egypt have increased during the past five years from U.S.$13.8 billon in 2004/05 to U.S.$25.2 billion in 2008/09, an increase of U.S.$11.4 billion, or 82.6%, the trade deficit has widened during the same period from

U.S.$10.4 billion in 2004/05 to U.S.$25.2 billion, an increase of U.S.$14.8 billion, or 142.3%.  This increase is due to a 145.0% increase in imports, which increased from U.S.$24.2 billion in 2004/05 to U.S.$50.3 billion in 2008/09, an increase of U.S.$26.1 billion, or 108.7%, due to strong domestic demand, trade liberalization and a strengthening of the Egyptian Pound.  The effect of the trade deficit on the Republic's current account has been partially offset by increases in services and transfers income over the same period.

Export proceeds decreased by 14.3% from U.S.$29.4 billion in 2007/08 to U.S.$25.2 billion in 2008/09.  This decrease is primarily due to decreased petroleum exports, which declined by 24.1% (from U.S.$14.5 billion to U.S.$11.0 billion) over the period.

Services income decreased by 16.5% from U.S.$15.0 billion in 2007/08 to U.S.$12.5 billion in 2008/09. The main contributors to this decrease were a U.S.$0.4 billion (or 8.5%) decrease of Suez Canal tolls and a U.S.$1.4 billion (or 41.1%) decrease in investment income.

Net transfers decreased by 11.7% from U.S.$9.3 billion in 2007/08 to U.S.$8.2 billion in 2008/09.  This decrease is primarily due to decreased remittances from Egyptians working abroad due to the global financial crisis.

The following table sets forth data on gross private transfers flowing into the Republic.

### Gross Private Transfers

| | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09[1] |
|---|---|---|---|---|---|
| | | | (U.S.$ millions) | | |
| **Total Private Transfers (Gross)** .................................. | **4,330** | **5,034** | **6,321** | **8,559** | **7,806** |
| United States.................................................................. | 1,620 | 1,516 | 2,080 | 2,763 | 2,269 |
| Saudi Arabia.................................................................. | 726 | 776 | 859 | 959 | 976 |
| United Arab Emirates ..................................................... | 372 | 729 | 990 | 1,393 | 1,380 |
| Kuwait ........................................................................... | 589 | 923 | 1,106 | 1,797 | 1,594 |
| Germany ........................................................................ | 231 | 198 | 210 | 229 | 208 |
| United Kingdom ............................................................. | 169 | 147 | 236 | 268 | 482 |
| Switzerland.................................................................... | 103 | 143 | 261 | 256 | 213 |
| Other.............................................................................. | 521 | 601 | 580 | 895 | 683 |

*Source: CBE.*

_____
Note:
(1)     Preliminary data.


*Capital and Financial Account*

The Republic's capital and financial account declined from U.S.$7.6 billion in 2007/08 to U.S.$1.4 billion in 2008/09, a decrease of 81.6%, principally due to a decrease in foreign direct investment from U.S.$13.2 billion in 2007/08 to U.S.$8.1 billion in 2008/09, a decrease of U.S$5.1 billion, and an increase in net portfolio investment outflows from U.S.$1.4 billion in 2007/08 to U.S.$9.2 billion, an increase of U.S.$7.8 billion.

**Foreign Trade**

Foreign trade in Egypt has witnessed significant developments during recent years.  The Government has overhauled Egypt's customs legislation to streamline the process for importing and exporting goods.  A number of regulations and decrees have been introduced to improve inspection and control procedures, simplify documentation, reduce costs and delays, improve logistics and liberalize trade movements.

The number of customs procedures and approvals required to import or export goods has been reduced significantly.  In addition, the time taken to issue customs declaration forms has been reduced to 24 hours.  A "green route" allowing for the immediate release of imported/exported goods which meet certain criteria has also been introduced.

To ensure that customs legislation is implemented effectively and efficiently, a new "one stop" control point for export and import licensing and the release of consignments has been established through the General Authority for Export and Import Control and the Customs Authority (departments of the Ministry of Trade and Industry and the Ministry of Finance, respectively) in collaboration with other ministries and agencies.

44

As a result, in part, of this liberalization of foreign trade, total trade in goods, both imports and exports, has increased every year since 2002/03.  Total trade increased from LE 38.0 billion in 2004/05 to LE 48.9 billion in 2005/06, LE 60.3 billion in 2006/07 and LE 82.2 billion in 2007/08 before declining to LE 75.5 billion in 2008/09.  This represents increases of LE 10.9 billion (or 28.7%) in 2005/06, as compared to 2004/05, LE 11.4 billion (or 23.3%) in 2006/07, as compared to 2004/06, and LE 21.9 billion (or 36.3%) in 2007/08, as compared to 2006/07, and a decrease of LE 6.7 billion (or 8.2%) in 2008/09, as compared to 2007/08.  Over the period 2004/05 to 2008/09, imports have generally grown faster than imports (108.0% over the period for imports, as compared to 81.9% for exports).

*Exports*

The following table sets forth the value of products exported for the periods indicated.

### Exports by Product[1]

|  | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09 |
|---|---|---|---|---|---|
|  |  | | (U.S.$ billions) | | |
| **Fuel Exports**............................................ | **5.5** | **10.4** | **10.3** | **14.8** | **11.4** |
| Crude Petroleum.................................... | 2.0 | 3.2 | 3.1 | 4.9 | 4.0 |
| Petroleum products[2]............................. | 3.4 | 7.0 | 7.0 | 9.6 | 7.0 |
| **Non-Fuel Exports** ................................. | **6.9** | **7.1** | **10.2** | **13.8** | **13.4** |
| Raw Materials........................................ | 0.7 | 0.7 | 0.7 | 1.1 | 0.9 |
| Semi-finished goods .............................. | 0.8 | 1.2 | 2.0 | 1.8 | 1.9 |
| Finished goods ....................................... | 5.3 | 5.2 | 7.5 | 10.9 | 10.6 |
| **Other Exports**[3] ..................................... | **1.5** | **1.0** | **1.5** | **0.7** | **0.4** |
| **Total Exports** ........................................ | **13.8** | **18.5** | **22.0** | **29.4** | **25.2** |

*Source:  CBE.*

Notes:
(1)    According to the Harmonized System Coding (Degree of Processing).
(2)    Including gas and bunker and jet fuel.
(3)    Including exports of Free Zones.

As a result of increased investment in the Egyptian economy and the Government's trade liberalization policies, total exports increased 34.1% in 2005/06, 18.9% in 2006/07 and 33.6% in 2007/08, before declining by 14.3% in 2008/09 due to the global financial crisis.

The following tables set forth the destination of exports from Egypt for the periods indicated.

### Destinations of Egyptian Exports

|  | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09 |
|---|---|---|---|---|---|
|  |  | | (U.S.$ billions) | | |
| European Union............................................... | 5.1 | 7.0 | 7.4 | 9.8 | 8.5 |
| United States ................................................... | 4.6 | 5.6 | 6.9 | 9.3 | 6.4 |
| Arab countries ................................................. | 1.6 | 2.1 | 2.7 | 3.2 | 3.9 |
| Asian countries (excluding Arab countries) .... | 1.4 | 2.1 | 3.0 | 4.4 | 3.1 |
| Other European countries ................................ | 0.8 | 1.0 | 1.0 | 1.3 | 0.9 |
| African countries (excluding Arab countries).. | 0.2 | 0.3 | 0.3 | 0.8 | 0.6 |
| Commonwealth of Independent States[1] .......... | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 |
| Other countries[2] ............................................. | 0.1 | 0.3 | 0.5 | 0.4 | 1.5 |
| **Total Exports** ............................................... | **13.8** | **18.5** | **22.0** | **29.4** | **25.2** |

*Source:  CBE.*

Notes:
(1)    Includes Russia.
(2)    Including exports of Free Zones.

In 2008/09, the European Union was the largest importer of Egyptian goods, purchasing 33.7% of Egyptian exports. The United States was Egypt's second largest trading partner purchasing 25.4% of Egyptian exports, followed by the other Arab countries, with 15.5%, and Asian countries, with 12.3%.

## *Imports*

The following table sets forth the levels of Egyptian imports by product for the periods indicated.

### Imports by Product[1]

| | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09 |
|---|---|---|---|---|---|
| | | | (U.S.$ billions) | | |
| **Fuel Imports**............ | **2.5** | **2.6** | **2.8** | **4.9** | **4.9** |
| Petroleum products[2].................. | 2.3 | 2.5 | 2.6 | 4.5 | 4.4 |
| Coal and types thereof................ | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 |
| **Non-Fuel Imports** ............ | **19.2** | **25.0** | **31.3** | **45.5** | **42.9** |
| Raw Materials ................... | 4.3 | 5.2 | 5.6 | 9.7 | 6.5 |
| Intermediate Goods ............. | 7.2 | 9.2 | 11.4 | 16.8 | 16.7 |
| Investment Goods ............... | 4.5 | 7.0 | 9.0 | 10.4 | 10.2 |
| Consumer Goods ............... | 3.2 | 3.5 | 5.3 | 8.5 | 9.6 |
| **Other Imports**[3] ............ | **2.5** | **2.8** | **4.2** | **2.4** | **2.5** |
| **Total Imports** ............ | **24.2** | **30.4** | **38.3** | **52.8** | **50.3** |

*Source: CBE.*

Notes:
(1)   According to The Harmonized System Coding (H.S.C.) (Degree of Use).
(2)   Including gas and bunker and jet fuel.
(3)   Including imports of Free Zones, and commodity grants and loans.

The trade liberalization policies adopted by the Government and general economic growth have resulted in an increase in international imports. Total imports increased 25.6% in 2005/06, 26.0% in 2006/07 and 37.9% in 2007/08, before declining by 4.7% in 2008/09, due to the global financial crisis.

The following table sets forth the origin of Egyptian imports for the periods indicated.

### Origins of Egyptian Imports

| | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09 |
|---|---|---|---|---|---|
| | | | (U.S.$ billions) | | |
| European Union................ | 7.9 | 11.3 | 13.0 | 18.0 | 18.8 |
| United States ................ | 5.2 | 5.7 | 8.2 | 9.8 | 7.5 |
| Asian countries (excluding Arab countries) ...... | 3.6 | 4.4 | 6.0 | 9.9 | 9.5 |
| Arab countries ................ | 2.1 | 2.7 | 3.2 | 5.5 | 4.8 |
| Other European countries ................ | 2.0 | 2.3 | 3.2 | 4.1 | 5.4 |
| Commonwealth of Independent States[1] .......... | 0.6 | 0.7 | 0.7 | 1.7 | 1.6 |
| African countries (excluding Arab countries)............ | 0.2 | 0.2 | 0.3 | 0.4 | 0.4 |
| Other countries ................ | 2.6 | 2.7 | 3.6 | 3.4 | 2.3 |
| **Total Imports**[2] ................ | **24.2** | **30.4** | **38.3** | **52.8** | **50.3** |

*Source: CBE.*

Notes:
(1)   Includes Russia.
(2)   Including imports of Free Zones.

In 2008/09, the European Union was the largest source of exporter of goods into Egypt, accounting for 37.4% of imports into Egypt.  Asian countries followed the European Union, with 16.9%, followed by the United States, with 14.9%, and Arab countries, with 9.5%.

The following table sets forth the transactions with the Egyptian Free Zones with the rest of the world.

### Free Zones Transactions with the Rest of the World

|  | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09 |
|---|---|---|---|---|---|
|  |  |  | (U.S.$ billions) |  |  |
| Exports to the Rest of the World | 1.9 | 2.9 | 4.3 | 4.6 | 6.6 |
| Imports to the Rest of the World | 2.7 | 4.4 | 4.1 | 4.8 | 8.0 |
| Net Transactions | (0.8) | (1.5) | 0.2 | (0.2) | (1.4) |

*Source: General Authority for Investment & Free Zones.*

### Foreign Direct Investment

Since 2004, the Government has introduced major reforms in business and investment policy.  The Government has addressed major constraints historically affecting inward investment in Egypt.  The General Authority for Investment and Free Zones has streamlined the procedures for inward investment thereby establishing a favorable investment climate which, among other factors, has helped to attract increased inflows of FDI which supports accelerated economic growth.

In 2008/09, overseas investment in Egypt's petroleum sector accounted for 68.8% of all FDI, up from 30.0% and 27.3% in 2005/06 and 2007/08, respectively.  In contrast, FDI in non-petroleum sectors of the economy decreased to U.S.$1.3 billion in 2008/09 from U.S.$4.3 billion and U.S.$8.0 billion in 2005/06 and 2006/07, respectively.

Net FDI inflows increased from U.S.$428 million in 2001/02 (0.55% of GDP) to U.S.$11.1 billion in 2006/07 (8.5% of GDP) and U.S.$13.2 billion in 2007/08 (8.2% of GDP), before declining to U.S.$8.1 billion in 2008/09 (4.3% of GDP).

According to the *International Investment Report 2008*, published by the U.N. Conference on Trade and Development, Egypt ranked first in North Africa and second in Africa in attracting foreign direct investment.  Egypt ranks twentieth (out of 141) in the most recent Inward FDI Performance Index published by the U.N. Conference on Trade and Development in 2008 for the period 2005-07.

The following table sets out total foreign direct investment and the countries of origin for the periods indicated.

### Net Foreign Direct Investment by Country

| | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09[1] |
|---|---|---|---|---|---|
| | | | (U.S.$ millions) | | |
| **Total Net Foreign Direct Investment** | **3,901.8** | **6,111.4** | **11,053.2** | **13,236.5** | **8,113.4** |
| **Inflows** | **4,134.5** | **9,098.0** | **13,084.0** | **17,802.2** | **12,836.1** |
| United States | 2,040.1 | 4,553.5 | 4,681.3 | 6,447.8 | 3,515.0 |
| United Kingdom | 50.1 | 1,724.7 | 2,209.6 | 3,239.3 | 3,231.8 |
| France | 338.8 | 565.7 | 36.7 | 1,302.7 | 254.3 |
| Spain | 5.2 | 361.4 | 6.7 | 20.8 | 27.0 |
| Germany | 42.0 | 113.6 | 97.2 | 250.3 | 102.6 |
| Saudi Arabia | 32.4 | 99.0 | 204.0 | 365.4 | 514.1 |
| Switzerland | 40.3 | 78.3 | 49.4 | 236.0 | 154.6 |
| Kuwait | 17.2 | 72.5 | 24.8 | 1,597.2 | 118.0 |
| Bahrain | 29.5 | 65.6 | 18.6 | 39.5 | 20.5 |
| United Arab Emirates | 40.6 | 63.0 | 3,049.5 | 726.2 | 1,037.4 |
| Netherlands | 218.9 | 8.4 | 39.6 | 55.7 | 134.0 |
| Oman | 70.1 | 0.0 | 1.2 | 4.9 | 11.1 |
| Others | 1,209.3 | 1,392.2 | 2,665.7 | 3,516.3 | 3,715.7 |
| **Outflows**[2] | **(232.7)** | **(2,986.5)** | **(2,031.1)** | **(4,565.7)** | **(4,722.7)** |

*Source: CBE*

_____

**Notes:**
(1)    Preliminary data.
(2)    Including cost recovery and profit sharing related to international oil and gas companies.

# MONETARY SYSTEM

**Central Bank of Egypt**

The Central Bank of Egypt (the "**CBE**"), founded in 1961, is an autonomous public legal entity governed by Law No. 88 of 2003, which outlines the CBE's authority and responsibilities.  The CBE is the issuer of all Egyptian currency and banknotes.  It is responsible for formulating and implementing monetary, credit and banking policy, maintaining price stability, managing the Republic's gold and foreign reserves and regulating and supervising the banking sector.

*Monetary Policy*

Since 2005, the CBE has taken active steps to modernize its monetary policy formulation and operations. Several institutional and operational changes have been initiated to facilitate monetary policy formulation and assessment and provide the foundations for formally adopting an inflation-targeting regime once certain conditions have been met.

*Institutional changes*

- The Coordinating Council on Monetary Policy, headed by the Prime Minister, was established in January 2005 to enhance consistency between monetary and fiscal policy.

- A Monetary Policy Committee ("**MPC**") has been established.  It convenes every six weeks to decide on appropriate actions with respect to key policy rates.  The MPC consists of nine members including the CBE's governor and two deputy governors.  To enhance transparency, the MPC's decisions are communicated to the market through a monetary policy statement, which is released on the CBE's external web-site following each MPC meeting.

*Operational changes*

- In December 2004, the CBE formally launched an online interbank system for foreign exchange trading, consolidating the supply of foreign exchange in the banking system whereby most banks became capable of satisfying their clients' foreign exchange needs, eroding the unofficial foreign exchange market and causing the Egyptian Pound to appreciate against the U.S. Dollar.

- In June 2005, the CBE introduced an interest rate corridor for the CBE's two standing facilities, the overnight lending and a deposit facility.  The interest rates on the two standing facilities define the ceiling and floor of the corridor.  By setting the rates on the standing facilities, the MPC determines the corridor within which the overnight rate can fluctuate.  Steering the overnight rate within this interest rate corridor is the operational target of the CBE.

- In October 2009, the CBE introduced a new core inflation index derived from the CPI index published monthly by CAPMAS, but which excludes fruit and vegetable prices, which largely depend on volatile weather and harvest conditions, and administered prices. The index has helped the CBE better communicate it views on underlying inflationary pressures. The new index is expected to serve as an important tool in efforts to prevent inflationary spill-over from food and certain energy price volatility. The CBE also launched a specialized monetary policy page on its website and plans to introduce a periodical Monetary Policy Report in 2010.

**The Egyptian Banking Sector and Reform**

The CBE has been implementing the banking sector reform program launched by the Government in September 2004. Since then, significant progress has been made in the banking sector, foreign exchange market and monetary policy. Improvements have included the consolidation of the banking sector, the divesture of state-owned banks' stakes in joint venture banks, the strengthening of the capital base of Egyptian banks, the sale of 80% of Bank of Alexandria to Italy's Intesa Sanpaolo Group, the ongoing restructuring of the remaining state-owned banks, and the strengthening of the supervisory capacity of the CBE.

In 2002, the banking sector was comprised of seven fully state-owned banks (including four commercial banks, a real estate bank, an industrial development bank and an agricultural bank) and 50 private banks (of which 25 were foreign majority-owned, including 15 branches of foreign banks).  Subsequent banking reform has been primarily driven by an increase in the minimum capital requirement for banks from LE 100 million to LE 500 million, leading to a structural change in Egypt's banking sector.  The number of banks decreased from 52 banks in December 2004 to 39 banks in December 2009. This change is reflected in an increase in the banking sector's total net worth, which has doubled from approximately LE 30 billion in 2004 to approximately LE 70 billion in 2009. The total number of branches increased from 2,841 in 2004 to 3,443 in 2009.

The following table sets forth statistics regarding the Egyptian banking sector, as at June 30, for the years indicated.

### Structure of the Egyptian Banking System

| | 2005 | | 2006 | | 2007 | | 2008 | | 2009 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | *Banks* | *Branches* | *Banks* | *Branches* | *Banks* | *Branches* | *Banks* | *Branches* | *Banks* | *Branches* |
| Public Sector Banks..... | 7 | 2,185 | 7 | 2,222 | 6 | 2,074 | 6 | 2,089 | 5 | 2,088 |
| Private Sector Banks.... | 34 | 607 | 29 | 674 | 28 | 930 | 27 | 1,145 | 27 | 1,270 |
| Private and Joint Venture Banks ............. | 11 | 49 | 7 | 48 | 7 | 52 | 7 | 63 | 7 | 85 |
| **Total**........................... | **52** | **2,841** | **43** | **2,944** | **41** | **3,056** | **40** | **3,297** | **39** | **3,443** |

*Source: CBE*

The divesture of stakes in joint venture banks has had a positive impact on Egypt's banking sector by bringing about the entry of a number of European and regional banks (such as Intesa Sanpaolo, Piraeus Bank, and Union National Bank). International banks which were already active in the Egyptian banking sector (such as Crédit Agricole, Barclays Bank and Société Générale) have consolidated their positions in the market either through new acquisitions or through raising their shareholdings in their existing Egyptian subsidiaries.

The Government believes that its ongoing banking sector reform program, including the strengthening of banking supervision and regulation and a continuing effort to reduce non-performing loans, has aided the Republic's banking system in withstanding the external shock of the global financial crisis, enhanced competition in the banking industry and created a healthier business environment.

The following table sets forth the aggregate financial position of banks for the periods indicated.

**Aggregate Financial Position of Banks**

| | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09 |
|---|---|---|---|---|---|
| | | | (LE millions) | | |
| **Assets** | | | | | |
| Cash | 6,594 | 6,813 | 7,705 | 10,261 | 11,128 |
| Securities and Investments | | | | | |
| *Treasuries* | 170,659 | 172,402 | 158,481 | 201,858 | 332,597 |
| *CBE Notes & Certificates of Deposit* | — | 21,563 | 17,617 | — | — |
| Balances with Domestic Banks | 124,986 | 121,695 | 217,363 | 278,185 | 173,482 |
| Balances with Foreign Banks | 51,204 | 72,554 | 124,366 | 122,792 | 77,120 |
| Loans and Discount Balances | 308,195 | 324,041 | 353,746 | 401,425 | 429,957 |
| Other Assets | 41,990 | 42,494 | 58,645 | 68,790 | 67,709 |
| **Total Assets** | **703,628** | **761,562** | **937,923** | **1,083,311** | **1,091,993** |
| | | | | | |
| **Liabilities and Capital** | | | | | |
| Capital | 22,949 | 27,112 | 33,037 | 37,576 | 41,550 |
| Reserves | 12,419 | 13,418 | 12,552 | 19,763 | 21,371 |
| Provisions | 49,541 | 54,950 | 53,469 | 62,314 | 69,748 |
| Long-Term Loans and Bonds | 14,254 | 17,526 | 26,351 | 22,285 | 22,045 |
| Obligations to Domestic Banks | 22,671 | 21,488 | 82,619 | 98,699 | 31,004 |
| Obligations to Foreign Banks | 12,262 | 8,770 | 10,006 | 13,327 | 18,195 |
| Total Deposits | 519,649 | 568,841 | 649,953 | 747,199 | 809,694 |
| Other Liabilities | 49,883 | 49,457 | 69,936 | 82,148 | 78,386 |
| **Total Liabilities** | **703,628** | **761,562** | **937,923** | **1,083,311** | **1,091,993** |

*Source: CBE.*

The following table sets forth the composition of deposits with all domestically operating banks for the periods indicated.

**Bank Deposits**

| | As at June 30 | | | | |
|---|---|---|---|---|---|
| | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09 |
| **Total Deposits** | **519,649** | **568,841** | **649,953** | **747,199** | **809,694** |
| *Demand Deposits* | 51,557 | 62,431 | 78,759 | 100,569 | 102,852 |
| *Time and Saving Deposits* | 445,132 | 479,805 | 542,982 | 612,737 | 673,048 |
| *Blocked or retained deposits* | 22,960 | 26,605 | 28,212 | 33,893 | 33,794 |
| | | | | | |
| **Local Currency Deposits** | **369,067** | **401,143** | **463,320** | **552,080** | **598,586** |
| *Demand Deposits* | 31,606 | 41,793 | 50,366 | 71,971 | 69,261 |
| *Time and Saving deposits* | 324,664 | 345,953 | 396,351 | 460,285 | 509,156 |
| *Blocked or retained deposits* | 12,797 | 13,397 | 16,603 | 19,824 | 20,169 |
| | | | | | |
| **Foreign Currencies Deposits** | **150,582** | **167,698** | **186,633** | **195,119** | **211,108** |
| *Demand Deposits* | 19,951 | 20,638 | 28,393 | 28,598 | 33,591 |
| *Time and Saving deposits* | 120,468 | 133,852 | 146,631 | 152,452 | 163,892 |
| *Blocked or retained deposits* | 10,163 | 13,208 | 11,609 | 14,069 | 13,625 |

*Source: CBE*

### *Non-Performing Loans*

A significant achievement of the current Government has been the reduction of outstanding debt owed by 164 public sector enterprises to the four public sector banks. Outstanding non-performing public-sector loans of approximately LE 31.5 billion have been reduced as a result of an agreement between the Ministry of Finance, the CBE and the Ministry of Investments, involving cash contributions. The remaining balance of approximately LE 4 billion is expected to be settled

during 2010.  Bank of Alexandria, received a cash contribution from the Ministry of Finance of approximately LE 6.9 billion prior to its acquisition by Intesa Sanpaolo Group.  Moreover, a cash settlement amounting to LE 9.1 billion was made in December 2006 to partially settle non-performing public sector loans to Banque Misr, National Bank of Egypt and Banque du Caire. The remaining balance is expected to be settled during 2010. This comprehensive settlement led to an immediate reduction in interest expenses charged to the relevant public sector enterprises, bringing further stability to these enterprises' operations and balance sheets.

### Banking Supervision

The objective of the Banking Supervision unit at the CBE is to maintain the financial stability of the banking system as well as the soundness of banks operating in Egypt.  The Banking Supervision unit aims to achieve this objective through on-site and off-site supervision, macro prudential surveillance and by implementing a risk-based approach to supervision.

In 2009, the CBE signed a protocol with the European Central Bank and seven European national central banks to assist the Banking Supervision Unit in the implementation of the Basel II framework in the Egyptian banking sector with the aims of improving risk and capital management and encouraging financial stability.

Reporting of prudential requirements, periodical financial data and credit registry data by banks takes place via electronic linkage between banks and the CBE.  The first private credit bureau, I-Score, which was established by 27 Egyptian banks and the Social Development Fund and commenced its operations in the first quarter of 2008, provides credit information on natural persons and SMEs to its members, including financial institutions, mortgage lenders, credit card companies and mobile phone operators.

The key regulations currently imposed by the CBE on the banking sector include:

- *Capital requirement*:  The minimum requirement for paid up capital is LE 500 million for domestic banks and U.S.$50 million for branches of foreign banks.

- *Capital Adequacy*:  Banks are required to maintain a capital base (Tier I and Tier II) of at least 10% of risk weighted assets.

- *Reserve Requirements*:  Banks are required to maintain with the CBE, 14% of banks' deposits in local currency and 10% of banks' deposits in foreign currency.  Local currency reserves are non-interest bearing, while foreign currency deposits receive interest at the London Interbank Bid Rate.

- *Liquidity Requirements*:  Banks must comply with a liquidity ratio of not less than 20% on the local portion deposits and 25% in respect of foreign portion.

- *Exposure Limits*:  A bank's long or short position in any one currency must not exceed 10% of its capital base, while the total short or long positions in all currencies must not exceed 20% of the capital base.

- *Asset Classification and Provisioning*:  Instruction concerning asset classification and provisioning issued in 1991 were replaced by regulations issued by CBE in May 2005, to be adopted by banks as at December 2005.   These regulations include standards for creditworthiness and provisioning, taking into consideration the obligor risk rating (ORR) for loans granted to business organizations, grading the credit risk inherent to the customer into ten categories, and required provision (0% to 5% as general provision, and 20%, 50%, 100% as specific provision).  The regulations allow some collateral to be taken under specific conditions and include standards for consumer and SME lending and provisioning.

- *Credit Exposure Limits*:  Exposure to a single borrower and his related parties was amended in February 2006 to 20% and 25%, respectively compared to 30% in the past.  Total exposures exceeding 10% of a bank's capital base should not exceed 8 times its capital base.

Current exposure limits to connected parties are as follows:

- Banks are not allowed to grant any type of credit facilities or guarantees to board of directors, external auditors and their connected parties.

- The same applies to major shareholders who are not represented on the board and their connected parties.

- As for major legal shareholders not represented on the board:

  o   For public companies, the exposure should not exceed 5% of a bank's capital base and the total exposures to these companies should not exceed 10% of a bank's capital base.

  o   For private companies, the exposure should not exceed 2% of a bank's capital base and the total exposures to these companies should not exceed 5% of a bank's capital base.

- Bank management other than board members and a bank's subsidiaries are treated on an arms'-length basis.

*Bank placements/exposure with correspondents*

Bank placements and exposure (excluding branches of foreign banks) with a single correspondent abroad should not exceed 10% of total placements and exposures with correspondents or U.S.$3 million, whichever is larger taking into account that total placements and exposures should not exceed 40% of a bank's capital base.

*Equity Participation*

Banks can own up to 40% of the issued capital in non-financial companies and 100% of financial companies.  The total value of these shares must not exceed a bank's total capital base.

*Developer and Acquisition Finance*

Among other specified general rules, banks are required to increase the risk weights applicable to high risk transactions such as developer finance and acquisition finance.

*SMEs*

As part of the banking sector reform in Egypt, an initiative was launched to enhance access to finance with a special focus on SMEs. Accordingly, the CBE's Board of Directors' issued a decree in December 2008 exempting direct finance to certain SMEs from the reserve requirements and enhancing coordination between the relevant authorities.

*Banking Sector Reporting Guidelines*

In December 2008, the CBE issued new guidelines requiring banks to prepare their financial statements in accordance with IFRS.

*Ownership in Banks*

The CBE's written consent is required to acquire a stake greater than 10% in an Egyptian bank, and the CBE must be notified if ownership exceeds 5%.

*Anti Money-Laundering Measures*

Banks must know the identities and the legal status of their customers and report all suspicious transactions to the CBE. Each bank must appoint a compliance officer to ensure the effective application of the laws and to assess the effectiveness of such bank's anti-money laundering system.

**Inflation and Interest Rates**

Inflation, as measured by the CPI, has increased from 3.1% in December 2005 to 13.2% in December 2009.  In March 2010, inflation was 12.2%, as compared to 12.8% in February 2010 and 13.6% in January 2010.  Core inflation, which does not take fruit and vegetable and regulated prices into account, was 7.4% in December 2009. This decrease was primarily a result of lower food prices, in general, and lower fruit and vegetable prices, in particular, which have been driving increases in

inflation since February 2009. In addition to the foregoing, recent increases in the inflation rate are due, in part, to the increase in prices of certain domestic energy products and higher external demand for selected agricultural goods (including fruits and vegetables) coinciding with a decline in domestic supply of these goods.

The CBE's recent assessment of the Egyptian economy has been that risks to the domestic growth outlook were decreasing while inflationary pressures were largely reduced. Against this background, the CBE has eased monetary policy in 2009 by cutting the overnight lending rate and overnight deposit rate six times by a cumulative 3.3% and 3.8%, respectively, with the most recent cut in September 2009. The discount rate was cut by 3.0% in 2009.

The following table shows annual inflation rates as measured by the CPI for the twelve months ended in the month indicated year-on-year.

### Inflation—Twelve Months Percentage Change

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| January | 9.6 | 3.4 | 12.5 | 10.5 | 14.3 | 13.6 |
| February | 6.9 | 4.0 | 12.8 | 12.1 | 13.5 | 12.8 |
| March | 5.6 | 3.7 | 13.0 | 14.4 | 12.1 | 12.2 |
| April | 4.7 | 4.4 | 11.6 | 16.4 | 11.7 | – |
| May | 5.1 | 5.3 | 10.0 | 19.7 | 10.2 | – |
| June | 4.7 | 7.2 | 8.6 | 20.2 | 9.9 | – |
| July | 4.3 | 8.4 | 7.8 | 22.0 | 9.9 | – |
| August | 4.7 | 8.9 | 8.2 | 23.6 | 9.0 | – |
| September | 3.8 | 9.6 | 9.3 | 21.5 | 10.8 | – |
| October | 3.0 | 11.8 | 7.5 | 20.2 | 13.3 | – |
| November | 3.2 | 12.2 | 6.9 | 20.3 | 13.2 | – |
| December | 3.1 | 12.4 | 6.9 | 18.3 | 13.2 | – |

In addition to the factors cited above, the following factors contributed to upward inflationary pressure over the past year:

- food and non-alcoholic beverage prices (with a relative weight in the calculation of the CPI of 48.3%) increased, largely due to a 79.6% increase in the price of fruits and vegetables, as well as increases in poultry prices;

- hotels, cafés and restaurants prices (a relative weight of 3.6%) increased by 10.6%; and

- education prices, composed principally of public and private school tuition fees (a relative weight of 4.4%), increased by 10.6%.

The following table shows the composition of the CPI and the relative weight of the components that CAPMAS uses to calculate the CPI.

**Compositing and Weighting of the CPI**

| Component | Weight |
|---|---|
| | (%) |
| **General Index** | **100.00** |
| Food and non-alcoholic beverages | 48.33 |
| Tobacco and related products | 2.57 |
| Clothing and footwear | 7.90 |
| Housing, water, electricity, gas and other fuels | 13.46 |
| Furnishings, household equipment and routine maintenance of dwellings | 4.17 |
| Medical care | 3.61 |
| Transportation | 5.22 |
| Communications | 3.64 |
| Recreation and culture | 3.39 |
| Education | 4.38 |
| Hotels, cafés and restaurants | 3.55 |
| Miscellaneous services | 4.23 |

*Source: CAPMAS*

The Government is considering amending the methodology used to calculate the CPI, including, *inter alia*, the basket of goods and services used to calculate the CPI.  If and when such amendments are made, CPI figures may not be comparable to those set forth in this Prospectus.

**Liquidity and Credit Aggregates**

The following table sets forth the liquidity and credit aggregates for the periods indicated.

**Liquidity and Credit Aggregates**

| | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09 | Jul-Dec 09 |
|---|---|---|---|---|---|---|
| | | | (LE millions) | | | |
| M1[1] | 89,685 | 109,274 | 131,290 | 170,579 | 182,991 | 196,973 |
| Domestic Liquidity (M2)[2] | 493,884 | 560,356 | 662,688 | 766,664 | 831,211 | 866,354 |
| Change in Domestic Liquidity *(%)* | 13.6 | 13.5 | 18.3 | 15.7 | 8.4 | 9.5 |
| Foreign Currency Deposits as a % of M2 | 24.5 | 24.4 | 23.2 | 20.8 | 20.1 | 18.2 |
| Foreign Currency Deposits as a % of | | | | | | |
| Total Deposits | 28.1 | 28.2 | 26.7 | 24.1 | 23.4 | 20.9 |
| **Domestic Credit:** | | | | | | |
| Government (net) | 159,889 | 184,131 | 178,324 | 174,005 | 273,122 | 328,753 |
| Public Business Sector | 37,421 | 32,888 | 24,446 | 26,897 | 33,147 | 35,633 |
| Private Business Sector | 228,195 | 239,338 | 268,606 | 291,718 | 304,470 | 293,503 |
| Household Sector | 41,267 | 53,175 | 59,938 | 78,332 | 84,588 | 88,924 |
| **Total Domestic Credit** | **466,771** | **509,532** | **531,314** | **570,953** | **695,326** | **746,813** |
| Year-on-year Change in Domestic | | | | | | |
| Credit *(%)* | 10.6 | 9.2 | 4.3 | 7.5 | 21.8 | 7.4 |

*Source: CBE*

_____
Notes:
(1)    Money in circulation plus local currency demand deposits.
(2)    M1 plus local currency time and saving deposits and foreign currency deposits.

Domestic liquidity grew by 68.3% over the five-year period from 2004/05 to 2008/09.  Domestic credit increased by 49.0% over the same period.

On a year-on-year basis, domestic liquidity increased by LE 64.5 billion (or 8.4%) from June 30, 2008 to June 30, 2009, compared to a LE 104.0 billion (or 15.7%) increase from June 30, 2007 to June 30, 2008.  Domestic credit increased by LE 124.4 billion (21.8%) and LE 39.6 billion (7.5%) over the same periods, respectively.

Foreign currency deposits as a percentage of M2 has recently been declining, with an 18.0% decrease from June 30, 2005 to June 30, 2009, which is due to the positive interest rate differential between the Egyptian Pound and major foreign currencies and the appreciation of the Egyptian Pound against such currencies.  Foreign currency deposits as a percentage of total deposits have similarly declined, with a 20.2% decrease from June 30, 2005 to June 30, 2009.

The following table sets forth the discount rate, 91-day Treasury bill rate and overnight interbank rates as at the end of the periods indicated.

## Interest Rates

| | Discount Rate | 91 day T-bills | Overnight Interbank Rate |
|---|---|---|---|
| | | (%) | |
| **June 30:** | | | |
| 2002 | 11.00 | 7.20 | 10.49 |
| 2003 | 10.00 | 10.27 | 11.76 |
| 2004 | 10.00 | 11.28 | 10.46 |
| 2005 | 10.00 | 9.06 | 9.77 |
| 2006 | 9.00 | 8.84 | 8.42 |
| **2007:** | | | |
| January | 9.00 | 9.44 | 9.23 |
| February | 9.00 | 8.37 | 8.81 |
| March | 9.00 | 8.28 | 8.84 |
| April | 9.00 | 7.53 | 8.79 |
| May | 9.00 | 7.12 | 8.76 |
| June | 9.00 | – | 8.79 |
| July | 9.00 | 6.98 | 8.75 |
| August | 9.00 | 7.82 | 8.75 |
| September | 9.00 | 7.20 | 8.75 |
| October | 9.00 | 6.92 | 8.75 |
| November | 9.00 | 7.12 | 8.75 |
| December | 9.00 | 6.85 | 8.75 |
| **2008:** | | | |
| January | 9.00 | 5.99 | 8.75 |
| February | 9.00 | 5.26 | 9.00 |
| March | 9.00 | 5.16 | 9.50 |
| April | 9.00 | 5.94 | 9.50 |
| May | 9.00 | 9.21[1] | 10.00 |
| June | 9.00 | 9.70 | 10.53 |
| July | 10.00 | 10.31 | 10.50 |
| August | 11.00 | 12.99 | 11.02 |
| September | 11.50 | 13.50 | 11.84 |
| October | 11.50 | 12.76 | 11.86 |
| November | 11.50 | 11.91 | 11.58 |
| December | 11.50 | 11.63 | 11.55 |
| **2009:** | | | |
| January | 11.50 | 11.37 | 11.55 |
| February | 10.50 | 10.51 | 10.55 |
| March | 10.50 | 10.26 | 10.06 |
| April | 10.00 | 10.41 | 10.06 |
| May | 9.50 | 10.18 | 9.53 |
| June | 9.00 | 10.16 | 9.04 |
| July | 9.00 | 10.18 | 9.04 |
| August | 8.50 | 9.63 | 8.52 |
| September | 8.50 | 9.61 | 8.27 |
| October | 8.50 | 9.71 | 8.27 |
| November | 8.50 | 10.12 | 8.28 |
| December | 8.50 | 9.84 | 8.29 |
| **2010:** | | | |
| January | 8.50 | 9.71 | 8.27 |
| February | 8.50 | 9.63 | 8.27 |
| March | 8.50 | 9.71 | 8.26 |

*Source: CBE*

Note:
(1)   The increase from April – May 2008 was partially caused by the implementation of a withholding tax on treasury bills, revoking a previous tax exemption.

**Foreign Exchange Rates**

The currency of the Republic is the Egyptian Pound. From 1991-2003, the exchange rate of the Egyptian Pound was pegged to the U.S. Dollar. In January 2003, the CBE abandoned the exchange rate mechanism within which the Egyptian Pound floated relative to the U.S. Dollar, and the Egyptian Pound now trades freely against foreign currencies.

From 1992 to 1997, the increased foreign exchange earnings on the back of the stabilization program, external debt forgiveness and rescheduling made the currency peg sustainable during that period. However, in 1997, the Republic's balance of payments suffered from the combined effect of lower oil prices, reduced tourism receipts and reduced capital inflows following the Asian market crisis. Increased foreign currency demand in 1997 led to a shortage, in particular in respect of U.S. Dollars, and a gap developed between the official exchange rate announced by the CBE and the unofficial rate on the foreign exchange market. The CBE gradually increased the peg from U.S.$1.00 = LE 3.40 in June 2000 to U.S.$1.00 = LE 4.50 in January 2002. The CBE abandoned the peg on January 29, 2003.

Following the CBE's abandonment of the currency peg in 2003, the unofficial parallel market rate soared with heightened speculation in the foreign exchange market, reaching a premium of over 15% compared to the banking system rate in late 2003. However, in the second half of 2004, strong current account inflows and higher interest rates caused both the official and the unofficial foreign exchange rate to substantially converge.

On December 23, 2004, the CBE formally launched an online interbank system for foreign exchange trading. The system consolidated the supply of foreign exchange in the banking system whereby most banks became capable of satisfying their clients' foreign exchange needs, eroding the unofficial foreign exchange market and causing the Egyptian Pound to further appreciate against the U.S. Dollar. Accordingly, the Government abolished the foreign exchange surrender requirement that had been introduced in 2003. In 2008/09, the total transaction volume in the interbank system was U.S.$44 billion. The upgrade of the CBE's foreign currency management and the interbank system was a major stabilizing factor during the global financial crisis, in particular during the period from August to October 2008, during which the Republic experienced a net capital outflow as a result of the liquidation of certain foreign investors' position in government bills.

The following table sets forth average data relating to the official exchange rate between the Egyptian Pound and the U.S. Dollar for the periods indicated

### Egyptian Pound–U.S. Dollar Exchange Rates[1]

| Period | Exchange Rate |
| --- | --- |
| | (LE per U.S.$1) |
| **2005** | 5.791 |
| **2006** | 5.740 |
| **2007** | 5.644 |
| **2008** | 5.438 |
| **2009** | |
| January | 5.519 |
| February | 5.556 |
| March | 5.623 |
| April | 5.620 |
| May | 5.612 |
| June | 5.591 |
| July | 5.566 |
| August | 5.528 |
| September | 5.504 |
| October | 5.463 |
| November | 5.450 |
| December | 5.474 |
| **2010** | |
| January | 5.437 |
| February | 5.472 |
| March | 5.469 |

*Source: CBE*

**Note:**

(1)     The rates in this table may differ from the actual rates used in the preparation of the information appearing in this Prospectus.

In the period from June 2003 to March 2010, the value of the Egyptian Pound, calculated on a monthly average basis, has appreciated against the U.S. Dollar from U.S.$1.00 = LE 6.03 to U.S.$1.00 = LE 5.47, or 9.3%.  Average daily interbank volume is approximately U.S.$180 million.

Forward and swap transactions are allowed in the Egyptian foreign exchange interbank market, subject to certain limitations, including the requirement that they can only be effected in connection with underlying commercial transactions.  However, the market remains thin and undeveloped.

### Net International Reserves

Prior to the onset of the global financial crisis, net international reserves had been steadily increasing from U.S.$19.3 billion at the end of June 2005 to U.S.$34.6 billion at the end of June 2008.  At the end of June 2009, however, net international reserves had decreased to U.S.$31.3 billion, a decrease of 10.5% or U.S.$3.3 billion.  As a result of the improving domestic and international economic climate, at the end of December 2009, net international reserves had increased to U.S.$34.2 billion and U.S.$34.5 billion at the end of March 2010.

The CBE has embarked on a new investment policy for managing the Republic's foreign international reserves with the objective of shifting from traditional investment vehicles, such as deposits, to other short-term financial instruments.  This is in addition to diversifying its reserve currencies in line with a strategy, which takes into account a number of factors, such as the currency structure of external debt and foreign trade.

The following table sets forth the net international reserves of the CBE as at the end of each period.

### Net International Reserves

| | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09 | Jul-Dec 09 |
|---|---|---|---|---|---|---|
| | | | (U.S.$ millions) | | | |
| **Net International Reserves** ................ | **19,302** | **22,931** | **28,559** | **34,572** | **31,310** | **34,163** |
| Gross Official Reserves............................ | 19,322 | 22,952 | 28,589 | 34,603 | 31,347 | 34,209 |
| Gold........................................................ | 779 | 1,119 | 1,186 | 1,633 | 1,680 | 1,680 |
| Foreign Currencies ................................. | 18,345 | 21,666 | 27,232 | 32,787 | 29,493 | 31,157 |
| Special Drawing Rights........................... | 93 | 113 | 128 | 130 | 115 | 1,301 |
| **Banks' Net Foreign Assets** .................... | **7,554** | **12,529** | **21,675** | **23,172** | **14,724** | **14,366** |
| Assets ..................................................... | 11,360 | 15,557 | 25,458 | 27,444 | 19,630 | 19,241 |
| Liabilities .............................................. | 3,806 | 3,028 | 3,783 | 4,772 | 4,906 | 4,875 |
| Months of Import Coverage—Goods ........ | 9.6 | 9.0 | 8.9 | 7.9 | 7.5 | 8.7 |

*Source: CBE*

### The Establishment of the Egyptian Financial Services Authority

The EFSA was established in 2009 as an integrated financial supervisory authority.  The EFSA results from the consolidation of the Capital Market Authority (the "**CMA**"), the Insurance Authority and the Mortgage Finance Authority, as well as certain other agencies in order to create a single efficient, market-oriented regulator with enhanced supervisory and regulatory roles.  The objectives of the EFSA are to promote the stability and soundness of non-bank financial markets, regulate non-bank financial markets, establish market rules, protect investors and establish systems and rules to ensure efficiency and transparency of these markets.

### The Egyptian Stock Market

Egypt's stock exchange, the Egyptian Exchange is governed by a common board of directors.  The Egyptian Exchange's predecessor exchanges, the Alexandria Stock Exchange and the Cairo Exchange, were established in 1888 and 1903, respectively.  Government policies adopted in the mid-1950s led to a drastic reduction in activity on the exchanges which remained dormant between 1961 and 1992.

The Government's economic reform program resulted in the adoption of the Capital Market Law 95 of 1992 which empowered the CMA, an independent institution that has since been replaced by the EFSA, to regulate the securities industry and laid the regulatory framework for that industry. Law 95 permits the establishment of companies that provide underwriting of subscriptions, brokerage services, securities and mutual fund management, clearance and settlement of security transactions and venture capital activities. It also authorizes the issuance of corporate bonds, eliminates the 7% cap on bond interest rates and authorizes the issuance of bearer shares. Activity on the Egyptian Exchange has increased following initial public offerings by the Government as part of its privatization program.

Misr for Clearing, Settlement and Central Depository ("**MCSD**") was established in 1994 to handle clearing and settlement operations. Its shareholders include the Egyptian Exchange, brokers and dealers, the public and private sector banks. Since the establishment of MCSD, the securities market has been moving towards dematerialization of certificates. Since July 2000, all shares are traded in dematerialized form on the Egyptian Exchange. MCSD is 50% owned by Egyptian banks and financial intermediaries, 45% owned by securities intermediaries and 5% owned by the Egyptian Exchange.

In 2006, several important executive regulations were introduced by the CMA, the most important of which are the rules governing corporate governance and acquisitions and tender offer rules.

New amended listing rules will shortly be introduced which will make it easier for foreign companies to list on the Egyptian Exchange. The Egyptian Exchange chose the OMX Group to deliver a new trading system, which was implemented in 2008. The new system will provide the Egyptian Exchange with a new trading platform that deals in cash and derivative markets, which will help the Egyptian Exchange to introduce new products such as structured products, exchange traded funds, futures and options.

Currently, the Egyptian Exchange is the only Arab exchange that is a full member of the World Federation of Exchanges. The chairman of the Egyptian Exchange also currently chairs the African Securities Exchanges Association and is the current Vice Chairman of the Federation of Euro-Asian Exchanges.

*EGX 30 Performance*

The EGX 30 index had grown substantially in recent years before declining in 2008 as a result of the global financial crisis. The EGX 30 increased by 146.0% in 2005, 10.3% in 2006 and 51.0% in 2007 The EGX 30 index declined by 57.0% in 2008 but increased by 31.8% in 2009 and a further 5.8% in the first two months of 2010. In addition, from its low point in February 2008 to the end of February 2010, the EGX 30 has increased by 95.7%. The Egyptian stock market has also witnessed growth in trade volumes, mainly due to increased participation by international, regional and retail customers. Foreign investors, on average, constitute more than 30% of the stock exchange daily business volume.

As at December 31, 2009, the EFSA licensed 141 brokerage companies, 21 mutual fund managers, 30 underwriting and venture capital companies and one company for clearing and settlements. As at December 31, 2009, there were 306 listed companies, with a total market capitalization of LE 500 billion.

The following table sets forth selected indicators for the Egyptian Exchange as at December 31 of each year.

### Selected Indicators for the Egyptian Exchange

|  | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| Total Market Capitalization (*LE billions*) | 456 | 534 | 768 | 474 | 500 |
| Total Market Capitalization (*as a % of GDP*) | 74 | 86 | 88 | 53 | 48 |
| Total Value of Trading (*LE billions*)[1] | 161 | 287 | 363 | 530 | 448 |
| Number of Listed Companies | 744 | 595 | 435 | 373 | 306 |
| Number of Transactions (*in millions*) | 4.2 | 6.8 | 9.0 | 13.5 | 14.6 |
| EGX 30 Index (*end of period*) | 6,325 | 6,973 | 10,550 | 4,596 | 6,209 |

*Source: Egyptian Exchange*

_____
**Note:**
(1)   Listed and OTC.

# PUBLIC FINANCE

**The Budget Process**

The Government's fiscal year runs from July 1 to June 30.  In October of each year, the Ministry of Finance issues a circular to all Government authorities outlining in a general manner the fiscal policies, targets and economic assumptions to be adhered to in the preparation of their respective budgets.  By December of each year, the Ministry of Finance receives and reviews the draft budgets submitted by government entities following which mutual discussions of submitted budgets take place through joint committees.

By the following February, the Ministry of Finance prepares a preliminary Budget Sector draft budget, which is submitted to the Ministerial Economic Sub-committee headed by the Prime Minister.  The Ministerial Economic Sub-committee may introduce amendments to the draft budget.  The final budget is submitted first to the President and then to the Parliament before the end of March.  The budget is then discussed amongst various parliamentary committees and is usually approved and ratified by the Parliament before the end of June.  See "—Treatment of Public Sector and State-Owned Enterprises" below.

The budget presented to, and ratified by, the Parliament represents a ceiling for total expenditure for Government authorities during the year.  The Parliament also discusses the public sector closing accounts and approves them each year.  In addition, budget figures are also discussed with the IMF missions in the context of the Article IV consultations visits.

**Treatment of Public Sector and State-Owned Enterprises**

Law 53 of 1973 as amended and executive regulations made thereunder regulate the process of preparing and implementing the General State Budget of the Republic.  The general government accounts are a compilation of the fiscal operations of the budget sector, which comprises central administrative and local administrative units and the Service Authorities, the National Investment Bank ("**NIB**") and the Social Insurance Funds.  In this regard, fiscal reporting is completed on a consolidated cash basis, which requires the exclusion of financial interrelations between the three bodies.

Budget sector accounts include revenues and expenditures for the following entities:

- Central Administration Units, such as Ministries and their affiliated agencies;

- Local Administration Units, representing the 29 governorates; and

- Service Authorities.

Both Local Administration Units and Service Authorities depend on the Treasury to finance their respective yearly deficits.

There are two levels of published public finance data, (i) stand-alone Budget Sector fiscal data, and (ii) general Government fiscal data, which include consolidated fiscal data of the Budget Sector, the NIB and Social Insurance Funds accounts.

*Economic Authorities*

Economic Authorities, such as the Suez Canal Authority, EGPC, the New Urban Communities Authority, the National Postal Authority and the Radio and Television Authority, are wholly owned by the Government but operate on a for profit basis.  The financial operations of the Economic Authorities are accounted for in the national budget through either a transfer of profits (dividends) to the Ministry of Finance or capital contributions made by the Ministry of Finance to such authorities.

*Service Authorities*

Service Authorities are Government-owned and administered organizations operating on a non-profit basis, such as Cairo University, the National Sewage Authority, the National Meteorology Authority and the National Authority for Roads and Bridges.  Service Authorities generally provide social services, such as education, health and research.

*Government-owned entities*

The accounts of other Government-owned entities (other than Economic Authorities), such as the Government-owned National Bank of Egypt, Bank Misr and Misr Insurance, as well as holding companies regulated by Law 203, are not included in the State Budget.  However, the national budget reflects capital transfers to, and dividends received from, holding companies and other Government owned institutions.

**Improving Budget Classification**

Law 97 of 2005 enacted the budget for 2005/06 in accordance with to the IMF 2001 Government Finance Statistics ("**GFS**") classification standard (modified to cash principles).  The new system, which is consistent with international budget accounting practices, is designed to generate more consistent reporting during the year.  The new accounting procedures are intended to bring greater transparency to the budget and public sector economic activity.  This should permit better analysis of resources and expenditures to improve efficiency and to ensure that the budget remains focused on the social and economic priorities of the Government.

GFS distinguishes between economic, administrative and functional classifications.  There is a clear distinction between revenues, expenditures and financing transactions, as well as between transfers and exchange transactions.  Fiscal policy is monitored on the basis of cash surplus/deficit and the overall fiscal balance.

**Government Finances and Projections**

The 2009/10 and 2010/11 budgets include medium-term projections, as well as fiscal sustainability analysis by the Macro Fiscal Policy Unit (the "**MFPU**") within the Ministry of Finance.  The MFPU prepares economic and fiscal policy advice for the Minister of Finance.  The MFPU has the following key functions:

- producing medium term budget projections consistent with the overall government macroeconomic framework;

- monitoring budget execution to identify important developments and recommend appropriate action;

- recommending structural reforms to facilitate the sustainability of the fiscal and macroeconomic sectors;

- assessing macroeconomic and fiscal effects of different revenue and expenditure policy options;

- coordinating technical consultations between the Ministry of Finance and international financial institutions; and

- monitoring international economic developments to assess the impact on Egypt's economy.

**Budget Automation**

Use of an Automated Government Expenditure System ("**AGES**") has led to more efficient preparation of the budget.  The Ministry of Finance is now working on the second phase of automation which will require on-line linkage of other ministries' budget preparation and automated issuance of end of year closing accounts.  AGES is designed to be compatible with the GFS budget classification.

**Recent Budgets**

The budget for 2009/10 was passed in June 2009 and projected the ratio of the  budget deficit to GDP to be 8.4% of GDP, as compared to a budgeted ratio of 8.0% of GDP for 2008/09 and an actual ratio of 6.9% for 2008/09.

The following table sets out the budgets for the periods indicated.

**Budgets—2008/09 – 2009/10**

|  | 2008/09 | 2009/10[1] |
|---|---|---|
|  | (LE millions) | |
| **Revenues and Grants** | **276,795** | **224,987** |
| Tax Revenues | 166,569 | 145,544 |
| Grants | 5,557 | 7,700 |
| Other Revenues | 104,669 | 71,743 |
| **Expenditures** | **356,844** | **323,917** |
| Wages and Salaries | 79,039 | 87,485 |
| Purchases of Goods and Services | 23,833 | 27,349 |
| Interest Payments | 52,930 | 71,066 |
| Subsidies, Grants and Social Benefits | 136,762 | 73,480 |
| Other Expenditures | 25,788 | 28,058 |
| Purchases of Non-Financial Assets | 38,493 | 36,479 |
| **Cash Deficit** | **80,049** | **98,931** |
| **Net Acquisition of Financial Assets** | **3,274** | **730** |
| **Overall Fiscal Deficit** | **83,323** | **99,661** |
| Overall Deficit/GDP (%)[2] | 8.0 | 8.4 |
| Primary Deficit/GDP (%)[2] | 2.9 | 2.4 |
| Revenues/GDP (%)[2] | 26.6 | 19.1 |
| Expenditure/GDP (%)[2] | 34.3 | 27.4 |

*Source: Ministry of Finance*

Notes:
(1)    The figures set forth in this column represent the Republic's budget with respect to its receipts and expenditures and certain other financial data. While the Republic believes that these assumptions and targets were reasonable when made, some are beyond the control or influence of the Republic and actual outcomes will depend on future events. Accordingly, no assurance can be given that the Republic's financial performance and condition will in fact match the forecasts in the Republic's budget.

(2)    For 2009/10, Ministry of Finance's projected GDP figure of LE 1,181.1 billion is used in calculating this ratio.

The proposed budget for 2010/11 has been transmitted by the Council of Ministers to Parliament in March 2010 and is subject to debate in Parliament and amendment prior to its adoption. The proposed budget projects total revenues of LE 280.5 billion and expenditures of LE 398.0 billion resulting in a cash deficit of LE 117.5 billion. Following budgeted net acquisition of financial assets of LE 8.3 billion, the overall fiscal deficit is budgeted at LE 109.2 billion, representing 7.9% of projected 2010/11 GDP at LE 1,377.1 billion.

*Revenues*

Total revenues for 2009/10 are projected at LE 225.0 billion compared to LE 276.8 in the 2008/09 budget, a decrease of 18.7%, principally due to lower projected GDP growth, lower tax revenues, lower tourism receipts and lower Suez Canal revenues. Tax revenues are projected to decrease by 12.6% to LE 145.5 billion for 2009/10 compared to LE 166.6 billion for the 2008/09 budget.

Other revenues comprising mainly of year-end profits, royalties and dividends transferred to the Treasury from various economic authorities, such as the Suez Canal, EGPC, NUCA, or public sector banks and publicly-owned companies are projected to decrease by 31.5% to LE 71.7 billion compared to LE 104.7 billion in the 2008/09 budget.

*Expenditures*

Estimated Government expenditure is projected to decrease by 9.2% to LE 323.9 billion in 2009/10 compared to LE 356.8 billion in the 2008/09 budget. Wages and salaries for 2009/10 are budgeted at LE 87.5 billion compared to LE 79.0 billion budgeted for 2008/09, representing an increase of 10.8%. Interest payments on domestic and external debt are budgeted at LE 71.1 billion for 2009/10 compared to LE 52.9 billion budgeted for 2008/09, representing an increase of 34.4%. Subsidies, grants and social benefits, which include subsidies for commodities, transportation, medicine and exports, is

budgeted at LE 73.5 billion in 2009/10 compared to LE 136.8 billion in the 2008/09 budget, a 46.3% decrease, principally due to lower international commodity prices.

**2009/10 Interim Results**

Budget sector operations for the period from July to December 2008 and 2009 resulted in an increase in the ratio of overall deficit to GDP of 4.9%.

The following table sets out the interim results for the periods indicated.

**Interim Results—July to December 2008 and 2009**

|  | July-Dec 2008 | July-Dec 2009 [1] |
|---|---|---|
|  | (LE millions) | |
| **Revenues and Grants** | **127,679** | **94,691** |
| Tax Revenues | 71,714 | 65,632 |
| Grants | 5,666 | 1,949 |
| Other Revenues | 50,299 | 27,111 |
| **Expenditures** | **163,499** | **152,442** |
| Wages and Salaries | 33,303 | 38,013 |
| Purchases of Goods and Services | 7,824 | 9,651 |
| Interest Payments | 23,726 | 33,233 |
| Subsidies, Grants and Social benefits | 72,704 | 39,441 |
| Other Expenditures | 11,480 | 13,762 |
| Purchases of Non-Financial assets | 14,463 | 18,343 |
| **Cash Deficit** [2] | **35,820** | **57,751** |
| **Net Acquisition of Financial assets** | **236** | **(269)** |
| **Overall Fiscal Deficit** | **36,056** | **57,483** |
| Overall Deficit/GDP (%) [3] | 3.5 | 4.9 |
| Primary Deficit/GDP (%) [3] | 1.2 | 2.1 |
| Revenues/GDP (%) [3] | 12.3 | 8.0 |
| Expenditure/GDP (%) [3] | 15.7 | 12.9 |

*Source: Ministry of Finance*

Notes:
(1)    Preliminary data,
(2)    Overall deficit excluding net acquisition of financial assets.
(3)    July - December ratios are based on full year GDP. For 2009/10, Ministry of Finance projected GDP figure of LE 1,181.1 billion is used.

*Revenues*

Total revenues and grants declined to LE 94.7 billion from LE 127.7 billion, or 25.8%, primarily due to a decline in tax revenues by 8.5% and a decline in other revenues from LE 50.3 billion to LE 27.1 billion, or 46.1%.  This decline is due to lower dividends, royalties and surpluses transferred by Government-owned authorities, companies and banks due to slower economic growth.

*Expenditures*

Total expenditures decreased by 6.8% to LE 152.4 billion or 12.9% of GDP, compared to LE 163.5 billion or 15.6% of GDP.  Wages and salaries increased to LE 38.0 billion from LE 33.3, or 14.1%. Interest payments, due to the increase of total debt stock as well as high domestic interest rates increased to LE 33.2 billion compared to LE 23.8 billion, 39.5%. Subsidies, grants and social benefits decreased by 45.8% to LE 39.4 billion compared to LE 72.7 billion reflecting lower international commodity prices.

**Public Accounts**

The following table sets forth a summary of the revenues, expenditure and overall balance of the budget sector public accounts for the periods indicated.

### Summary of Government Fiscal Operations Budget Sector[1]

| | 2005/06 | 2006/07 | 2007/08 | 2008/09 | 2009/10[1] |
|---|---|---|---|---|---|
| | | | (LE millions) | | |
| **Revenues and Grants** | **151,266** | **180,215** | **221,404** | **282,505** | **224,987** |
| Tax Revenues | 97,778 | 114,326 | 137,195 | 163,222 | 145,544 |
| Income Tax | 48,268 | 58,535 | 67,059 | 80,254 | 58,749 |
| Property Taxes | 1,214 | 1,788 | 2,052 | 2,763 | 8,106 |
| Taxes on Goods and Services | 34,699 | 39,436 | 49,747 | 62,650 | 61,376 |
| Taxes on International Trade | 9,654 | 10,370 | 14,020 | 14,091 | 14,018 |
| Other Taxes | 3,944 | 4,198 | 4,317 | 3,464 | 3,295 |
| Grants | 2,379 | 3,886 | 1,463 | 7,984 | 7,700 |
| Other Revenues | 51,108 | 62,003 | 82,747 | 111,299 | 71,743 |
| Returns on Financial Assets | 36,373 | 45,110 | 52,455 | 53,395 | 47,622 |
| Proceeds from Sales of Goods and Services | 7,891 | 9,774 | 12,038 | 16,216 | 13,202 |
| Other | 5,244 | 6,419 | 17,450 | 40,608 | 10,536 |
| **Expenditures** | **207,811** | **222,029** | **282,290** | **351,500** | **323,917** |
| Wages and Salaries | 46,719 | 52,153 | 62,839 | 76,147 | 87,485 |
| Purchases of Goods and Services | 14,428 | 17,028 | 18,470 | 25,072 | 27,349 |
| Interest Payments | 36,814 | 47,700 | 50,528 | 52,810 | 71,066 |
| Subsidies, Grants and Social benefits | 68,897 | 58,442 | 92,371 | 127,033 | 73,480 |
| Other Expenditures | 19,740 | 21,208 | 23,892 | 27,007 | 28,058 |
| Purchases of Non-Financial assets | 21,212 | 25,498 | 34,191 | 43,430 | 36,479 |
| **Cash Deficit[2]** | **56,544** | **41,815** | **60,886** | **68,995** | **98,930** |
| **Net Acquisition of Financial assets** | (6,160) | 12,883 | 236 | 2,831 | 730 |
| **Overall Fiscal Deficit** | **50,385** | **54,697** | **61,122** | **71,826** | **99,660** |
| Overall Deficit/GDP (%)[3] | 8.2 | 7.3 | 6.8 | 6.9 | 8.4 |
| Primary Deficit/GDP (%)[3] | 2.2 | 0.9 | 1.2 | 1.8 | 2.4 |
| Revenues/GDP (%)[3] | 24.5 | 24.2 | 24.7 | 27.2 | 19.1 |
| Expenditure/GDP (%)[3] | 33.6 | 29.8 | 31.5 | 33.8 | 27.4 |

*Source: Ministry of Finance*

**Notes:**
(1)    Budgeted.
(2)    Overall deficit excluding net acquisition of financial assets.
(3)    For 2009/10, Ministry of Finance projected GDP figure of LE 1,181.1 billion is used.

*Summary*

Total budget sector revenues have grown over each of the past four years from LE 151.2 billion in 2005/06 to LE 282.5 billion in 2008/09.  Total budget sector revenues increased by 36.4% in 2005/06, 19.4% in 2006/07, 22.9% in 2007/08 and 27.6% in 2008/09.

Total budget sector expenditures have also grown over each of the past four years from LE 207.8 billion in 2005/06 to LE 351.5 billion in 2008/09.  The rates of growth in budget sector total expenditure over the past four years were  28.6% in 2005/06, 6.8% in 2006/07, 27.2% in 2007/08 and 24.5% in 2008/09.  The principal factors in the increases in expenditures in the past two years have been increases in employee wage costs (45.8% and 14.9% in 2007/08 and 2008/09, respectively), subsidies (58.2% and a 37.6%, respectively), purchases of goods and services (8.2% and a 35.7%, respectively).  Remaining expenditure sources had only slight increases for the most part.

Although the budget sector overall fiscal deficit has grown from LE 51.6 billion in 2004/05 to LE 71.8 billion in 2008/09, the overall deficit as a percentage of total GDP has fallen from 9.6% to 6.9% over the period.

*Revenues*

The Government's principle sources of revenues are corporation taxes, general sales taxes, customs duties and transferred profits (dividends) from government-owned entities.  The Government also receives revenue in the form of grants from international agencies.

Total budget sector revenues increased from LE 110.9 billion in 2004/05 to LE 282.5 billion in 2008/09 representing an increase in revenues of 154.7% over the period.

In 2008/09, tax revenues accounted for 57.8% of total budget sector revenues.  Tax revenues include income tax, corporation income tax, general sales tax and customs duties.  The Suez Canal and the oil sector are the main sources of corporate income tax revenues, contributing LE 10.4 billion and LE 34.1 billion, respectively, in corporate income tax for 2008/09.

Non-tax revenues mainly comprise of the proceeds of assets sales, as well as yearly royalties, profits and dividend transfers from the Suez Canal, the CBE, various economic authorities and other public sector enterprises.

The following table sets out budget sector revenues for the periods indicated.

**Revenues**

| | 2005/06 | 2006/07 | 2007/08 | 2008/09[(1)] | 2009/10[(2)] |
|---|---|---|---|---|---|
| | | | (LE millions) | | |
| **Total Revenues and Grants** | **151,266** | **180,215** | **221,404** | **282,505** | **224,987** |
| Annual Change *(%)* | 36.4 | 19.1 | 22.9 | 27.6 | (20.4) |
| Percentage of GDP[(3)] | 24.5 | 24.2 | 24.7 | 27.2 | 19.1 |
| Percentage of Total Revenues and Grants | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Percentage of Tax Revenues | 154.7 | 157.6 | 161.4 | 173.1 | 154.6 |
| | | | | | |
| **Tax Revenues** | **97,778** | **114,326** | **137,195** | **163,222** | **145,544** |
| Annual Change *(%)* | 29.1 | 16.9 | 20.0 | 19.0 | (10.8) |
| Percentage of GDP[(3)] | 15.8 | 15.3 | 15.3 | 15.7 | 12.3 |
| Percentage of Total Revenues and Grants | 64.6 | 63.4 | 62.0 | 57.8 | 64.7 |
| Percentage of Tax Revenues | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | | | | |
| **Income Tax** | **48,268** | **58,535** | **67,059** | **80,254** | **58,749** |
| Annual Change *(%)* | 52.9 | 21.3 | 14.6 | 19.7 | (26.8) |
| Percentage of GDP[(3)] | 7.8 | 7.9 | 7.5 | 7.7 | 5.0 |
| Percentage of Total Revenues and Grants | 31.9 | 32.5 | 30.3 | 28.4 | 26.1 |
| Percentage of Tax Revenues | 49.4 | 51.2 | 48.9 | 49.2 | 40.4 |
| | | | | | |
| **Property Tax** | **1,214** | **1,788** | **2,052** | **2,763** | **8,106** |
| Annual Change *(%)* | 17.4 | 47.3 | 14.8 | 34.6 | 193.4 |
| Percentage of GDP[(3)] | 0.2 | 0.2 | 0.2 | 0.3 | 0.7 |
| Percentage of Total Revenues and Grants | 0.8 | 1.0 | 0.9 | 1.0 | 3.6 |
| Percentage of Tax Revenues | 1.2 | 1.6 | 1.5 | 1.7 | 5.6 |
| | | | | | |
| **Taxes on Goods and Services** | **34,699** | **39,436** | **49,747** | **62,650** | **61,376** |
| Annual Change *(%)* | 10.4 | 13.7 | 26.1 | 25.9 | (2.0) |
| Percentage of GDP[(3)] | 5.6 | 5.3 | 5.6 | 6.0 | 5.2 |
| Percentage of Total Revenues and Grants | 22.9 | 21.9 | 22.5 | 22.2 | 27.3 |
| Percentage of Tax Revenues | 35.5 | 34.5 | 36.3 | 38.4 | 42.2 |
| | | | | | |
| **Taxes on International Trade** | **9,654** | **10,370** | **14,020** | **14,091** | **14,018** |
| Annual Change *(%)* | 24.7 | 7.4 | 35.2 | 0.5 | (0.5) |
| Percentage of GDP[(3)] | 1.6 | 1.4 | 1.6 | 1.4 | 1.2 |
| Percentage of Total Revenues and Grants | 6.4 | 5.8 | 6.3 | 5.0 | 6.2 |
| Percentage of Tax Revenues | 9.9 | 9.1 | 10.2 | 8.6 | 9.6 |
| | | | | | |
| **Grants** | **2,379** | **3,886** | **1,463** | **7,984** | **7,700** |
| Annual Change *(%)* | (16.6) | 63.3 | (62.4) | 445.7 | (3.6) |
| Percentage of GDP[(3)] | 0.4 | 0.5 | 0.2 | 0.8 | 0.7 |
| Percentage of Total Revenues and Grants | 1.6 | 2.2 | 0.7 | 2.8 | 3.4 |
| Percentage of Tax Revenues | 2.4 | 3.4 | 1.1 | 4.9 | 5.3 |
| | | | | | |
| **Other Revenues** | **51,108** | **62,003** | **82,747** | **111,299** | **71,743** |
| Annual Change *(%)* | 58.5 | 21.3 | 33.5 | 34.5 | (35.5) |
| Percentage of GDP[(3)] | 8.3 | 8.3 | 9.2 | 10.7 | 6.1 |
| Percentage of Total Revenues and Grants | 33.8 | 34.4 | 37.4 | 39.4 | 31.9 |
| Percentage of Tax Revenues | 52.3 | 54.2 | 60.3 | 68.2 | 49.3 |

*Source: Ministry of Finance*

**Note:**
(1)    Preliminary
(2)    Budgeted.
(3)    For 2009/10, Ministry of Finance projected GDP figure of LE 1,181.1 billion is used.

*Expenditures*

The rates of growth in budget sector total expenditure over the past four years were 28.6% in 2005/06, 6.8% in 2006/07, 27.2% in 2007/08 and 24.5% in 2008/09.

The following table sets out budget sector expenditures for the periods indicated.

## Expenditures

| | 2005/06 | 2006/07 | 2007/08 | 2008/09[1] | 2009/10[2] |
|---|---|---|---|---|---|
| | | | (LE millions) | | |
| **Expenditures** | **207,811** | **222,029** | **282,290** | **351,500** | **323,917** |
| Annual Change *(%)* | 28.6 | 6.8 | 27.1 | 24.5 | (7.8) |
| Percentage of GDP[3] | 33.6 | 30.4 | 31.5 | 33.8 | 27.5 |
| Percentage of Total Expenditures | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Percentage of Tax Revenues | 213 | 195.5 | 205.8 | 215.4 | 222.6 |
| | | | | | |
| **Wages and Salaries** | **46,719** | **52,153** | **62,838** | **76,147** | **87,485** |
| Annual Change *(%)* | 12.5 | 11.6 | 20.5 | 21.2 | 14.9 |
| Percentage of GDP[3] | 7.6 | 7.1 | 7.0 | 7.3 | 7.4 |
| Percentage of Total Expenditures | 22 | 23.5 | 22.3 | 21.7 | 27.0 |
| Percentage of Tax Revenues | 48 | 45.9 | 45.8 | 46.7 | 60.1 |
| | | | | | |
| **Purchases of Goods and Services** | **14,428** | **17,028** | **18,470** | **25,072** | **27,349** |
| Annual Change *(%)* | 14.4 | 18.0 | 8.5 | 35.7 | 9.1 |
| Percentage of GDP[3] | 2.3 | 2.3 | 2.1 | 2.4 | 2.3 |
| Percentage of Total Expenditures | 7 | 7.7 | 6.5 | 7.1 | 8.4 |
| Percentage of Tax Revenues | 15 | 15.0 | 13.5 | 15.4 | 18.8 |
| | | | | | |
| **Interest Payments** | **36,814** | **47,700** | **50,528** | **52,810** | **71,066** |
| Annual Change *(%)* | 12.3 | 29.6 | 5.9 | 4.5 | 34.6 |
| Percentage of GDP[3] | 6 | 6.5 | 5.6 | 5.1 | 6.0 |
| Percentage of Total Expenditures | 18 | 21.5 | 17.9 | 15.0 | 21.9 |
| Percentage of Tax Revenues | 38 | 42.0 | 36.8 | 32.4 | 48.8 |
| | | | | | |
| **Subsidies, Grants and Social Benefits**[4] | **68,897** | **58,442** | **92,371** | **127,033** | **73,480** |
| Annual Change *(%)* | 131.9 | (15.2) | 58.1 | 37.5 | (42.2) |
| Percentage of GDP[3] | 11.2 | 8.0 | 10.3 | 12.2 | 6.2 |
| Percentage of Total Expenditures | 33 | 26.3 | 32.7 | 36.1 | 22.7 |
| Percentage of Tax Revenues | 70 | 51.5 | 67.3 | 77.8 | 50.5 |
| | | | | | |
| **Other expenditures** | **19,740** | **21,208** | **23,892** | **27,007** | **28,058** |
| Annual Change *(%)* | (9) | 7.4 | 12.7 | 13.0 | 3.9 |
| Percentage of GDP[3] | 3.2 | 2.9 | 2.7 | 2.6 | 2.4 |
| Percentage of Total Expenditures | 9 | 9.6 | 8.5 | 7.7 | 8.7 |
| Percentage of Tax Revenues | 20 | 18.7 | 17.4 | 16.5 | 19.3 |
| | | | | | |
| **Purchase of Non-financial Assets** | **21,212** | **25,498** | **34,191** | **43,430** | **36,480** |
| Annual Change *(%)* | (8.9) | 20.2 | 34.1 | 27.0 | (16.0) |
| Percentage of GDP[3] | 3.4 | 3.5 | 3.8 | 4.2 | 3.1 |
| Percentage of Total Expenditures | 10 | 11.5 | 12.1 | 12.4 | 11.3 |
| Percentage of Tax Revenues | 22 | 22.5 | 24.9 | 26.6 | 25.1 |

*Source: Ministry of Finance*

Note:
(1)   Preliminary.
(2)   Budgeted.
(3)   For 2009/10, Ministry of Finance projected GDP figure of LE 1,181.1 billion is used.
(4)   Subsidies increased from LE 29,706 million for 2004/05 to LE 68,897 million in 2005/06 following the decision by the Ministry of Finance to include fuel and energy subsidies in the total for Subsidies.

**Social Spending and Subsidies**

Government spending on subsidies to support low-income Egyptians has increased in recent years.  Domestic energy subsides accounted for 6.8% of GDP in 2005/06, compared to 9.0% in 2008/09 due to higher international oil and commodity prices.  The fiscal cost of fuel subsidies is projected to decline to approximately 5% of GDP in 2009/10, due to lower international energy and commodity prices (such as corn, wheat and edible oil) and the discontinuation of electricity subsidies in the 2009/10 budget, which amounted to LE 3 billion in 2008/09. Egypt continues to provide one of the highest domestic fuel price subsidies in the world.

The Government's current subsidy policy consists principally of:

- providing subsidies for major staples, such as wheat, corn, sugar and cooking oil, transportation and certain petroleum products, such as gas oil, natural gas and butane;

- further reforming the administration of the subsidy system in order to reduce costs and ensure that subsidies benefit the intended recipients; and

- providing financial assistance to the major subsidized sectors of the economy, such as education and healthcare.

Total subsidies for 2009/10 are budgeted at LE 59.5 billion compared to LE 94.3 billion for 2008/09, a decrease of 37.0% due to a decrease in imported wheat prices, which declined from U.S.$480 per ton during 2008 to U.S.$185 per ton as at December 31, 2009, a decrease in international butane and gasoil prices and the discontinuation of electricity subsidies in the 2009/10 budget.

The following table sets forth the details of the actual subsidies for 2008/09 and the budgeted subsidies for 2009/10.

**Subsidies**

| | 2008/09[1] | 2009/10[2] |
|---|---|---|
| | (LE millions) | |
| **Commodity Subsidies** | **19,877** | **13,841** |
| Wheat | 15,900 | 10,628 |
| Sugar | 1,348 | 2,039 |
| Food oil | 1,971 | 1,038 |
| Other Commodity Subsidies (rice, tea, etc.) | 657 | 136 |
| **Petroleum Subsidies** | **62,703** | **33,694** |
| Natural Gas | 8,200 | 1,559 |
| Butane | 11,153 | 7,747 |
| Gasoline | 7,200 | 5,783 |
| Kerosene | 450 | 111 |
| Gas Oil | 32,300 | 17,519 |
| Fuel Oil | 3,400 | 975 |
| **Electricity subsidies** | **3,000** | **0** |
| **Support Subsidies:** | **8,750** | **11,940** |
| Housing Loan Interest | 712 | 662 |
| Transportation | 556 | 641 |
| Medicine | 405 | 412 |
| Potable Water | 750 | 750 |
| Low-income Housing | 1,000 | 1,000 |
| Export Subsidies | 2,000 | 3,700 |
| Industrial Zones | 400 | 400 |
| Training | 500 | 200 |
| Other subsidies | 2,427 | 4,175 |
| **Total** | **94,330** | **59,475** |

*Source: Ministry of Finance*

Notes:
(1)   Preliminary data.
(2)   Budgeted.

## Public Private Partnership

In line with its long term strategy to promote private sector involvement in the economic and social development of Egypt, the Government introduced the Public Private Partnership (**"P3"**) program in June 2006. The program is intended to reduce pressure on the Government budget and capitalize on private sector efficiencies and management skills in the provision of public services, leading to better quality public services at reduced costs. The P3 program also creates an incentive to ease budgetary constraints in the short-term without affecting longer term sustainability whereas private financing supports increased infrastructure investments without adding to Government borrowings.

The P3 Central Unit at the Ministry of Finance is in charge of studying and coordinating public private partnership initiatives with other Government ministries. Since its inception, a new waste water treatment plant (with a capacity of 8.8 million cubic feet (0.3 million cubic meters) per day) for Cairo has been funded and there are currently four further tenders in various stages in addition to further projects worth approximately U.S.$15 billion being planned in the energy and transportation sectors. The Shoura Council passed a new P3 law, which is being debated in the People's Assembly.

## National Investment Bank

The NIB was established by Law 119 of 1980 for funding infrastructure investments according to the Government's five year economic and development plans.

Until July 2006, the NIB was funded through the collection of operating surpluses transferred from the two state pension funds, proceeds from "investment certificates" marketed through the 350 branches of the National Bank of Egypt, and postal saving.  The operating surplus from the pension funds was traditionally deposited with the NIB to finance the Republic's infrastructure investments.  However, interest on the deposits was capitalized, resulting in an operating deficit for the Social Insurance Funds.  This deficit was financed by the Treasury.  This complicated the budget process and reduced transparency in fiscal policy.

In order to reduce the distortion created by this arrangement between the pension funds, the NIB and the Treasury, in July 2006 the Ministry of Finance decided to assume all outstanding obligations of the NIB to the Social Insurance Funds by issuing a five year note for LE 197.7 billion paying monthly interest.  Going forward, NIB will serve as a development fund to finance infrastructure projects on a for-profit basis.

The following table sets forth the NIB's sources and use of funds for the periods indicated.

### National Investment Bank Sources and Uses

|  | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
|  |  |  | (LE millions) |  |  |
| **Sources** | **316,476** | **351,205** | **166,201** | **188,601** | **197,058** |
| Social Insurance Fund for Government Employees... | 122,913 | 135,735 | 27,428 | 29,076 | 29,638 |
| Social Insurance Fund for Public & Private Business Sector Employees | 96,093 | 105,703 | 20,574 | 22,632 | 24,895 |
| Proceeds from Investment Certificates | 58,485 | 64,038 | 68,485 | 78,714 | 81,458 |
| Accumulated Interest on Investment Certificates (Category A) | 6,852 | 7,028 | 7,579 | 7,509 | 8,654 |
| Proceeds from US Dollar Development Bonds | 1,418 | 824 | 483 | 152 | 11 |
| Post Office Savings | 33,902 | 39,097 | 43,518 | 49,257 | 54,487 |
| Net Balance of the NIB with the Banking System..... | (4,917) | (3,757) | (2,951) | (3,881) | (4,806) |
| Others [1] | 1,730 | 2,537 | 1,085 | 5,142 | 2,721 |
| **Uses** | **316,476** | **351,205** | **166,201** | **188,601** | **197,058** |
| Government | 143,751 | 142,622 | 0 | 0 | 0 |
| Economic Authorities | 58,265 | 50,196 | 51,734 | 51,279 | 50,062 |
| Public & Private Sector, Concessionary loans and Others | 114,460 | 158,387 | 114,467 | 137,322 | 146,996 |

*Source: Ministry of Finance*

Note:
(1)    Including deposits of the private insurance funds, saving certificates, and loans & deposits of various authorities

### Social Insurance Funds

Egypt has two general pension funds: one for public sector employees and the other for private sector employees.  The Government makes contributions to the public sector pension fund in its capacity as employer.  Historically, pension funds have been required by law to deposit their surplus funds with the NIB.

This pension system covers 70% of the labor force in virtually all occupational categories, providing contributions equivalent to 2.9% of GDP.  The pension system pays benefits to approximately 50% of Egypt's elderly population at a cost of 3.8% of GDP.

The Ministry of Finance has submitted legislation to address inefficiencies and to establish a system that is sustainable for future generations.  The proposed law would reform the public pension system, introduce a new funded pillar, expand voluntary private pensions and create prudential standards applicable to all providers of voluntary schemes.

# PUBLIC SECTOR DEBT

**Public Debt Management**

The role of the Ministry of Finance's Public Debt Management Unit is to procure Government budget funding requirements at the lowest long-term cost relative to the general level of interest rates, consistent with prudent fiscal and monetary policy framework.  The Debt Management Unit follows a market-orientated funding strategy based on projected budgetary requirements, determining frequency, volume, timing and maturities for all debt issues.

In July 2004, the Ministry of Finance launched the Primary Dealer System for Government securities (the "**Primary Dealer System**") in order to more efficiently distribute, manage and reduce over time its cost of debt.  As at December 31, 2009, there were 15 banks participating in the Primary Dealer System, including internationally recognized banks.  Since 2004, a quarterly financing calendar is issued and posted on the Ministry of Finance's website.

The Ministry of Finance's debt management policy is aimed at lengthening the maturity of domestic public debt, as well as consolidating a domestic yield curve by means of increasing its medium-to-long term issuance in order to reduce refinancing risk.  To further this goal, it has increased its issuance of long-term fixed income securities to LE 124.3 billion as at December 31, 2009, from LE 13 billion, as at June 30, 2004, an 856.2% increase. As at February 28, 2010, total outstanding issuances were LE 133 billion    As at December 31, 2009, the average life for the tradable debt was 2.1 years and is expected to increase to 3.5 years by December 2011.

In July 2005, the Ministry of Finance, in coordination with Egypt's national oil company, EGPC, through a special purpose vehicle (Petroleum Export Ltd.), issued Egypt's first amortizing pre-paid forward sale transaction backed by crude oil and naphtha products.  As at December 31, 2009, U.S.$468 million was outstanding.

In July 2007, in an effort to diversify its investor base, the Republic issued its first global notes denominated in Egyptian Pounds with principal and interest payable in U.S. Dollars.  The notes have a nominal value of LE 6 billion, bearing a coupon of 8.75% and mature in July 2012.

In May 2009, the New Urban Community Authority ("**NUCA**"), an economic authority wholly-owned by the Ministry of Housing, in co-ordination with the Ministry of Finance issued the first Asset Backed Security for LE 4.6 billion to mature in 2017. The issue, guaranteed by the Treasury, received a AAA local rating.

In January 2010, the regulations promulgated under the Capital Market Law were amended to allow public authorities to issue debt in the domestic market. Accordingly, NUCA issued a LE 2.5 billion five-year floating rate note (based on the six month T-Bill yield) and a LE 2.5 billion 13-month fixed rate note. Both issues were guaranteed by the Treasury. Effective from January 2010, in order to support and enhance the development of an effective government securities market and reduce illiquidity premiums and refinancing risks, the Ministry of Finance implemented a new transparent and visible issuance strategy comprised of three pillars:

- limiting future debt issuances to a small number of benchmarks maturities (*i.e.,* three, five, seven and ten years);

- increasing the frequency of re-openings of each security so as to raise each security's outstanding principal amount to LE 10 billion; and

- increasing the standardization of debt issuance, in particular for government bonds.

**Domestic Debt**

Public sector debt in Egypt comprises the domestic debt of the central government (Budget Sector domestic debt), debt of the Economic Authorities and external debt of the central government and all government-owned enterprises, whether or not directly guaranteed by the central government. For the purposes of this section, external debt is debt payable in foreign currency held by non-Egyptian entities.

Budget Sector domestic debt consists of debt payable in Egyptian Pounds and foreign currency debt held by Egyptian entities and excludes the debt of the NIB and Economic Authorities.  Currently, the only such foreign-currency denominated domestic debt are the notes issued in 1991 by the Ministry of Finance to certain public sector banks in respect of their foreign exchange liabilities, the outstanding dollar-denominated Eurobonds issued in 2001 and the dollar-linked Eurobonds issued in 2007.

Egypt's net budget sector domestic debt was 54.1% of GDP at the end of 2008/09 compared to 53.5% at the end of 2007/08.  As at December 31, 2009 net budget sector debt was 53.9% of GDP.  Total outstanding Government securities increased from LE 569.0 billion at the end of 2007/08 to LE 681.8 billion at the end of 2008/09 and as at December 31, 2009 total outstanding Government securities stand at LE 732.0.

The following table sets forth Egypt's outstanding domestic debt at the end of the periods indicated.

### Budget Sector Domestic Debt

| | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09 | Dec 09[1] |
|---|---|---|---|---|---|---|
| | (LE millions) | | | | | |
| **Gross Budget Sector Debt** ......................... | **543,893** | **554,837** | **591,001** | **599,603** | **699,667** | **777,438** |
| Securities............................................. | 340,898 | 349,958 | 562,897 | 568,848 | 681,837 | 732,007 |
| T-Bills (under one year) issued via Primary Dealers.............................................. | 79,907 | 103,144 | 118,657 | 146,439 | 239,080 | 251,751 |
| T- Bills issued for CBE for Monetary Policy purposes[2]......................................... | 45,000 | — | — | — | — | — |
| T-Bonds issued via Primary Dealers.................... | 27,000 | 58,000 | 57,000 | 78,500 | 92,500 | 124,267 |
| Notes issued in favor the CBE........................ | 147,875 | 145,554 | 144,517 | 121,783 | 121,113 | 117,816 |
| External Debt Revaluation Notes[3] ...................... | 13,582 | 16,582 | 19,582 | — | — | 9,063 |
| Banks Recapitalization Notes........................ | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| GASC[4] Bonds........................................ | 2,705 | 1,881 | 1,881 | 595 | 595 | 595 |
| Public Sector FX liability Notes........................ | 12,070 | 12,014 | 11,886 | 11,126 | 11,677 | 11,445 |
| Insurance Notes..................................... | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Eurobonds (held domestically)........................ | 5,122 | 5,109 | 3,868 | 3,750 | 7,809 | 8,007 |
| Bond issued for Social Insurance Fund[5] .............. | — | — | 197,799 | 198,902 | 201,248 | 201,248 |
| Housing Bonds..................................... | 124 | 122 | 119 | 117 | 115 | 115 |
| The 5% Government Bonds........................... | 1,513 | 1,552 | 1,588 | 1,636 | 1,700 | 1,700 |
| Pension Funds Short-Term Deposits .................... | — | 2,065 | 4,517 | 2,343 | 2,343 | 2,343 |
| Budget Sector Borrowing from NIB[5] .................... | 185,090 | 197,725 | — | — | — | — |
| Budget Sector Bank Loans........................... | 17,905 | 5,089 | 23,587 | 28,412 | 15,487 | 43,088 |
| **Budget Sector Deposits**........................... | **(153,385)** | **(109,948)** | **(112,829)** | **(120,904)** | **(137,341)** | **(142,671)** |
| **Net Domestic Budget Sector Debt**........................... | **390,508** | **444,889** | **478,172** | **478,699** | **562,326** | **634,767** |
| Gross Domestic Budget Sector Debt/GDP (%)............ | 101.0 | 89.8 | 79.4 | 67.0 | 67.4 | 65.9 |
| Net Domestic Budget Sector Debt/GDP (%) ............ | 72.5 | 72.0 | 64.2 | 53.5 | 54.1 | 53.8 |

*Source: Ministry of Finance*

Notes:
(1)   Preliminary data.
(2)   Issued by the Ministry of Finance with maturities of three and six months for monetary policy purposes.  Since 2005, the CBE has issued its own Monetary Policy tools.
(3)   The External Debt Revaluation Notes were issued to assume additional costs in respect of external debt servicing following the devaluation of the Egyptian Pound in 2003.  The Revaluation Notes are issued for the CBE.
(4)   General Authority for Supply of Commodities.
(5)   In 2006, outstanding debt of the Treasury to the Social Insurance Fund (through the National Investment Bank) was recognized as a direct liability of the Treasury to the Social Insurance Fund.  (See "Public Finance—National Investment Bank").

### External Debt

The total external debt consists of the external portion of the long-term indebtedness incurred directly by the Government, the external long-term indebtedness incurred by budget-controlled agencies, the external long-term indebtedness incurred directly or guaranteed by the Government and the private sector non-guaranteed debt.  External private sector debt guaranteed by the Government is not included unless and until the Government is called upon to make payment under its guarantee.  As at December 31, 2009, Egypt's total external debt amounted to U.S.$33.3 billion.

Since 1991, the majority of Egypt's external borrowings have consisted of bilateral and multilateral finance, as well as debt securities placed in the international capital markets.  Egypt has been current on its external debt payments since 1991.

In July 2001, the Republic issued its first Eurobonds for U.S.$500 million, which matured and was repaid in 2006 and U.S.$1 billion, which will mature in 2011.

In accordance with the U.S. Wartime Supplemental Appropriation Act, 2003 (Public Law 108-11), the Ministry of Finance, in September 2005 issued a 10-year note for U.S.$1.25 billion bearing a coupon of 4.45%, fully guaranteed as to principal and interest by the United States government acting through the United States Agency for International Development ("**USAID**").

In November 2006, the Government signed two new loans with the World Bank and the African Development Bank for U.S.$500 million each, in support of the Government's financial sector reform program.  In June 2007, the Egyptian Pound-equivalent of these two loans (approximately LE 5.7 billion) was lent by the Ministry of Finance as a stand-by loan to Banque Misr in support of its acquisition and potential privatization of Banque du Caire.  In October 2008, a second development policy loan agreement was signed with the World Bank for U.S.$500 million, of which the Egyptian Pound-equivalent of U.S.$400 million was lent by the Treasury as a stand-by loan to the National Bank of Egypt and the Egyptian Pound-equivalent of U.S.$100 million was lent to the Insurance Holding Company.

In July 2007, the Government issued its first five-year-Egyptian Pound-denominated global notes payable in U.S. Dollars in the international markets.  The bond had a nominal amount of LE 6 billion (U.S.$1,045,582,203), a coupon of 8.75% and will mature in 2012.

### Debt Restructuring

In the late 1980s, the Egyptian economy faced two major problems: (i) economic stagnation and negative growth and (ii) heavy indebtedness.  At the same time, inflation was in the 20-30% range.  With the onset of hostilities in the Middle East in August 1990, Egypt's economy suffered from substantial losses of tourist receipts, remittances from abroad and a depressed business climate.

To combat these problems, the Government, in 1990, launched a reform program centered on creating a decentralized, market-based, open economy.  This program combined less expansionary fiscal and monetary policies with real sector reforms, the introductions of market-based exchange and interest rate systems, a more efficient and equitable tax system and a reduction of import tariffs and subsidies.  The Government reform program was supported by measures agreed with the IMF.

In March 1991, the Government agreed with the IMF to borrow 278 million Special Drawing Rights ("**SDR**"), on the condition that the Government implement an economic reform program.

Subsequently, Egypt requested an 18-month standby credit agreement from the IMF, which was approved in May 1991.  In addition, the IMF granted Egypt a U.S.$372 million loan.  As a result of the standby credit agreement and the new loan, Egypt agreed with the IMF to pursue certain economic reforms.  In June 1991, the World Bank also agreed to provide a U.S.$520 million loan to the Republic.

In May 1991, the Paris Club, in coordination with the IMF and the World Bank, agreed to provide a comprehensive reorganization of the entire stock of Egypt's external public debt, which amounted to U.S.$20.6 billion.  The agreement provided, over time, for up to a 50% reduction in the net present value of debt.  In order to achieve this reduction, creditors were offered three options: (i) reduction of principal, (ii) reduction of the interest rate and (iii) a lesser interest rate reduction than option (ii) combined with partial capitalization of moratorium interest at longer maturities.

The economic reform program that the Government agreed with the IMF was implemented in three stages and provided for certain debt forgiveness if certain economic reform program goals were met.  The first two stages were implemented in 1991; the third stage was implemented in 1996.  Since completion of this program, the Republic has not made any further agreements with the IMF.  The IMF's role in the Republic is currently limited to providing technical expertise and advice.

*Debt Cancellation*

In late 1990, the United States forgave approximately U.S.$7 billion in military debt owed by Egypt because of Egypt's support during the first Gulf War.  This relieved Egypt of annual repayments of more than U.S.$700 million.  Other countries in Europe, the Persian Gulf and Canada also forgave certain debt obligations of the Republic.  By November 1990, total debt cancellation reached approximately U.S.$14 billion.

*Historical Development of Egypt's External Debt*

The following table sets forth the historical debt stock, as at the end of the periods indicated.

**External Debt Stock**

|  | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09 | Dec 09[1] |
|---|---|---|---|---|---|---|
|  |  |  | (U.S.$ millions)[2] |  |  |  |
| **Medium- and Long-Term Public and Publicly-Guaranteed Debt** |  |  |  |  |  |  |
| Bilateral Loans (Paris Club) | 19,264 | 18,819 | 18,476 | 19,737 | 18,060 | 17,922 |
| Bilateral Loans (Non-Paris Club) | 762 | 705 | 716 | 842 | 846 | 890 |
| Suppliers and Buyers Credit | 781 | 980 | 792 | 764 | 324 | 361 |
| Multilateral Loans | 5,058 | 5,205 | 6,815 | 7,361 | 8,169 | 9,594 |
| Sovereign Bonds maturing 2011 | 614 | 612 | 320 | 296 | 277 | 245 |
| Sovereign Bonds (guaranteed by USAID) maturing 2015 | 0 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 |
| Egyptian Pound-denominated Eurobond | 0 | 0 | 0 | 1,106 | 399 | 388 |
| Arab International Bank Deposits | 500 | 300 | 0 | 0 | 0 | 0 |
| **Total** | **26,979** | **27,871** | **28,369** | **31,355** | **29,324** | **30,650** |
| **Private Sector Non-Guaranteed Debt** | **115** | **89** | **79** | **18** | **83** | **77** |
| **Short Term Debt** | **1,855** | **1,633** | **1,450** | **2,519** | **2,124** | **2,561** |
| **Total[3]** | **28,949** | **29,593** | **29,898** | **33,892** | **31,531** | **32,287** |

*Source: CBE*

Notes:
(1) Preliminary data.
(2) Using end of period exchange rate.
(3) The pre-paid forward sale amortized notes issued for U.S.$1.6 billion in July 2005 by Petroleum Export Ltd (the "**PEL Notes**"), a special purpose vehicle used by EGPC, which are secured against crude oil and naphtha products, are not included in Egypt's external debt.  As at December 31, 2009, the nominal outstanding amount of the PEL Notes is U.S.$468 million.  The PEL Notes mature in 2010 and 2011.

The following table sets forth details of Egypt's outstanding international Government Bonds.

**Outstanding Government Bonds**

| Issue Date | Issue Size | Coupon | Maturity | S&P Rating |
|---|---|---|---|---|
| 07/11/2001 | U.S.$1,000,000,000 | 8.750 | 07/11/2011 | BB+ |
| 09/15/2005 | U.S.$1,250,000,000 | 4.450 | 09/15/2015 | AAA[1] |
| 07/18/2007 | LE 6,000,000,000 | 8.750 | 07/18/2012 | BB+ |

*Source: Ministry of Finance*

Note:
(1) Guaranteed by USAID.

The following table sets forth the medium- and long-term public and publicly-guaranteed external debt by origin of creditor at the end of the periods indicated.

**Medium- and Long-term Public and Publicly-Guaranteed External Debt by Creditor**

| Creditor | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09 | Dec 2009[1] |
|---|---|---|---|---|---|---|
| | (U.S.$ millions)[2] | | | | | |
| International Organizations[3][4] | 5,058.2 | 5,205.0 | 6,815.2 | 7,361.5 | 8,168.8 | 9,593.9 |
| France | 4,627.3 | 4,574.7 | 4,545.8 | 4,893.0 | 4,130.2 | 4,039.2 |
| United States | 4,541.9 | 4,267.4 | 4,019.1 | 3,786.0 | 3,527.2 | 3,393.3 |
| Germany | 3,131.0 | 3,259.5 | 3,551.2 | 4,232.9 | 3,795.9 | 3,867.9 |
| Japan | 4,044.1 | 3,532.5 | 3,179.8 | 3,558.2 | 3,784.9 | 3,839.8 |
| Guaranteed Sovereign Bonds[5] | 0.0 | 1,250.0 | 1,250.0 | 1,250.0 | 1,250.0 | 1,250.0 |
| Egyptian Pound-denominated Eurobond | 0.0 | 0.0 | 0.0 | 1,106.1 | 398.7 | 388.4 |
| Spain | 817.0 | 824.9 | 819.4 | 796.2 | 740.1 | 715.0 |
| United Kingdom | 267.4 | 804.8 | 667.8 | 653.1 | 197.6 | 186.1 |
| Italy | 781.7 | 725.5 | 665.4 | 611.8 | 538.1 | 515.4 |
| Austria | 547.6 | 535.6 | 539.3 | 586.3 | 479.6 | 467.9 |
| Kuwait | 427.2 | 488.1 | 506.4 | 630.8 | 653.9 | 701.0 |
| Switzerland | 451.0 | 437.1 | 412.6 | 458.8 | 396.4 | 395.2 |
| Sovereign Bonds[6] | 613.6 | 611.9 | 320.3 | 295.7 | 277.4 | 244.9 |
| Denmark | 166.9 | 177.4 | 223.2 | 251.3 | 233.8 | 289.3 |
| Canada | 210.7 | 218.3 | 218.2 | 217.3 | 185.1 | 192.2 |
| Australia | 203.8 | 186.7 | 193.5 | 198.0 | 159.5 | 162.6 |
| China | 102.2 | 105.1 | 106.4 | 127.2 | 120.1 | 125.5 |
| The Netherlands | 87.5 | 90.1 | 95.5 | 110.8 | 97.5 | 98.6 |
| Belgium | 91.3 | 89.6 | 89.7 | 97.4 | 80.1 | 77.0 |
| United Arab Emirates | 80.8 | 68.3 | 58.2 | 47.6 | 37.5 | 32.4 |
| Sweden | 40.2 | 39.3 | 39.2 | 41.3 | 30.2 | 31.0 |
| Saudi Arabia | 38.6 | 36.9 | 31.2 | 29.1 | 28.4 | 31.3 |
| Bahrain | 111.1 | 5.5 | 12.7 | 6.1 | 4.6 | 4.6 |
| Norway | 36.3 | 35.5 | 8.3 | 8.0 | 7.2 | 6.9 |
| Czech Republic | 0.0 | 0.0 | 0.8 | 0.8 | 0.8 | 0.0 |
| Lebanon | 0.0 | 0.0 | 0.0 | 0.0 | 0.6 | 0.3 |
| Syria | 0.0 | 0.0 | 0.2 | 0.0 | 0.0 | 0.0 |
| Arab International Bank Deposits[7] | 500.0 | 300.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Jordan | 1.2 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 |
| Taiwan | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total** | **26,978.8** | **27,870.9** | **28,369.4** | **31,355.2** | **29,324.2** | **30,649.7** |

*Source: CBE*

Notes:
(1)   Preliminary data.
(2)   Using end of period exchange rate.
(3)   Includes international organizations, such as the European Investment Bank, the International Development Association, the Arab Fund for Economic and Social Development, the International Bank for Reconstruction and Development and the African Development Bank.
(4)   Includes U.S.$1,191 million representing the IMF's SDR allocation to Egypt (SDR 762.5 million).
(5)   Guaranteed Notes are a Eurobond issued by the Government and guaranteed by the United States government pursuant to U.S. Public Law 108 of 2003.
(6)   In 2001, the Government issued a five-year and a ten-year bond for U.S.$500 million and U.S.$1 billion, respectively.  The five-year bond matured in 2006 and was repaid.  U.S.$320.3 million is that portion of the ten-year bond maturing in 2011 held by non-resident investors.
(7)   As at December 2004, the deposit of the Arab International Bank was converted from a short-term debt to a long-term deposit.

The following table sets forth historical figures of medium- and long-term public and publicly-guaranteed debt by currency at the end of periods indicated.

**Medium- and Long-term Public and Publicly-Guaranteed External Debt by Currency**

| | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09 | Dec 2009[1] |
|---|---|---|---|---|---|---|
| | | | | (U.S.$ millions)[2] | | |
| U.S. Dollar | 9,709 | 10,735 | 10,924 | 10,566 | 10,466 | 10,399 |
| Euro | 9,276 | 9,427 | 9,793 | 11,373 | 10,214 | 10,238 |
| Japanese Yen | 3,842 | 3,531 | 3,200 | 3,601 | 3,949 | 4,010 |
| Kuwaiti Dinar | 1,424 | 1,450 | 1,601 | 1,810 | 1,731 | 1,888 |
| Special Drawing Rights | 1,326 | 1,347 | 1,503 | 1,472 | 1,307 | 2,455 |
| Egyptian Pound | 0 | 0 | 0 | 1,106 | 424 | 418 |
| Swiss Franc | 561 | 550 | 526 | 596 | 541 | 548 |
| British Pound Sterling | 254 | 247 | 260 | 246 | 207 | 193 |
| Canadian Dollar | 154 | 164 | 167 | 169 | 140 | 149 |
| Australian Dollar | 142 | 129 | 139 | 148 | 114 | 119 |
| Danish Kroner | 139 | 144 | 146 | 162 | 137 | 136 |
| UAE Dirham | 48 | 45 | 41 | 37 | 33 | 32 |
| Swedish Kroner | 38 | 37 | 37 | 39 | 28 | 29 |
| Saudi Riyal | 38 | 37 | 31 | 29 | 28 | 31 |
| Norwegian Kroner | 28 | 28 | 1 | 1 | 5 | 5 |
| **Total** | **26,979** | **27,871** | **28,369** | **31,355** | **29,324** | **30,650** |

*Source: CBE*

_____

Notes:
(1)   Preliminary data.
(2)   Using end of period exchange rate.

The following table sets forth historical figures of short-term external debt at the end of periods indicated.

**Short-term External Debt**

| | 2004/05 | 2005/06 | 2006/07 | 2007/08 | 2008/09 | Dec 2009 |
|---|---|---|---|---|---|---|
| | | | | (U.S.$ millions)[1] | | |
| **Short-Term Debt** | **1,854.8** | **1,633.0** | **1,449.5** | **2,519.3** | **2,124.0** | **2,561.0** |
| Deposits (Non-Residents) | 819.3 | 633.1 | 536.0 | 1,048.3 | 1,156.1 | 1,262.3 |
| Trade Credits | 758.2 | 872.3 | 824.6 | 1,339.2 | 947.9 | 1,291.2 |
| Loans | 31.5 | 9.0 | 24.0 | 36.5 | 20.0 | 7.5 |
| Banking Facilities | 245.8 | 118.6 | 64.9 | 95.3 | 0.0 | 0.0 |

*Source: CBE*

_____

Note:
(1)   Using end of period exchange rate.

The following table sets forth the outstanding public with the International Bank for Reconstruction and Development (the "**IBRD**"), which is one of the institutions that comprise the World Bank Group, as at December 31, 2009.

## Public Debt with the IBRD

| Interest Rate Basis | Outstanding Amount | Currency[(1)] | Maturity Date |
|---|---|---|---|
| | (thousands) | | |
| Fixed 2.15%................................................. | 1,826.9 | U.S. Dollars | 05/01/2010 |
| Fixed 2.15%................................................. | 27,865.5 | U.S. Dollars | 05/01/2011 |
| Fixed 2.32%................................................. | 11,420.4 | U.S. Dollars | 11/01/2011 |
| Libor 6 m + 50 basis points ......................... | 19,691.3 | U.S. Dollars | 06/01/2012 |
| Fixed 2.89%................................................. | 27,006.4 | U.S. Dollars | 06/15/2014 |
| Fixed 2.89%................................................. | 10,627.2 | U.S. Dollars | 12/15/2014 |
| Libor 6 m + 50 basis points ......................... | 13,452.0 | U.S. Dollars | 03/15/2019 |
| Libor 6 m + 50 basis points ......................... | 65,245.6 | U.S. Dollars | 07/15/2013 |
| Libor 6 m + 50 basis points ......................... | 751.8 | U.S. Dollars | 01/15/2018 |
| Libor 6 m + 50 basis points ......................... | 39,385.8 | U.S. Dollars | 05/15/2018 |
| Libor 6 m + 75 basis points ......................... | 39,575.0 | U.S. Dollars | 07/15/2019 |
| Libor 6 m + 50 basis points ......................... | 4,649.8 | U.S. Dollars | 04/15/2020 |
| Libor 6 m + 50 basis points ......................... | 360,984.7 | U.S. Dollars | 02/15/2020 |
| Libor 6 m + 50 basis points ......................... | 7,173.8 | U.S. Dollars | 10/01/2024 |
| Libor 6 m + 50 basis points ......................... | 12,481.5 | U.S. Dollars | 11/01/2024 |
| Libor 6 m + 50 basis points ......................... | 166,348.2 | U.S. Dollars | 09/01/2025 |
| Libor 6 m + 50 basis points ......................... | 4,044.0 | U.S. Dollars | 03/01/2026 |
| Fixed 3.925% + 50 basis points.................... | 500,000.0 | U.S. Dollars | 02/15/2019 |
| Libor 6 m + 5 basis points ........................... | 7,300.0 | U.S. Dollars | 03/01/2026 |
| Fixed 3.65%................................................. | 500,000.0 | U.S. Dollars | 02/15/2019 |
| Average Yield 364 day T-Bills + 25 basis points ........ | 30,077.0 | Egyptian Pounds | 03/01/2026 |
| **Total**................................................................ | **1,849,907.1** | | |

*Source: Ministry of Finance and CBE*

_____

Note:
(1)      Using end of period exchange rate for U.S. Dollar-denominated debt.

## Guaranteed Debt

The following table sets forth publicly-guaranteed private sector external debt.

## Publicly-Guaranteed Private Sector External Debt

| Borrower | Outstanding Amount |
|---|---|
| | (U.S.$ millions) |
| Mid-East Petroleum ................................................................................................................ | 143.9 |
| ANSDK................................................................................................................................... | 112.0 |
| Export Development Bank ...................................................................................................... | 64.5 |
| GASCO................................................................................................................................... | 24.9 |
| Grand Beach Company ........................................................................................................... | 8.8 |
| Others ..................................................................................................................................... | 19.1 |
| **Total** ..................................................................................................................................... | 373.2 |

*Source: Ministry of Finance and CBE*

**Debt Service Projections**

The following table sets forth Egypt's medium and long-term public and publicly-guaranteed external debt service for the years indicated based on outstanding debt as at December 31, 2009.

### Medium- and Long-Term Public and Publicly-Guaranteed External Debt Service

| Period | Principal | Interest | Total | | Period | Principal | Interest | Total |
|--------|-----------|----------|-------|---|--------|-----------|----------|-------|
| | | | | (U.S.$ millions)[1] | | | | |
| 2010/H1 | 1000.49 | 322.74 | 1323.23 | | 2030/H2 | 81.50 | 7.74 | 89.24 |
| 2010/H2 | 967.02 | 331.06 | 1298.27 | | 2031/H1 | 71.82 | 7.10 | 78.92 |
| 2011/H1 | 998.25 | 315.51 | 1313.76 | | 2031/H2 | 66.85 | 6.72 | 73.56 |
| 2011/H2[2] | 1225.83 | 313.79 | 1539.61 | | 2032/H1 | 63.59 | 6.31 | 69.90 |
| 2012/H1 | 999.21 | 284.38 | 1283.60 | | 2032/H2 | 59.29 | 5.94 | 65.23 |
| 2012/H2[3] | 1392.93 | 283.13 | 1676.06 | | 2033/H1 | 53.71 | 5.55 | 59.26 |
| 2013/H1 | 1053.27 | 245.37 | 1298.64 | | 2033/H2 | 51.16 | 5.23 | 56.39 |
| 2013/H2 | 1067.12 | 246.36 | 1313.48 | | 2034/H1 | 49.92 | 4.86 | 54.78 |
| 2014/H1 | 1086.22 | 224.79 | 1311.01 | | 2034/H2 | 46.83 | 4.55 | 51.37 |
| 2014/H2 | 1137.10 | 225.88 | 1362.98 | | 2035/H1 | 46.48 | 4.19 | 50.67 |
| 2015/H1 | 1146.05 | 204.43 | 1350.48 | | 2035/H2 | 45.60 | 3.90 | 49.49 |
| 2015/H2[4] | 2415.93 | 203.94 | 2619.87 | | 2036/H1 | 42.05 | 3.56 | 45.61 |
| 2016/H1 | 1168.67 | 155.43 | 1324.09 | | 2036/H2 | 40.70 | 3.27 | 43.98 |
| 2016/H2 | 1192.30 | 154.52 | 1346.82 | | 2037/H1 | 39.57 | 2.95 | 42.51 |
| 2017/H1 | 723.55 | 134.48 | 858.02 | | 2037/H2 | 37.91 | 2.69 | 40.59 |
| 2017/H2 | 727.46 | 134.65 | 862.10 | | 2038/H1 | 24.70 | 2.37 | 27.08 |
| 2018/H1 | 716.10 | 117.82 | 833.92 | | 2038/H2 | 20.27 | 2.31 | 22.58 |
| 2018/H2 | 732.29 | 117.21 | 849.50 | | 2039/H1 | 17.49 | 2.21 | 19.70 |
| 2019/H1 | 697.58 | 100.95 | 798.54 | | 2039/H2 | 17.09 | 2.17 | 19.26 |
| 2019/H2 | 722.51 | 99.80 | 822.31 | | 2040/H1 | 15.26 | 2.09 | 17.35 |
| 2020/H1 | 659.13 | 84.60 | 743.73 | | 2040/H2 | 14.27 | 2.05 | 16.32 |
| 2020/H2 | 762.11 | 83.03 | 845.14 | | 2041/H1 | 12.65 | 1.97 | 14.62 |
| 2021/H1 | 621.08 | 68.79 | 689.86 | | 2041/H2 | 12.53 | 1.95 | 14.48 |
| 2021/H2 | 593.77 | 66.73 | 660.50 | | 2042/H1 | 11.65 | 1.88 | 13.53 |
| 2022/H1 | 402.78 | 54.31 | 457.09 | | 2042/H2 | 9.35 | 1.86 | 11.21 |
| 2022/H2 | 428.55 | 54.44 | 482.99 | | 2043/H1 | 9.30 | 1.80 | 11.10 |
| 2023/H1 | 397.31 | 45.29 | 442.60 | | 2043/H2 | 6.77 | 1.79 | 8.57 |
| 2023/H2 | 413.08 | 44.82 | 457.90 | | 2044/H1 | 5.35 | 1.75 | 7.10 |
| 2024/H1 | 388.86 | 36.47 | 425.33 | | 2044/H2 | 5.11 | 1.75 | 6.86 |
| 2024/H2 | 405.30 | 35.55 | 440.85 | | 2045/H1 | 5.11 | 1.70 | 6.81 |
| 2025/H1 | 382.27 | 27.77 | 410.04 | | 2045/H2 | 4.71 | 1.71 | 6.42 |
| 2025/H2 | 401.89 | 26.27 | 428.16 | | 2046/H1 | 3.65 | 1.66 | 5.31 |
| 2026/H1 | 369.20 | 19.33 | 388.53 | | 2046/H2 | 3.54 | 1.68 | 5.22 |
| 2026/H2 | 357.41 | 17.28 | 374.69 | | 2047/H1 | 2.20 | 1.64 | 3.84 |
| 2027/H1 | 108.69 | 11.87 | 120.55 | | 2047/H2 | 1.16 | 1.66 | 2.81 |
| 2027/H2 | 126.44 | 12.70 | 139.14 | | 2048/H1 | 0.83 | 1.63 | 2.47 |
| 2028/H1 | 96.74 | 10.39 | 107.13 | | 2048/H2 | 0.31 | 1.65 | 1.96 |
| 2028/H2 | 109.42 | 10.70 | 120.12 | | 2049/H1 | 0.31 | 1.62 | 1.93 |
| 2029/H1 | 91.15 | 9.12 | 100.27 | | 2049/H2 | 0.31 | 1.65 | 1.96 |
| 2029/H2 | 94.07 | 9.00 | 103.07 | | 2050/H1 | 0.31 | 1.62 | 1.93 |
| 2030/H1 | 78.07 | 7.96 | 86.03 | | 2050/H2 | 0.06 | 1.64 | 1.70 |
| | | | | | **Total** | **29,458.62**[5] | **5,075.00**[6] | **34,533.62** |

*Source: CBE*

_____
**Notes:**
(1)   All sums based on the exchange rate on December 31, 2009.
(2)   Includes U.S.$244.90 million sovereign bond maturing.
(3)   Includes U.S.$388.41 million Egyptian pound Euro Bond maturing.
(4)   Includes U.S.$1,250 million guaranteed notes maturing.
(5)   Excludes U.S.$1,191 million representing SDR allocation by the IMF to its member countries, Egypt's share is SDR 762.53 million.
(6)   Includes U.S.$133.77 million representing forecast interest of SDR allocation.


**Debt Record**

Other than as described above, Egypt has not, within a period of 20 years prior to the date of this Prospectus, defaulted on the principal or interest of any external security.

# TERMS AND CONDITIONS OF THE NOTES

*The following is the text of the Terms and Conditions of the Notes, which will be endorsed on each note in definitive form:*

The U.S.$1,000,000,000 5.75% Notes due 2020 (the "**2020 Notes**") and the U.S.$500,000,000 6.875% Notes due 2040 (the "**2040 Notes**" and, together with the 2020 Notes, the "**Notes**") of The Arab Republic of Egypt (the "**Republic**") were authorized pursuant to the provisions of Law 73 of 2009, published on May 19, 2009 in the Official Gazette. A fiscal agency agreement to be dated April 29, 2010 (the "**Fiscal Agency Agreement**") will be entered into in relation to the Notes among the Republic, The Bank of New York Mellon, as fiscal agent (the "**Fiscal Agent**") and as registrar (the "**Registrar**"), the other paying agents named therein (together with the Fiscal Agent and the Registrar, the "**Paying Agents**") and the transfer agents named therein (the "**Transfer Agents**"). Any reference herein to the 2020 Notes includes any further 2020 Notes issued pursuant to Condition 12 and forming a single series with the 2020 Notes and any reference herein to the 2040 Notes includes any further 2040 Notes issued pursuant to Condition 12 and forming a single series therewith.

In these Conditions, "Fiscal Agent", "Registrar", "Paying Agents" and "Transfer Agents" shall include any successors appointed from time to time in accordance with the provisions of the Fiscal Agency Agreement and any reference to an "Agent" or "Agents" shall mean any or all (as applicable) of such persons.

The statements set out in these Conditions include summaries of, and are subject to, detailed provisions of the Fiscal Agency Agreement. The Noteholders (as defined in Condition 1(b)) are bound by, and deemed to have notice of, all the provisions of the Fiscal Agency Agreement. Copies of the Fiscal Agency Agreement are available for inspection during usual business hours at the principal office of the Fiscal Agent and at the offices of each of the other Agents.

References to "**Conditions**" are, unless the context otherwise requires, to the numbered paragraphs of these Conditions.

**1.**          **Form, Denomination, Title Transfer**

*(a)*          *Form and Denomination*

The Notes are in registered form, without coupons, in the denominations of U.S.$100,000 or any amount in excess thereof which is an integral multiple of U.S.$1,000. The Notes will be numbered serially. Notes sold pursuant to Rule 144A ("**144A Notes**") under the U.S. Securities Act of 1933, as amended (the "**U.S. Securities Act**"), shall initially be represented by a Global Note (as defined below) in substantially the form (subject to completion) attached to the Fiscal Agency Agreement (the "**Restricted Global Note**"). Notes sold pursuant to Regulation S (the "**Regulation S Notes**") under the U.S. Securities Act shall initially be represented by a Global Note in substantially the form (subject to completion) attached to the Fiscal Agency Agreement (the "**Unrestricted Global Note**"). 144A Notes in definitive form will be issued in exchange for interests in the Restricted Global Note, and will bear a legend as set forth in the Fiscal Agency Agreement, and Regulation S Notes in definitive form will be issued in exchange for interests in the Unrestricted Global Note, and will also bear a legend as set forth in the Fiscal Agency Agreement, in each case, only in the limited circumstances described in the Fiscal Agency Agreement. Interests in the Restricted Global Note are exchangeable for interests in the Unrestricted Global Note and interests in the Unrestricted Global Note are exchangeable for interests in the Restricted Global Note, in each case as described in the Fiscal Agency Agreement.

*(b)*          *Title Generally*

Subject as set out below, title to the Notes will pass upon registration in the register for the Notes maintained pursuant to the Fiscal Agency Agreement (the "**Register**"), or upon registration of transfers in accordance with the provisions of the Fiscal Agency Agreement. Prior to the due presentation of a Note for registration of transfer, the Republic, the Fiscal Agent, the Paying Agents and any of their respective agents may treat the Person (as defined in Condition 3(b)) in whose name such Note is registered as the owner of such Note for the purpose of receiving payment of principal and interest and any other amount on such Note (whether or not it is overdue and regardless of any notice of ownership, trust or any interest in it or any writing on it, or its theft or loss), and none of the Republic, the Fiscal Agent, the Paying Agents or any of their respective agents will be liable for treating such Person as the registered owner of the Note.

"**Noteholder**" or "**holder,**" when used with respect to any Note, means the Person in whose name the Note is registered in the Register or, in the case of joint holders, the first named thereof; *provided, however,* that for so long as any of the Notes

is represented by a Note in global form (a **"Global Note"**) held on behalf of any of Euroclear Bank S A./N.V. (**"Euroclear"**), Clearstream Banking, *société anonyme* (**"Clearstream Luxembourg"**) or The Depository Trust Company (**"DTC"**) or its nominee, as the case may be, each Person who is for the time being shown in the records of Euroclear, Clearstream Luxembourg or DTC (collectively the **"Clearing Agents"** and each individually a **"Clearing Agent"**) as the holder of a particular principal amount of such Notes (in which regard any certificate or other document issued by Euroclear, Clearstream Luxembourg or DTC as to the principal amount of the Notes standing to the account of any Person shall be conclusive and binding for all purposes except in the case of manifest error), shall be treated by the Republic, the Fiscal Agent, the Paying Agents and any of their respective agents as the holder of such principal amount of such Notes for all purposes other than with respect to the payment of principal or interest or any other amount on the relevant Notes, for which purpose the registered owner of the relevant Global Note shall be treated by the Republic, the Fiscal Agent, the Paying Agents and any of their respective agents as the holder of such Notes in accordance with and subject to the terms of the relevant Global Note. So long as the Notes are represented by one or more Global Notes, they will be transferable only in accordance with the prevailing rules and procedures of the Clearing Agents.

Any reference herein to Euroclear, Clearstream Luxembourg, DTC or the Clearing Agents shall, whenever the context so permits, be deemed to include a reference to any additional or alternative clearing system approved by the Republic, the Fiscal Agent, provided that such clearing system is recognized by the Luxembourg Stock Exchange.

*(c)        Transfer of Notes*

Subject to Condition 1(e), a Note may be transferred, in whole or in part, in an authorized denomination upon the surrender of the Notes to be transferred, together with the form of transfer endorsed on it duly completed and executed, at the specified office of the Registrar or any Transfer Agent (which shall include a Transfer Agent in Luxembourg, as long as the Notes are listed on the Luxembourg Stock Exchange), together with such evidence as the Registrar or, as the case may be, such Transfer Agent may reasonably require in order to prove the title of the transferor to the Note and the authority of the persons who have executed the form of transfer. In the case of a permitted transfer of only part of a Note, a new Note in respect of the balance not transferred will be issued to the transferor and a new Note in respect of the balance transferred will be issued to the transferee. Each new Note to be issued upon the transfer of Notes will, upon the effective receipt of such form of transfer by the Registrar or a Transfer Agent at its respective specified office, be available for delivery at such specified office, or at the request of the holder of such new Note, will, within five Relevant Banking Days (as defined below) of receipt of such form of transfer, be mailed at the risk of the Person entitled to the new Note to such address as may be specified in such form of transfer. For these purposes, a form of transfer received by the Registrar or a Transfer Agent during the period of 15 calendar days ending on the due date for any payment on each relevant Note shall be deemed not to be effectively received by such Registrar or Transfer Agent until the day following the due date for such payment.

All transfers of Notes and entries on the Register will be made subject to the detailed regulations concerning transfer of Notes set forth in the Fiscal Agency Agreement. The regulations may be changed by the Republic with prior written approval of the Registrar to reflect changes in legal requirements or in any other manner which is not prejudicial to the interests of the Noteholders and does not affect the transferability of the Notes. A copy of the current regulations will be mailed by the Registrar to any Noteholder who requests a copy. **"Relevant Banking Day"** means a day on which commercial banks are open for business in the place where the specified office of the Registrar or a relevant Transfer Agent, as the case may be, is located.

*(d)        No Charge*

Registration or transfer of a Note will be effected without charge to the holder or transferee thereof, but upon payment (or against such indemnity from the holder or the transferee thereof as the Registrar or the relevant Transfer Agent may require) in respect of any stamp duty (or any other documentary tax or duty), tax or other governmental charge of whatever nature which may be levied or imposed in connection with such registration or transfer.

*(e)        Closed Periods*

No Noteholder may require the transfer of a Note to be registered during the period of 15 calendar days ending on the due date for any payment on such Note.

**2.**       **Status**

The Notes constitute direct, unconditional, unsecured (subject to Condition 3) and unsubordinated obligations of the Republic. The Notes shall at all times rank *pari passu* without any preference among themselves and at least pari passu with all other present and future unsecured and unsubordinated External Indebtedness (as defined below) of the Republic. The full faith and credit of the Republic is pledged for the due and punctual payment of the Notes and for all obligations of the Republic with respect thereto.

**3.**       **Negative Pledge**

*(a)*       *Negative Pledge*

So long as any of the Notes remains outstanding (as defined in the Fiscal Agency Agreement), the Republic will not create or permit to subsist any lien, pledge, mortgage, security interest, deed of trust, charge or other encumbrance or arrangement having a similar effect (any of the foregoing, a "**Lien**") (other than Permitted Liens) upon the whole or any part of its existing or future assets or revenues to secure any Public External Indebtedness of the Republic or any other Person or any Guarantee thereof unless, at the same time or prior thereto, the obligations of the Republic under the Notes and the Fiscal Agency Agreement are secured equally and rateably therewith or have the benefit of such other arrangements as may be approved by a resolution of holders of at least 75% in aggregate principal amount of the outstanding Notes.

*(b)*       *Definitions*

In these Conditions:

"**External Indebtedness**" means any indebtedness of any Person for money borrowed or raised, which is payable, or which at the option of the relevant creditor or holder thereof may be payable, in a currency other than the lawful currency of the Republic.

"**Guarantee**" means, in relation to any indebtedness of any Person, any obligation of another Person to pay such indebtedness including (without limitation):

(i)       any obligation to purchase such indebtedness;

(ii)      any obligation to lend money, to purchase or subscribe shares or other securities or to purchase assets or services in order to provide funds for the payment of such indebtedness;

(iii)     any indemnity against the consequences of a default in the payment of such indebtedness; and

(iv)     any other agreement to be responsible for such indebtedness.

"**Permitted Lien**" means:

(i)       any Lien upon property incurred for the purpose of financing the acquisition or construction of such property or any renewal or extension of any such Lien which is limited to the original property covered thereby and which secures any renewal or extension of the original secured financing;

(ii)      any Lien existing on any property at the time of its acquisition and any renewal or extension of any such Lien which is limited to the original property covered thereby and which secures any renewal or extension of the original secured financing;

(iii)     any Lien in existence on April 29, 2010; and

(iv)     any Lien incurred for the purpose of financing all or part of the costs of the acquisition, construction, development or expansion of any project (including costs such as escalation, interest during construction and financing and refinancing costs), provided that the property over which such Lien is granted consists solely of the assets and revenues of such project.

**"Person"** means any individual, company, corporation, firm, partnership, joint venture, association, unincorporated organization, trust or any other juridical entity, including, without limitation, state or agency of a state or other entity, whether or not having separate legal personality.

**"Public External Indebtedness"** means any External Indebtedness which (i) is in the form of or a represented by any bond, debenture, note or other similar instrument and (ii) as of the date of its issue is, or is capable of being, quoted, listed or ordinarily purchased and sold on any stock exchange, automated trading system or over-the-counter or other securities market.

## 4.        Interest

Each 2020 Note bears interest from April 29, 2010 (the **"Issue Date"**) at the rate of 5.75% per annum (the **"2020 Rate of Interest"**), payable semi-annually in arrear on April 29 and October 29 in each year (each, a **"2020 Interest Payment Date"**) until maturity; provided, however, that the first payment of interest will be made on October 29, 2010 for the period from and including the Issue Date to but excluding October 29, 2010. With respect to the 2020 Notes, each period beginning on (and including) the Issue Date or any 2020 Interest Payment Date and ending on (but excluding) the next 2020 Interest Payment Date is herein called an **"Interest Period"**.

Each 2040 Note bears interest from the Issue Date at the rate of 6.875% per annum (the **"2040 Rate of Interest"**), payable semi-annually in arrear on April 30 and October 30 in each year (each, a **"2040 Interest Payment Date"**) until maturity; provided, however, that the first payment of interest will be made on October 30, 2010 for the period from and including the Issue Date to but excluding October 30, 2010. With respect to the 2040 Notes, each period beginning on (and including) the Issue Date or any 2040 Interest Payment Date and ending on (but excluding) the next 2040 Interest Payment Date is herein called an **"Interest Period"**.

Each Note will cease to bear interest from and including its due date for redemption unless, upon due presentation, payment of principal in respect of the Note is improperly withheld or refused, in which case it will continue to bear interest at the Rate of Interest until the earlier of (a) the day on which all sums due in respect of such Note up to that day are received by or on behalf of the relevant Noteholder and (b) the Business Day (as defined in Condition 6(a)(iii)) after the Fiscal Agent has given notice to the Noteholders of receipt of all sums due in respect of all sums due in respect of all Notes up to that Business Day (except to the extent that there is any subsequent default in payment in accordance with these Conditions).

All interest shall be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each.

## 5.        Redemption, Purchase and Cancellation

*(a)        Final Redemption*

Unless previously purchased and cancelled, the 2020 Notes will be redeemed at their principal amount on April 29, 2020 (the **"2020 Maturity Date"**), payable as provided in Condition 6, and, unless previously purchased and cancelled, the 2040 Notes will be redeemed at their principal amount on April 30, 2040 (the **"2040 Maturity Date"** and, together with the 2020 Maturity Date, the **"Maturity Dates"**), payable as provided in Condition 6.

*(b)        Purchase and Cancellation*

The Republic may at any time purchase Notes in the open market or otherwise and at any price, provided that such purchase is made in accordance with the U.S. Securities Act and any other applicable securities laws. Any Notes so purchased may be cancelled or held and resold (provided that such resale is outside the United States, as defined in Regulation S under the U.S. Securities Act). If the Republic purchases Notes by tender, the tender must be available to all holders of the Notes. Any Notes so purchased, while held by or on behalf of the Republic shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorums at meetings of Noteholders. Any Notes so cancelled will not be reissued.

**6.**                    **Payments**

*(a)*          *Payments Generally*

*(i)*          *Method of Payment.* Payment of amounts (whether principal, interest or otherwise) due (other than in respect of the final redemption) in respect of the Notes will be made by check in U.S. Dollars drawn on a bank in New York City and mailed to the address (as recorded in the Register kept by the Registrar) of the Noteholder thereof (or to the address of the first named Person on the Register in respect of joint holders) on the relevant Record Date (as defined below) not later than the relevant due date for payment unless, prior to the relevant Record Date, the Noteholder has applied to the Registrar and the Registrar has acknowledged such application for payment to be made to a designated U.S. Dollar account, in which case payment shall be made on the relevant due date for payment by transfer to such account. Payment on a Global Note will be made through DTC, Euroclear or Clearstream Luxembourg, as the case may be.

*(ii)*          *Payments to Persons Who are Noteholders on Record Dates.* Payment of amounts due in respect of Notes (other than in respect of the final redemption) will be paid to the Noteholders thereof as appearing in the Register kept by the Registrar as at close of business (local time in the place of the specified office of the Registrar) on the fifteenth calendar day before the due date for such payment (the **"Record Date"**).

*(iii)*          *Payments of Amounts Due on Final Redemption.* Payment of amounts (including accrued interest) due on the final redemption of the Notes will be made against presentation and surrender of the relevant Notes at the specified office of the Registrar or any of the Paying Agents. If the due date for payment of the final redemption amount of any Note is not a Business Day (as defined below), then the Noteholders thereof will not be entitled to payment thereof until the next day which is a Business Day and no further payment on account of interest or otherwise shall be due in respect of such postponed payment unless there is a subsequent failure to pay in accordance with these Conditions, in which event interest shall continue to accrue as provided in Condition 4. For purposes of the Notes, **"Business Day"** means (i) a day on which commercial banks and foreign exchange markets settle payments in New York City, (ii) in relation to payments due upon presentation and/or surrender of any Note, a day on which commercial banks are open and foreign exchange markets settle payments in U.S. Dollars in the place of presentation and (iii) in relation to Global Notes, a day on which the Clearing Agents are in operation.

*(b)*          *Fiscal Laws; Commissions*

All payments of principal and interest in respect of the Notes are subject in all cases to any applicable fiscal or other laws and regulations in the place of payment, but without prejudice to the provision of Condition 7. No commissions or expenses shall be charged to the Noteholders in respect of payments under the Notes.

*(c)*          *Presentation Dates and Other Payment Matters*

*(i)*          *Presentation Dates.* A Noteholder shall be entitled to present a Note for payment only on a Presentation Date and shall not, except as provided in Condition 4, be entitled to any further interest or other payment if a Presentation Date is after the due date for the relevant payment. **"Presentation Date"** means a day which (subject to Condition 9) is or falls after the relevant due date or, if the due date is not or was not a Business Day, is or falls after the next following Business Day.

*(ii)*          *Other Payment Matters.* If a Note is presented for payment at a time when, as a result of differences in time zones, it is not practicable to transfer the relevant amount to an account designated for payment as provided above for value on the relevant Presentation Date, the Republic shall not be obligated to effect transfer to such account for value on such date but shall be obliged to transfer the relevant amount to such account for value on the first Business Day after such Presentation Date.

*(d)*          *Agents*

The initial Agents and their initial specified offices are listed below. Any of the Agents may resign in accordance with the provisions of the Fiscal Agency Agreement and the Republic reserves the right at any time to vary or terminate the appointment of any Agent and appoint additional or other Agents, provided that while the Notes are outstanding it will maintain (i) a Fiscal Agent, (ii) a Registrar,  (iii) a Paying Agent and (iv) a Transfer Agent having a specified office in Luxembourg, so long as the Notes are listed on the Luxembourg Stock Exchange and the rules of the Luxembourg Stock

Exchange so require. Notice of any change in the Agents or their specified offices will be given promptly to the Noteholders in accordance with Condition 13.

## 7.        Taxation

All payments of principal and interest in respect of the Notes by the Republic shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by the Republic or any political subdivision or any authority thereof or therein having power to tax (together, **"Taxes"**), unless such withholding or deduction is required by law. If any such withholding or deduction is required by law, the Republic shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them had no such withholding or deduction been required, except that no such additional amounts shall be payable:

to a holder, or to a third party on behalf of a holder, if such holder is liable for such Taxes in respect of such Note by reason of having some connection with the Republic other than the mere holding of such Note;

more than 30 days after the Relevant Date, except to the extent that the holder would have been entitled to such additional amounts on duly presenting the Note for payment on the last Business Day of such period of 30 days, assuming that day to have been a Presentation Date;

where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to Directive 2003/48/EC on the taxation of savings income in the form of interest payments or any law implementing or complying with, or introduced in order to conform to, such Directive; or

in respect of a Note presented for payment by or on behalf of a Noteholder who would have been able to avoid such withholding or deduction by presenting the relevant Note to another Paying Agent in a member state of the European Union.

In these Conditions, **"Relevant Date"** means the later of (i) the date on which the payment in question first becomes due and (ii) if the full amount payable has not been received in New York City by the Fiscal Agent on or prior to such due date, the date on which (the full amount having been so received) notice to that effect has been given to the Noteholders in accordance with Condition 13.

Any reference in these Conditions to principal or interest in respect of the Notes shall be deemed to include any additional amounts which may be payable under this Condition 7.

## 8.        Events of Default

If any of the following events (each an **"Event of Default"**) occurs and is continuing with respect to a series of Notes:

*(a)           Non-Payment*

The Republic fails to pay principal, premium, if any, or interest in respect of any of the Notes of such series when due and payable and such failure continues for a period of 15 days; or

*(b)           Breach of Other Obligations*

The Republic fails to perform any other obligations in respect of the Notes of such series and that failure continues for 30 days after any Noteholder of such series gives written notice to the Republic to remedy the failure and gives a copy of such notice to the Fiscal Agent; or

*(c)           Cross-Acceleration*

(i) Any other Public External Indebtedness of the Republic becomes due and payable prior to stated maturity thereof by reason of default, or (ii) any such Public External Indebtedness is not paid at maturity thereof, or (iii) any Guarantee of such Public External Indebtedness is not honored when due and called upon and, in the case of (ii) or (iii), that failure continues beyond any applicable grace period; provided, that the amount of Public External Indebtedness referred to in (i) and/or (ii)

and/or the amount payable under any Guarantee referred to in (iii) individually or in the aggregate exceeds U.S.$20,000,000 (or its equivalent in any other currency or currencies); or

*(d)        IMF Membership*

The Republic ceases to be a member in good standing, or becomes ineligible to use the resources of, the IMF or of any successor of which the Republic shall have become a member that performs the function of, or functions similar to, the IMF; or

*(e)        Moratorium*

The Republic shall have declared a general moratorium on the payment of principal of, or interest on, all or any part of its Public External Indebtedness; or

*(f)        Unenforceability*

For any reason whatsoever, the obligations under the Notes of such series or the Fiscal Agency Agreement become unlawful or are declared by a court of competent jurisdiction to be no longer binding on, or no longer enforceable against, the Republic; or

*(g)        Validity*

If the Republic or any of its political sub-divisions on behalf of the Republic contest the validity of any series of the Notes, then the holders of 25% or more in the aggregate principal amount of such series of the Notes then outstanding may, by written notice to the Republic at the specified office of the Fiscal Agent, declare such series of the Notes due and payable immediately; provided, that in the case of an Event of Default described in paragraphs (a) and (e) above, any holder of the relevant series of Notes may, by written notice to the Republic at the specified office of the Fiscal Agent, declare such Notes held by it (but only with respect to the relevant series of Notes held by it) due and payable immediately. Upon any declaration of acceleration, the principal, interest and all additional amounts payable on the relevant series of Notes will become immediately due and payable on the date the Republic receives written notice of the declaration, unless the Republic has remedied the Event of Default or Events of Default prior to receiving the notice. No delay or omission of any Noteholder of such series or any party to the Fiscal Agency Agreement to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or any other breach of obligations under the Fiscal Agency Agreement.

If the Republic receives notice in writing from Noteholders of at least 50% in aggregate principal amount of the relevant series of outstanding Notes to the effect that the Event of Default or Events of Default giving rise to any above-mentioned declaration of acceleration is or are cured following any such declaration and that such Noteholders wish the relevant declaration to be withdrawn, the Republic shall give notice thereof to the Noteholders of such series, with a copy to the Fiscal Agent, whereupon the relevant declaration shall be withdrawn and shall have no further effect but without prejudice to any rights or obligations that may have arisen before the Republic gives such notice (whether pursuant to these Conditions or otherwise). No such withdrawal shall affect any other or any subsequent Event of Default or any right of any Noteholder in relation thereto.

## 9.        Prescription

Any money paid by the Republic to the Fiscal Agent for payment due under any Note that remains unclaimed at the end of two years after the due date for that payment will be repaid to the Republic, and the holder of such Note shall thereafter look only to the Republic for payment.

Claims against the Republic in respect of principal and interest shall become void unless made within a period of ten years, in the case of principal, and five years, in the case of interest, from the appropriate Relevant Date.

## 10.        Replacement of Notes

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the specified office of the Registrar or the Transfer Agent with its specified office in Luxembourg, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to

evidence, security, indemnity and otherwise as the Republic may reasonably require. Mutilated or defaced Notes must be surrendered before replacements will be issued.

## 11.        Meetings of Noteholders, Modification and Waiver

The Republic, the Fiscal Agent or the holders of at least 10% in aggregate principal amount of the relevant series of Notes may call a meeting of Noteholders of such series at any time. The Republic or the Fiscal Agent (as the case may be) shall give the Noteholders of such series not less than 30 or more than 60 days' prior notice of each meeting. The notice of each meeting shall state: (i) the time and the place of the meeting; (ii) in general terms, the action proposed to be taken at the meeting; and (iii) the record date for determining the holders entitled to vote at the meeting. To be entitled to vote at any meeting, a Person must be a holder of the Notes of such series or a Person duly appointed in writing as a proxy for a Noteholder of such series. The Persons entitled to vote more than 50% of the aggregate principal amount of the outstanding Notes of such series will constitute a quorum. At the reconvening of any meeting adjourned for lack of quorum, the Persons entitled to vote at least 25% in aggregate principal amount of the Notes of such series outstanding will constitute a quorum for taking of any action set forth in the notice of the original meeting.  The Fiscal Agent may make reasonable and customary regulations as it deems advisable for any meeting with respect to the proof of the holding of Notes of such series, the adjournment and chairmanship of such meeting, the appointment and duties of inspectors of votes, certificates and other evidence of the right to vote and other matters concerning the conduct of the meeting that the Fiscal Agent deems appropriate.

The Republic and the Fiscal Agent may modify, amend or supplement the terms of the relevant series of Notes and the Fiscal Agency Agreement or the Noteholders of such series may take any action provided by the Fiscal Agency Agreement or the terms of the Notes of such series, with the vote or written consent of holders of not less than 66⅔% in aggregate outstanding principal amount of the relevant series of Notes; *provided, however,* that holders of not less than 75% in aggregate outstanding principal amount of the Notes of such series must consent to any amendment, modification or change that could or would: (i) change the due date for the payment of principal, any premium, or any interest on the Notes of such series; (ii) reduce or cancel the principal amount of the Notes of such series, the portion of the principal amount of the Notes of such series that is payable upon acceleration of the Maturity Date, the interest rate thereon or any premium payable upon redemption; (iii) change the currency or place of payment of principal of or any premium or interest on the Notes of such series; (iv) reduce the percentage of principal amount of the Noteholders of such series whose vote or consent is needed to modify, amend or supplement the Fiscal Agency Agreement or the terms of the Notes of such series or to take any other similar action; (v) change the Republic's obligation to pay additional amounts; (vi) change or waive the provisions of the Notes of such series set out in Condition 2; (vii) change any provision of the Notes of such series describing the circumstances in which the relevant series of Notes may be declared due and payable prior to their scheduled Maturity Date set out in Condition 8; (viii) permit the Republic to redeem the Notes of such series; or (ix) change the law governing the Notes of such series, the courts to the jurisdiction of which the Republic has submitted in the Notes of such series, the Republic's obligation to maintain an agent for service of process in the State of New York or the Republic's waiver of immunity, in respect of actions or proceeding brought by any Noteholder set out in Condition 16 (each, a **"Reserved Matter"**).

For the purposes of (i) ascertaining the right to attend and vote at any meeting of the Noteholders of such series and (ii) Condition 8 and this Condition 11, those Notes of such series (if any) which are for the time being held by any Person (including but not limited to the Republic) for the benefit of the Republic shall (unless and until ceasing to be so held) be deemed not to remain outstanding.

The Republic and the Fiscal Agent may, without the consent of the Noteholders, amend, modify or waive any provision of the Fiscal Agency Agreement or a series of Notes for the purpose of (i) adding to the Republic's covenants for the benefit of the Noteholders of such series, (ii) surrendering any of the Republic's rights or powers, (iii) providing collateral for the Notes of such series, (iv) curing any ambiguity or curing, correcting or supplementing any defective provision thereof or (v) amending the Fiscal Agency Agreement or the Notes of such series in any manner which the Republic and the Fiscal Agent may determine is of a formal, minor or technical nature and which shall not adversely affect the interest of any Noteholder of such series in any material respect.

Any modification, amendment or supplement pursuant to the terms of this Condition 11 shall be binding on all the Noteholders of such series, whether or not they are present at the meeting and whether or not they vote in favour, and shall be promptly notified to the Noteholders of such series in accordance with Condition 13.

**12.**          **Further Issues**

The Republic may from time to time, without the consent of the Noteholders, create and issue further 2020 Notes or 2040 Notes ranking equally in all respects (or in all respects except for the amount, the date of the first payment of interest thereon and for certain transfer restrictions) so that the same shall be consolidated and form a single series with the 2020 Notes or the 2040 Notes, as the case may be.

**13.**          **Notices**

*(a)*          *Publication of Notices*

Subject to Condition 13(b), notices to be given by the Republic to Noteholders will be published (i) in an English language daily newspaper of general circulation in London (which is expected to be the *Financial Times*) and (ii) for so long as any Notes are listed on the Luxembourg Stock Exchange and the rules of the Luxembourg Stock Exchange so require, notices concerning the Notes will be published on the internet website of the Luxembourg Stock Exchange (www.bourse.lu) or in a daily newspaper of general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*). Any notice published as provided above shall be deemed to have been given on the date of its publication, or if published more than once, on the date of its first publication.

*(b)*          *Notices through Clearing Agents*

So long as any Global Note is held on behalf of DTC, Euroclear or Clearstream Luxembourg, there may be substituted for notice through publication in newspapers in London and Luxembourg to Noteholders represented thereby the delivery of the relevant notice to the relevant Clearing Agent for communication by it to the Noteholders held in accounts with that Clearing Agent; *provided,* that so long as the Notes are listed on the Luxembourg Stock Exchange notice shall be given as provided in Condition 13(a)(ii).

*(c)*          *Effect of Certain Notices*

Neither the failure to give notice nor any defect in any notice given to any particular Noteholder shall affect the sufficiency of any notice with respect to other holders.

*(d)*          *Notices to the Republic and Any Agent*

Except as otherwise expressly provided herein, any request, demand, authorization, direction, notice, consent, election, waiver or other act of the Noteholders or other document provided or permitted by the Fiscal Agency Agreement to be made upon, given or furnished to, or filed by any Noteholder with,

(i)          the Fiscal Agent shall be sufficient for every purpose hereunder and under the Fiscal Agency Agreement, if made, given, furnished or filed in writing to the Fiscal Agent at its office specified herein or pursuant to the Fiscal Agency Agreement; or

(ii)          the Republic shall be sufficient for every purpose hereunder and under the Fiscal Agency Agreement (unless otherwise herein or therein expressly provided) if made, given, furnished or filed in writing to or with the Republic at the address specified on the signature pages of the Fiscal Agency Agreement, or at any other address previously furnished in writing to the Fiscal Agent by the Republic and notified to the Noteholders in accordance with Condition 13.

Any such notice by a Noteholder may be furnished or filed by any standard form of telecommunications, including telecopier, telex, telegram or email so long as such notice is confirmed in writing by the Noteholder or its agent and delivered promptly by airmail to the Fiscal Agent or the Republic, as the case may be, or, so long as the Notes are represented by a Global Note, through the relevant Clearing Agent's international communication system utilized for communication with its respective member organizations to the Fiscal Agent via DTC, Euroclear or Clearstream Luxembourg, in such manner as the Fiscal Agent and DTC, Euroclear or Clearstream Luxembourg, as the case may be, may approve for this purpose. The Republic or the Fiscal Agent, as the case may be, may require any Noteholder giving notice to furnish proof of its holding of the Notes.

**14.        Indemnity of the Fiscal Agent and Other Agents**

The Fiscal Agency Agreement contains provisions for the indemnification of the Fiscal Agent and the other Agents and for their relief from responsibility. The Fiscal Agent and each other Agent is entitled to enter into business transactions with the Republic without accounting for any profit. The Fiscal Agent and the other Agents are agents of the Republic and none of them is a trustee or fiduciary for any of the holders of the Notes, except in the limited circumstances expressly provided for in the Fiscal Agency Agreement.

**15.        Currency Indemnity**

U.S. Dollars is the sole currency of payment for all sums payable by the Republic under or in connection with the Notes. Any amount received or recovered in a currency other than U.S. Dollars (whether as a result of, or the enforcement of, a judgment or order of a court of any jurisdiction or otherwise) by any Noteholder in respect of any sum expressed to be due to it from the Republic shall only constitute a discharge of the Republic to the extent of the U.S. dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so). If that U.S. dollar amount is less than the U.S. dollar amount expressed to be due to the recipient under any Note, the Republic shall indemnify such recipient against any loss sustained by it as a result. In any event, the Republic shall indemnify the recipient against the cost of making any such purchase. These indemnities constitute separate and independent obligations from the Republic's other obligations, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by any Noteholder and shall continue in full force and effect despite any judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note or any judgment or order.

**16.        Governing Law**

The Fiscal Agency Agreement and the Notes are governed by, and shall be construed in accordance with, the laws of the State of New York. The Republic irrevocably agrees for the benefit of each of the Noteholders that the courts of the State of New York and the United States sitting in The City of New York, Borough of Manhattan shall have non-exclusive jurisdiction to settle any disputes which may arise out of or in connection with the Fiscal Agency Agreement or the Notes and that, accordingly, any suit, action or proceedings (collectively, **"Proceedings"**) arising out of or in connection therewith may be brought in any such courts. The Republic submits to the non-exclusive jurisdiction of the courts referred to in this Condition for purposes of any Proceeding and irrevocably and unconditionally waives to the fullest extent permitted by law, any objection which the Republic may have based an improper venue or *forum non conveniens* to the conduct of such Proceedings.

To the extent that the Republic may in any jurisdiction claim or acquire for itself or its assets immunity (sovereign or otherwise) from suit, execution, attachment or other legal process (whether through service or notice or otherwise), the Republic irrevocably agrees for the benefit of the holders not to claim, and irrevocably waives, such immunity, to the fullest extent permitted by the laws of such jurisdiction (other than immunity from pre-judgment attachments, which is expressly not waived). The waiver of immunity in this paragraph shall have the fullest scope permitted under the Foreign Sovereign Immunities Act of 1976 of the United States and is intended to be irrevocable for purposes of such act, but shall otherwise constitute a limited and specific waiver for the purpose of the Fiscal Agency Agreement and the Notes and under no circumstances shall it be interpreted as a general waiver by the Republic or a waiver of immunity in respect of (a) property used by a diplomatic or consular mission of the Republic, (b) property of a military character and under the control of a military authority or defense agency of the Republic or (c) property located in Egypt and dedicated to a public or governmental use (as distinct to property dedicated to a commercial use) by the Republic.

The Republic irrevocably appoints Ambassador Sameh Shoukry, Washington, D.C. or his successor as its authorized agent for the service of process in the United States.

# FORMS OF THE NOTES

**Form of Notes**

All Notes will be in registered form, without coupons attached. The Notes sold in offshore transactions in reliance on Regulation S will initially be in the form of Regulation S global notes, which will be deposited with a common depositary outside the United States registered in the name of a nominee of Euroclear or Clearstream Luxembourg. Until 40 days after the later of the commencement of the Offering and the time of delivery of the Notes, beneficial interests in a Regulation S global note may be held only through Euroclear or Clearstream Luxembourg, unless delivery is made through the related 144A global note in accordance with the certification requirements described below. The Notes sold to qualified institutional buyers in reliance on Rule 144A will initially be in the form of 144A global notes, which will be deposited with DTC, or a custodian of DTC, and registered in the name of a nominee of DTC.

The Notes (including beneficial interests in the global notes) will be subject to certain restrictions on transfer set forth in the Notes and in the Fiscal Agency Agreement and will bear a legend regarding such restrictions as provided in "Transfer Restrictions". Under certain circumstances, transfer may be made only upon receipt by the fiscal agent of a written certification (in the form(s) provided in the Fiscal Agency Agreement).

**Book-Entry Ownership of Global Notes**

The Republic has applied to Euroclear and Clearstream Luxembourg for acceptance in their respective book-entry settlement systems of the Regulation S global notes. The Republic has also applied to DTC for acceptance in its book entry settlement system of the 144A global notes.

Principal and interest payments on the Notes will be made by the Republic through the Fiscal Agent to a nominee of Euroclear and Clearstream Luxembourg as the holder of the Regulation S global notes and to a nominee of DTC as the holder of the 144A global notes. All payments duly made by the Republic as aforesaid shall discharge the liability of the Republic under the Notes to the extent of the sum or sums so paid. Therefore, after such payments have been duly made, none of the Republic, the Fiscal Agent or any Paying Agent will have any direct responsibility or liability for the payment of principal or interest on the Notes to owners of beneficial interests in the global notes which are held through the clearing systems. Payment by DTC Participants (as defined below) (which include certain underwriters, securities brokers and dealers, banks, trust companies and clearing corporations and which may in the future include certain other organizations) and Indirect DTC Participants (as defined below) (which include banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a DTC Participant, either directly or indirectly) to owners of beneficial interests in the 144A global notes will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in "street name", and will be the responsibility of the DTC Participants or Indirect DTC Participants. None of the Republic, the Fiscal Agent or any Paying Agent will have any responsibility or liability for any aspect of the records of DTC relating to payments made through DTC on account of beneficial interests in the 144A global notes or for maintaining, supervising or reviewing any records of DTC relating to such beneficial interests. Substantially similar principles will apply with regard to the Regulation S global notes and payments made through Euroclear and Clearstream Luxembourg to owners of interests therein.

**Exchange of Interests in Notes**

On or prior to the 40th day after the later of the commencement of the offering and the time of delivery of the Notes, a beneficial interest in a Regulation S global note may be held only through Euroclear or Clearstream Luxembourg, unless delivery is made through the related Rule 144A global note in accordance with the certification requirements described in this paragraph. Prior to the 40th day after the later of the commencement of the offering and the time of delivery of the Notes, a beneficial interest in a Regulation S global note may be transferred within the United States to a person who takes delivery in the form of an interest in the related Rule 144A global note only upon receipt by the transfer agent of a written certification (in the form(s) provided in the Fiscal Agency Agreement) from the transferors that the transfer is being made to a person whom the transferor, and any person acting on its behalf, reasonably believes is a qualified institutional buyer (a "QIB") and that the transaction is being made in reliance on Rule 144A. After the 40th day after the later of commencement of the offering and the time of delivery of the Notes (but not earlier), investors may also hold interests in a Regulation S global note through organizations other than Euroclear or Clearstream Luxembourg that are either DTC Participants or Euroclear participants or Clearstream Luxembourg participants.

Beneficial interests in a 144A global note may be transferred to a person who takes delivery in the form of an interest in a 144A global note without any written certification from the transferor or the transferee. Beneficial interests in a 144A global note may be transferred to a person who takes delivery in the form of an interest in a Regulation S global note only upon receipt by the Fiscal Agent of a written certification (in the form(s) provided in the Fiscal Agency Agreement) from the transferor to the effect that such transfer is in accordance with Rule 903 or 904 of Regulation S or Rule 144 under the U.S. Securities Act (if available). If such transfer occurs on or prior to the 40th day after the later of the commencement of the offering and the time of delivery of the Notes, the interest transferred will be held immediately thereafter through Euroclear or Clearstream Luxembourg.

Any beneficial interest in one of the global notes that is transferred to an entity who takes delivery in the form of an interest in the other global note will, upon transfer, cease to be an interest in such global note and become an interest in the other global note and, accordingly, will thereafter be subject to all transfer restrictions, if any, and other procedures applicable to beneficial interests in such other global note for as long as it remains such an interest.

Transfer of interests in global notes within DTC, Euroclear and Clearstream Luxembourg will be in accordance with the usual rules and operating procedures of the relevant clearing system. The laws of some States of the United States require that certain persons receive Notes in definitive form in respect of their holdings of the Notes. Consequently, the ability to transfer interests in a global note to such persons will be limited. Because DTC, Euroclear and Clearstream Luxembourg only act on behalf of participants, who in turn act on behalf of indirect participants, the ability of a person having an interest in a global note to pledge such interest to persons or entities which do not participate in the relevant clearing system or otherwise take actions in respect of such interest, may be affected by the lack of a Note in the definitive form representing such interest.

Subject to compliance with the transfer restrictions applicable to the Notes described above and under "Transfer Restrictions", cross-market transfers between DTC Participants, on the one hand, and Clearstream Luxembourg or Euroclear participants, on the other, will be effected in the Register.

DTC has advised the Republic that it will take any action permitted to be taken by a holder of the Notes (including, without limitation, the presentation of global notes for exchange as described below) only at the direction of one or more participants in whose account with DTC interests in global notes are credited, and only in respect of such portion of the aggregate principal amount of the global note as to which such participant or participants has or have given such direction. However, in certain circumstances, DTC will exchange the 144A global note for Notes in definitive form (which will bear the legend set out under "Transfer Restrictions").

Although DTC, Clearstream Luxembourg and Euroclear have agreed to the foregoing procedures in order to facilitate transfers of interests in global notes among participants and account holders of DTC, Euroclear and Clearstream Luxembourg, they are under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time. Neither the Republic, the Registrar nor any Transfer Agent or any Paying Agent will have any responsibility for the performance of DTC, Euroclear and Clearstream Luxembourg or their respective direct or indirect participants or account holders of their respective obligations under the rules and procedures governing their respective operations.

**Definitive Notes**

The Republic will issue the Notes in definitive form only if:

- (in the case of any 144A global note only) DTC is unwilling or unable to continue as depositary, is ineligible to act as depositary or ceases to be a "clearing agency" registered under the U.S. Securities Exchange Act of 1934, as amended (the "**U.S. Exchange Act**"), and the Republic is unable to locate a qualified successor within 90 days after (i) DTC notifies the Republic or (ii) the Republic becomes aware of this situation; or

- (in the case of any Regulation S global note only) Euroclear or Clearstream Luxembourg is closed for a continuous period of 14 days (other than by reason of legal holidays) or announces an intention to permanently cease business; or

- (in the case of any Regulation S global note only) the Republic, at its option, elects to terminate the book-entry system through Euroclear or Clearstream Luxembourg; or

- an event of default has occurred and is continuing, upon request of a Noteholder.

**Global Depositaries**

The information set out below in connection with DTC, Euroclear and Clearstream Luxembourg (together the "**clearing systems**") is subject to change in or reinterpretation of the rules, regulations and procedures of the clearing systems currently in effect. The information in this section concerning the clearing systems has been obtained from sources that the Republic believes to be reliable, but neither the Republic nor any initial purchaser takes any responsibility for the accuracy of such information. Investors wishing to use the facilities of any of the clearing systems are advised to confirm the applicability of the rules, regulations and procedures of the relevant clearing system. Neither the Republic nor any other party to the Fiscal Agency Agreement will have any responsibility or liability for any aspect of the records relating to, or payments made on account of interest in the Notes held through the facilities of, any clearing system or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

*DTC*

DTC has advised the Republic as follows: DTC is a limited purpose trust company organized under the laws of the State of New York, a "banking organization" within the meaning of the Banking Law of the State of New York, a member of the United States Federal Reserve System, a "**clearing corporation**" within the meaning of the State of New York Uniform Commercial Code and a "**clearing agency**" registered pursuant to Section 17A of the U.S. Exchange Act. DTC was created to hold securities for its participants ("**DTC Participants**") and to facilitate the clearance and settlement of securities transactions between DTC Participants through electronic book-entries, thereby eliminating the need for the physical movement of certificates. DTC Participants include securities brokers and dealers, banks, trust companies, clearing corporations and other organizations. Indirect access to the DTC system also is available to others such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a DTC Participant, either directly or indirectly ("**Indirect DTC Participants**"). DTC is owned by a number of its participants and by the New York Stock Exchange, Inc., the American Stock Exchange, Inc. and the National Association of Securities Dealers, Inc. Investors who are not DTC Participants may beneficially own securities held by or on behalf of DTC only through DTC Participants.

*Euroclear and Clearstream Luxembourg*

Euroclear and Clearstream Luxembourg have advised the Republic as follows:

Euroclear and Clearstream Luxembourg hold securities and book-entry interests in securities for participating organizations and facilitate the clearance and settlement of securities transactions between their respective participants through electronic book-entry changes in accounts of such participants. Euroclear and Clearstream Luxembourg provide to their participants, among other things, services for safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Euroclear and Clearstream Luxembourg interface with domestic securities markets. Euroclear and Clearstream Luxembourg participants are financial institutions such as underwriters, securities brokers and dealers, banks, trust companies and certain other organizations. Indirect access to Euroclear and Clearstream Luxembourg is also available to others such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Euroclear or Clearstream Luxembourg participant, either directly or indirectly.

Euroclear was created in 1968 to hold securities for its participants and to clear and settle transactions between its participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of certificates and any risk from lack of simultaneous transfers of securities and cash. The Euroclear System is owned by Euroclear Clearance System Public Limited Company and operated through a license agreement by Euroclear Bank S.A./N.V., a bank incorporated under the laws of the Kingdom of Belgium.

Euroclear is regulated and examined by the Belgian Banking and Finance Commission and the National Bank of Belgium.

Securities clearance accounts and cash accounts with Euroclear are governed by the terms and conditions governing the use of Euroclear, the related operating procedures of the Euroclear system and applicable Belgian law (collectively, the "**Euroclear Terms and Conditions**"). The Euroclear Terms and Conditions govern transactions of securities and cash within Euroclear, withdrawal of securities and cash from the system, and receipts of payments with respect to securities in the system. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the Euroclear Terms and Conditions only on behalf of Euroclear participants, and has no record of or relationship with persons holding through Euroclear participants.

# GLOBAL CLEARANCE AND SETTLEMENT

*The Republic has obtained the information in this section from sources it believes to be reliable, including from DTC, Euroclear and Clearstream Luxembourg. The Republic takes no responsibility, however, for the accuracy of this information. DTC, Euroclear and Clearstream Luxembourg are under no obligation to perform or continue to perform the procedures described below, and they may modify or discontinue them at any time. Neither the Republic nor the Fiscal Agent will be responsible for DTC's, Euroclear's or Clearstream Luxembourg's performance of their obligations under their rules and procedures, nor will the Republic or the Fiscal Agent be responsible for the performance by direct or indirect participants of their obligations under their rules and procedures.*

## Introduction

### *The Depository Trust Company*

DTC has advised the Republic that it is:

- a limited-purpose trust company organized within the meaning of the New York Banking Law;

- a "banking organization" under the New York Banking Law;

- a member of the Federal Reserve System;

- a "clearing corporation" within the meaning of the New York Uniform Commercial Code; and

- a "clearing agency" registered under Section 17A of the U.S. Securities Exchange Act of 1934.

DTC was created to hold securities for its participants and facilitate the clearance and settlement of securities transactions between its participants. It does this through electronic book-entry changes in the accounts of its direct participants, eliminating the need for physical movement of securities certificates. DTC is owned by a number of its direct participants and by the New York Stock Exchange, Inc., the American Stock Exchange and the National Association of Securities Dealers, Inc.

The laws of some states require certain purchasers of securities to take physical delivery of the securities in definitive form. These laws may impair i ability to transfer beneficial interests in the Notes to such purchasers. DTC can act only on behalf of its direct participants, who in turn act on behalf of indirect participants and certain banks. Thus, your ability to pledge beneficial interests in the Notes to persons that do not participate in the DTC system, and to take other actions, may be limited because you will not possess a physical certificate that represents your interest.

According to DTC, the foregoing information about DTC has been provided to us for informational purposes only and is not a representation, warranty or contract modification of any kind.

### *Euroclear and Clearstream Luxembourg*

Like DTC, Euroclear and Clearstream Luxembourg hold securities for their participants and facilitate the clearance and settlement of securities transactions between their participants through electronic book-entry changes in their accounts. Euroclear and Clearstream Luxembourg provide various services to their participants, including the safekeeping, administration, clearance and settlement, and lending and borrowing of internationally traded securities. Euroclear and Clearstream Luxembourg participants are financial institutions such as underwriters, securities brokers and dealers, banks, trust companies and other organizations. The underwriters and other banks, brokers, dealers and trust companies are either direct participants in or have indirect access to Euroclear or Clearstream Luxembourg by clearing through or maintaining a custodial relationship with Euroclear or Clearstream Luxembourg participants.

### *Ownership of the Notes through DTC, Euroclear and Clearstream Luxembourg*

The Republic will issue the Notes in the form of one or more fully registered book-entry securities, registered in the name of Cede & Co., a nominee of DTC. Financial institutions, acting as direct and indirect participants in DTC, will represent your

beneficial interests in the book-entry securities. These financial institutions will record the ownership and transfer of your beneficial interests through book-entry accounts. You may hold your beneficial interests in the book-entry securities through Euroclear or Clearstream Luxembourg, if you are a participant in such systems, or indirectly through organizations that are participants in such systems. Euroclear and Clearstream Luxembourg will hold their participants' beneficial interests in the book-entry securities in their customers' securities accounts with their depositaries. These depositaries of Euroclear and Clearstream Luxembourg in turn will hold such interests in their customers' securities accounts with DTC.

The Republic and the Fiscal Agent generally will treat the registered holder of the Notes, initially Cede & Co., as the absolute owner of the Notes for all purposes. Once the Republic and the Fiscal Agent make payments to the registered holders, the Republic and the Fiscal Agent will no longer be liable on the Notes for the amounts so paid. Accordingly, if you own a beneficial interest in the book-entry securities, you must rely on the procedures of the institutions through which you hold your interests in the book-entry securities (including DTC, Euroclear, Clearstream Luxembourg, and their participants) to exercise any of the rights granted to the holder of the book-entry securities. Under existing industry practice, if you desire to take any action that Cede & Co., as the holder of such book-entry securities, is entitled to take, then Cede & Co. would authorize the DTC participant through which you own your beneficial interest to take such action, and that DTC participant would then either authorize you to take the action or act for you on your instructions.

DTC may grant proxies or authorize its participants (or persons holding beneficial interests in the Notes through such participants) to exercise any rights of a holder or take any other actions that a holder is entitled to take under the Fiscal Agency Agreement or the Notes. Euroclear's or Clearstream Luxembourg's ability to take actions as a holder under the Notes or the Fiscal Agency Agreement will be limited by the ability of their respective depositaries to carry out such actions for them through DTC. Euroclear and Clearstream Luxembourg will take such actions only in accordance with their respective rules and procedures.

The Fiscal Agent will not charge you any fees for the Notes, other than reasonable fees for the replacement of lost, stolen, mutilated or destroyed Notes.  However, you may incur fees for the maintenance and operation of the book-entry accounts with the clearing systems in which your beneficial interests are held.

The laws of some states require certain purchasers of securities to take physical delivery of the securities in definitive form. These laws may impair your ability to transfer beneficial interests in the notes to such purchasers. DTC can act only on behalf of its direct participants, who in turn act on behalf of indirect participants and certain banks. Thus, your ability to pledge a beneficial interest in the notes to persons that do not participate in the DTC system, and to take other actions, may be limited because you will not possess a physical certificate that represents your interest.

**Transfers Within and Between DTC, Euroclear and Clearstream Luxembourg**

Since the purchaser determines the place of delivery, it is important for you to establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be on the desired value date. Although DTC, Euroclear and Clearstream Luxembourg have agreed to the following procedures in order to facilitate transfers of interests in the book-entry security among participants of DTC, Euroclear and Clearstream Luxembourg, they are under no obligation to perform or continue to perform these procedures, and these procedures may be discontinued at any time. Neither the Republic nor the Fiscal Agent will have any responsibility for the performance by DTC, Euroclear or Clearstream Luxembourg or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

*Trading Between DTC Purchasers and Sellers*

DTC participants will transfer interests in the Notes among themselves in the ordinary way according to DTC rules governing global securities issues.  DTC participants will pay for such transfers by wire transfer.

*Trading Between Euroclear and/or Clearstream Luxembourg Participants*

Participants in Euroclear and Clearstream Luxembourg will transfer interests in the Notes among themselves in the ordinary way according to the rules and operating procedures of Euroclear and Clearstream Luxembourg governing conventional Eurobonds.

*Trading Between a DTC Seller and a Euroclear or Clearstream Luxembourg Purchaser*

When the Notes are to be transferred from the account of a DTC participant to the account of a Euroclear or Clearstream Luxembourg participant, the purchaser must first send instructions to Euroclear or Clearstream Luxembourg through a participant at least one business day prior to the settlement date. Euroclear or Clearstream Luxembourg will then instruct its depositary to receive the Notes and make payment for them. On the settlement date, the depositary will make payment to the DTC participant's account and the Notes will be credited to the depositary's account. After settlement has been completed, DTC will credit the Notes to Euroclear or Clearstream Luxembourg, Euroclear or Clearstream Luxembourg will credit the Notes, in accordance with its usual procedures, to the participant's account, and the participant will then credit the purchaser's account. These securities credits will appear the next day (European time) after the settlement date. The cash debit from the account of Euroclear or Clearstream Luxembourg will be back-valued to the value date (which will be the preceding day if settlement occurs in New York). If settlement is not completed on the intended value date (*i.e.*, the trade fails), the cash debit will instead be valued at the actual settlement date.

Participants in Euroclear and Clearstream Luxembourg will need to make funds available to Euroclear or Clearstream Luxembourg in order to pay for the Notes by wire transfer on the value date. The most direct way of doing this is to pre-position funds (*i.e.*, have funds in place at Euroclear or Clearstream Luxembourg before the value date), either from cash on hand or existing lines of credit. Under this approach, however, participants may take on credit exposure to Euroclear and Clearstream Luxembourg until the Notes are credited to their accounts one day later.

As an alternative, if Euroclear or Clearstream Luxembourg has extended a line of credit to a participant, the participant may decide not to pre-position funds, but to allow Euroclear or Clearstream Luxembourg to draw on the line of credit to finance settlement for the Notes. Under this procedure, Euroclear or Clearstream Luxembourg would charge the participant overdraft charges for one day, assuming that the overdraft would be cleared when the Notes were credited to the participant's account. However, interest on the Notes would accrue from the value date. Therefore, in many cases the interest income on Notes which the participant earns during that one-day period will substantially reduce or offset the amount of the participant's overdraft charges. Of course, this result will depend on the cost of funds (*i.e.*, the interest rate that Euroclear or Clearstream Luxembourg charges) to each participant.

Since the settlement will occur during New York business hours, a DTC participant selling an interest in the Notes can use its usual procedures for transferring Notes to the depositaries of Euroclear or Clearstream Luxembourg for the benefit of Euroclear or Clearstream Luxembourg participants. The DTC seller will receive the sale proceeds on the settlement date. Thus, to the DTC seller, a cross-market sale will settle no differently than a trade between two DTC participants.

*Trading Between a Euroclear or Clearstream Luxembourg Seller and DTC Purchaser*

Due to time zone differences in their favor, Euroclear and Clearstream Luxembourg participants can use their usual procedures to transfer Notes through their depositaries to a DTC participant. The seller must first send instructions to Euroclear or Clearstream Luxembourg through a participant at least one business day prior to the settlement date. Euroclear or Clearstream Luxembourg will then instruct its depositary to credit the Notes to the DTC participant's account and receive payment. The payment will be credited in the account of the Euroclear or Clearstream Luxembourg participant on the following day, but the receipt of the cash proceeds will be back-valued to the value date (which will be the preceding day if settlement occurs in New York). If settlement is not completed on the intended value date (*i.e.*, the trade fails), the receipt of the cash proceeds will instead be valued at the actual settlement date.

If the Euroclear or Clearstream Luxembourg participant selling the Notes has a line of credit with Euroclear or Clearstream Luxembourg and elects to be in debit for the Notes until it receives the sale proceeds in its account, then the back-valuation may substantially reduce or offset any overdraft charges that the participant incurs over that one-day period.

Finally, a day trader that uses Euroclear or Clearstream Luxembourg and that purchases the Notes from a DTC participant for credit to a Euroclear or Clearstream Luxembourg accountholder should note that these trades would automatically fail on the sale side unless affirmative action were taken. At least three techniques should be readily available to eliminate this potential problem:

- borrowing through Euroclear or Clearstream Luxembourg for one day (until the purchase side of the day trade is reflected in its Euroclear or Clearstream Luxembourg account) in accordance with the clearing system's customary procedures;

- borrowing the Notes in the United States from a DTC participant no later than one day prior to settlement which would give the Notes sufficient time to be reflected in the borrower's Euroclear or Clearstream Luxembourg account in order to settle the sale side of the trade; or

- staggering the value dates for the buy and sell sides of the trade so that the value date for the purchase from the DTC participant is at least one day prior to the value date for the sale to the Euroclear or Clearstream Luxembourg accountholder.

# TAXATION

*The following discussion summarizes certain United States federal income and Egyptian tax considerations that may be relevant to you, as a holder of Notes.  This summary does not describe all of the tax considerations that may be relevant to you, particularly if the you are subject to special tax rules.  You should consult you own tax adviser about the tax consequences of holding the Notes, including the relevance to your particular situation of the considerations discussed below, as well as of state, local and other tax laws.*

## Egyptian Taxation

Under Tax Law 91 of 2005, interest payable on the Notes is subject to a 20% withholding tax unless reduced by a treaty. The Republic will pay, subject to customary exceptions, such additional amounts as will result in the receipt by the Noteholder of such amounts as would have been received by such Noteholder had no such withholding or deduction been required. See "Terms and Conditions of the Notes—Condition 7. Payment of Taxes".

## United States Federal Income Taxation

The following is a summary of the material U.S. federal income tax consequences of the ownership and disposition of the Notes by U.S. Holders, as defined in the next paragraph.  It is included herein for general information only and does not address every aspect of the income or other tax laws that may be relevant to you  in light of your investment circumstances or that may be relevant to certain types of investors subject to special treatment under U.S. income tax laws (for example, financial institutions, tax-exempt organizations, insurance companies, real estate investment trusts, regulated investment companies, persons that are broker-dealers, traders in securities who elect the mark to market method of accounting for their securities, U.S. Holders that have a functional currency other than the U.S. Dollar, controlled foreign corporations, passive foreign investment companies, corporations that accumulate earnings to avoid U.S. federal income tax or investors in partnerships or other pass-through entities).  In addition, this summary does not address the effect of the federal alternative minimum tax, or any state, local or foreign tax laws.  This discussion is limited to Initial Purchasers of the Notes who hold the Notes as capital assets under Section 1221 of the Internal Revenue Code of 1986, as amended (the "Code") and not as part of a straddle, hedging, integrated, conversion or constructive sale transaction, or as part of a "synthetic security" or other similar integrated financial transaction.  Furthermore, the discussion below is based upon provisions of the Code, the legislative history thereof, applicable Treasury regulations and administrative rulings and judicial decisions as of the date of this Prospectus.  Such authorities may be repealed, revoked or modified (including changes in effective dates, and possibly with retroactive effect) so as to result in U.S. federal income tax consequences different from those discussed below.

For purposes of the following discussion, you are a "**U.S. Holder**" if you are a beneficial owner of a Note and you are, for U.S. federal income tax purposes:

- an individual citizen or resident of the United States;

- a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income tax without regard to its source; or

- a trust, if (i) a court within the United States is able to exercise primary supervision over administration of the trust and one or more United States persons have authority to control all substantial decisions of the trust or (ii) it has a valid election in effect under applicable U.S. Treasury regulations to be treated as a domestic trust.

If you are a partnership or an entity treated as a partnership for U.S. federal income tax purposes and you owns any of the Notes, the tax treatment of a partner or an equity interest owner of such other entity will generally depend upon the status of the person and the activities of the partnership or other entity treated as a partnership.  If you are a partner of a partnership or an equity interest owner of another entity treated as a partnership holding any of the Notes, you should consult your tax advisors.

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, NOTEHOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS PROSPECTUS**

IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY NOTEHOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON NOTEHOLDERS UNDER THE U.S. INTERNAL REVENUE CODE OF 1986, AS AMENDED; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OR CIRCULAR 230) BY THE ISSUER OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) NOTEHOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

*Payments of Interest*

Stated interest on a Note will be taxable to you, if you are a U.S. Holder, as ordinary income at the time that you received it or it is accrued, depending on the your method of accounting for tax purposes.  If you use the cash method of tax accounting, you will realize an amount of interest income equal to the U.S. Dollar payment of interest received.  If you use the accrual method of tax accounting, you will realize an amount of interest income based on the average exchange rate in effect during the interest accrual period (or with respect to an interest accrual period that spans two taxable years, at the average exchange rate for the portion of the period within the taxable year).  Alternatively, if you use the accrual method, you may elect to translate all interest income on the Notes at the spot rate in effect on the last day of the accrual period in the taxable year or on the date the interest payment is received if that date is within five business days of the end of the accrual period.  If you make this election, it must be applied consistently to all debt instruments that you held at the beginning of the first taxable year to which the election applies and to all debt instruments subsequently acquired.  The election cannot be changed without the consent of the Internal Revenue Service.  If you use the accrual method of accounting for tax purposes, you will recognize foreign currency gain or loss on the receipt of an interest payment if the amount actually received differs from the amount of interest income accrued, to the extent that the difference is attributable to differences between the exchange rate used to accrue that income and the exchange rate used to compute the U.S. Dollar amount of the interest payment.  This foreign currency gain or loss will be treated as ordinary income or loss, but generally will not be treated as an adjustment to interest income received on a bond.

The Internal Revenue Service could take the position that the issue price of the Notes will be the Egyptian Pound value on the settlement date of the U.S. Dollar amount required to be paid for the Notes on that date (*i.e.,* the issue price determined by converting the U.S. Dollar amount paid for the Notes to Egyptian Pounds at the exchange rate in effect on the settlement date, as opposed to the pricing date).  In that case, the Notes might be treated as having been issued with original issue discount depending on the exchange rate in effect on the settlement date.  The Republic intends to treat the Notes as having been issued without original issue discount.  You should consult your tax advisors regarding the determination of the issue price of the Notes and the possibility that the Notes would be viewed to be issued with original issue discount.

Interest paid by the Republic on the Notes will constitute income from sources outside the United States.  Under the foreign tax credit rules, interest paid will, in general and depending on your individual circumstances, be "passive" or "general" income, which, in either case, is treated separately from other types of income for purposes of computing the foreign tax credit allowable to you under the U.S. federal income tax laws.

*Purchase, Sale, Redemption and Retirement of the Notes*

You will generally recognize gain or loss on the sale, redemption or retirement of a Note equal to the difference between the amount realized (not including any amounts attributable to accrued but unpaid interest) on the sale, redemption or retirement and your tax basis in the Note.  Subject to the discussion of foreign currency gain or loss below, that gain or loss will be capital, and will be long-term capital gain or loss if the Note was held for more than one year.  Under current law, net capital gains of individuals may be taxed at lower rates than items of ordinary income.  Your ability to offset capital losses against ordinary income is limited.  Any capital gain or loss that you recognize on the sale, redemption or retirement of a Note generally will be treated as income or loss from sources within the United States for foreign tax credit limitation purposes.

You must treat any portion of the gain or loss recognized on the sale or disposition of a Note as ordinary income or loss to the extent that gain or loss is attributable to changes in the U.S. Dollar/Egyptian Pound exchange rate.  Such gain or loss, however, will be taken into account only to the extent of the total gain or loss realized on the sale or disposition.

Although not entirely free from doubt, the Republic believes that your tax basis in a Note generally will be the U.S. Dollar value of the Egyptian Pound purchase price on the date of purchase (the settlement date), calculated at the exchange rate in effect on that date.  The U.S. Dollar amount that you actually pay for a Note may differ from the amount determined under

the preceding sentence, since the U.S. Dollar purchase price will be determined using a currency exchange rate determined as of the pricing date, rather than the settlement date.  You may recognize U.S.-source foreign currency gain or loss in an amount equal to such difference.  The Internal Revenue Service could take the position, however, that your tax basis in a Note will be equal to the U.S. Dollar amount that you actually paid for the Note.  You should consult your tax advisors regarding the determination of your tax basis in a Note.

*Treasury Regulations Requiring Disclosure of Reportable Transactions*

Treasury regulations require U.S. taxpayers to report certain transactions that give rise to a loss in excess of certain thresholds (a "**Reportable Transaction**").  Under these regulations, if you recognize a loss with respect to the Notes that is characterized as an ordinary loss due to changes in currency exchange rates (under any of the rules discussed above), you would be required to report the loss on Internal Revenue Service Form 8886 (Reportable Transaction Statement) if the loss exceeds the thresholds set forth in the regulations.  For individuals and trusts, this loss threshold is U.S.$50,000 in any single taxable year.  For other types of taxpayers and other types of losses, the thresholds are higher.  You should consult with your own tax advisor regarding any tax filing and reporting obligations that may apply in connection with acquiring, owning and disposing of Notes.

*Backup Withholding and Information Reporting*

In general, information reporting requirements will apply to payments of principal of and interest on the Notes to non-corporate U.S. Holders if those payments are made within the United States or by or through a custodian or nominee that is a United States Controlled Person, as defined below.  Backup withholding will apply to those payments if such a U.S. Holder fails to provide an accurate taxpayer identification number or, in the case of interest payments, fails to certify that it is not subject to backup withholding or is notified by the Internal Revenue Service that it has failed to report all interest and dividends required to be shown on its U.S. federal income tax returns.

The payment of proceeds of a sale or redemption of Notes effected at the U.S. office of a broker will generally be subject to the information reporting and backup withholding rules described above.  In addition, the information reporting rules will apply to payments or proceeds of a sale or redemption effected at a foreign office of a broker that is a United States Controlled Person, unless the broker has documentary evidence that the holder or beneficial owner is not a U.S. Holder (and has no actual knowledge or reason to know to the contrary) or the holder or beneficial owner otherwise establishes an exemption.

A "**United States Controlled Person**" is:

- a United States person (as defined in the United States Treasury regulations);

- a controlled foreign corporation for United States federal income tax purposes;

- a foreign person 50% or more of whose gross income is derived for tax purposes from a U.S. trade or business for a specified three-year period; or

- a foreign partnership in which United States persons hold more than 50% of the income or capital interests or which is engaged in a U.S. trade or business.

Any amounts withheld under the backup withholding rules from a payment to you generally will be allowed as a refund or a credit against your U.S. federal income tax liability as long as you provide the required information to the Internal Revenue Service.

**YOU SHOULD CONSULT YOUR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE U.S. FEDERAL TAX LAWS TO YOUR PARTICULAR SITUATIONS, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER THE LAWS OF ANY STATE, LOCAL OR NON-U.S. TAXING JURISDICTION PRIOR TO MAKING AN INVESTMENT IN THE NOTES.**

# PLAN OF DISTRIBUTION

Morgan Stanley & Co. International plc and HSBC Bank plc are acting as joint lead managers of the Offering (the "**Joint Lead Managers**") and, along with Banque Misr SAE and National Bank of Egypt SAE, will be the Initial Purchasers of the Notes. Subject to the terms and conditions in the purchase agreement dated April 22, 2010, each Initial Purchaser named below has agreed to purchase, and the Republic has agreed to sell to that Initial Purchaser, the principal amount of the Notes of each series (if any) set forth opposite such Initial Purchaser's name in the below table.

| Initial Purchaser | Principal Amount of 2020 Notes | Principal Amount of 2040 Notes |
|---|---|---|
| | (U.S.$) | |
| Morgan Stanley & Co. International plc | 500,000,000 | 262,500,000 |
| HSBC Bank plc | 450,000,000 | 237,500,000 |
| Banque Misr SAE | 25,000,000 | — |
| National Bank of Egypt SAE | 25,000,000 | — |
| **Total** | 1,000,000,000 | 500,000,000 |

The purchase agreement provides that the obligations of the Initial Purchasers to purchase the Notes are several and not joint, and are subject to certain conditions. The Initial Purchasers must purchase all the Notes if they purchase any of the Notes.

The Republic has been advised that the Initial Purchasers propose to resell the Notes at the offering prices set forth on the cover page of this Prospectus within the United States to qualified institutional buyers (as defined in Rule 144A) in reliance on Rule 144A and outside the United States in reliance on Regulation S. See "Transfer Restrictions". The prices at which the Notes are offered may be changed at any time without notice.

The Notes have not been and will not be registered under the U.S. Securities Act and may not be offered or sold within the United States except in transactions exempt from, or not subject to, the registration requirements of the U.S. Securities Act. See "Transfer Restrictions".

Accordingly, in connection with sales outside the United States, each Joint Lead Manager has agreed that, except as permitted by the purchase agreement and set forth in "Transfer Restrictions", it will not offer or sell Notes within the United States as part of the distribution of Notes.

In addition, until 40 days after the commencement of this offering, an offer or sale of Notes within the United States by a dealer that is not participating in this offering may violate the registration requirements of the U.S. Securities Act if that offer or sale is made otherwise than in accordance with Rule 144A.

The Notes in each series will constitute a new class of securities with no established trading market. Application has been made to list the Notes on the Luxembourg Stock Exchange and to trade them on the Luxembourg Stock Exchange's regulated market. The Notes are also expected to be eligible for trading in the PORTAL Market, NASDAQ Stock Market's screen-based automated market for trading of securities eligible for resale under Rule 144A. However, the Republic cannot assure you that the prices at which the Notes will trade in the market after this offering will not be lower than the initial offering price or that an active trading market for the Notes will develop and continue after this offering. The Initial Purchasers have advised the Republic that they currently intend to make a market in the Notes in each series. However, they are not obligated to do so and they may discontinue any market-making activities with respect to the Notes in each series at any time without notice. In addition, market-making activity may be subject to the limits imposed by applicable securities laws. Accordingly, the Republic cannot assure you as to the liquidity of or the trading market for the Notes in each series.

In connection with the issue of the Notes, Morgan Stanley (the "**Stabilizing Manager**") (or persons acting on behalf of the Stabilizing Manager) may over-allot Notes or effect transactions with a view to supporting the market price of the Notes in each series at a level higher than that which might otherwise prevail. However, there is no assurance that the Stabilizing Manager (or persons acting on behalf of the Stabilizing Manager) will undertake stabilization action. Any stabilization

action may begin on or after the date on which adequate public disclosure of the terms of the offer of the Notes in each series is made and, if begun, may be ended at any time, but it must end no later than the earlier of 30 days after the issue date of the Notes in each series and 60 days after the date of the allotment of the Notes in each series. Any stabilization action or over-allotment shall be conducted in accordance with all applicable laws and rules.

The Republic has agreed to indemnify the Initial Purchasers against certain liabilities, including liabilities under the U.S. Securities Act, or to contribute to payments that the Initial Purchasers may be required to make because of any of those liabilities.

**European Economic Area**

In relation to each Member State of the European Economic Area that has implemented the Prospectus Directive (each such Member State, a "**Relevant Member State**"), each Initial Purchaser has represented and agreed that with effect from (and including) the date on which the Prospectus Directive is implemented in that Relevant Member State (the "**Relevant Implementation Date**") it has not made and will not make an offer of the Notes to the public in that Relevant Member State prior to the publication of a prospectus in relation to the Notes which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from (and including) the Relevant Implementation Date, make an offer of Notes to the public in that Relevant Member State at any time:

(i)     to legal entities that are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(ii)    to any legal entity that has two or more of: (a) an average of at least 250 employees during the last financial year, (b) a total balance sheet of more than €43,000,000 and (c) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts;

(iii)   to fewer than 100 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) subject to obtaining the prior consent of the dealers; or

(iv)    in any other circumstances that do not require the publication by the Issuer of a prospectus or obtaining any approvals pursuant to Article 3(2) of the Prospectus Directive.

For the purposes of this provision, the expression an "**offer of Notes to the public**" in relation to any of the Notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the Notes to be offered so as to enable an investor to decide to purchase or subscribe the Notes, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "**Prospectus Directive**" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

**United Kingdom**

Each Initial Purchaser has represented and agreed that:

(a)     it has only communicated or caused to be communicated and will only cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of section 21 of the Financial Services and Markets Act 2000 (the "**FSMA**") received by it connection with the issue or sale of the Notes in circumstances in which section 21 of the FSMA does not apply to the Issuer; and

(b)     it has complied and will comply with all applicable provisions of the Financial Services and Markets Act 2000 with respect to anything done by it in relation to the Notes in, from or otherwise involving the United Kingdom.

**Saudi Arabia**

No action has been or will be taken in the Kingdom of Saudi Arabia that would permit a public offering or private placement of the Notes in the Kingdom of Saudi Arabia, or possession or distribution of any offering materials in the

Kingdom of Saudi Arabia in relation thereto. The Notes may only be offered and sold in the Kingdom of Saudi Arabia in accordance with Part 4 (Private Placements) of the Offers of Securities Regulations dated 20/8/11425H (corresponding to 4/10/2004G) (as. amended) (the "**Regulations**") and, in accordance with Article 11(a)(1) of the Regulations, the Notes will be offered to no more than 60 offerees in the Kingdom of Saudi Arabia with each such offeree paying an amount not less than one million Saudi Riyals or its equivalent. Prospective investors are informed that Article 17 of the Regulations places restrictions on secondary market activity with respect to the Shares. Any resale or other transfer. or attempted resale or other transfer, made other than in compliance with the above stated restrictions shall not be recognised by the Republic.

**United Arab Emirates**

This Prospectus does not, and is not intended to, constitute an invitation or an offer of securities in the United Arab Emirates (including the Dubai International Financial Centre) and, accordingly, should not be construed as such. This Prospectus is being issued to a limited number of selected institutional/sophisticated investors: (a) upon their request and confirmation that they understand that the Notes have not been approved or licensed by or registered with the United Arab Emirates Central Bank or any other relevant licensing authorities or governmental agencies in the United Arab Emirates; (b) on the condition that this Prospectus will not be provided to any person other than the original recipient, is not for general circulation in the United Arab Emirates and may not be reproduced or used for any other purpose; and (c) on the condition that no sale of securities or other investment products is intended to be consummated within the United Arab Emirates. The Notes are not offered or intended to be sold directly or indirectly to the public in the United Arab Emirates. No agreement relating to the sale of the Notes is intended to be consummated in the United Arab Emirates. This Prospectus has not been approved by or filed with the Dubai Financial Services Authority.

**General**

No action has been taken by the Republic or any of the Initial Purchasers that is intended to permit a public offer of the Notes in any country or jurisdiction where any such action for that purpose is required. Accordingly, each Initial Purchaser has undertaken that it will not, directly or indirectly, offer or sell any Notes or distribute or publish any prospectus, form of application, advertisement or other document or information in any country or jurisdiction except under circumstances that will, to the best of its knowledge and belief, result in compliance with any applicable laws and regulations and all offers and sales of Notes by it will be made on the same terms.

# TRANSFER RESTRICTIONS

*Because of the following restrictions, purchasers are advised to consult legal counsel prior to making any offer, sale, resale, pledge or other transfer of the Notes.*

Each purchaser of Notes will be deemed to have represented and agreed as follows (terms used in this paragraph that are defined in Rule 144A or in Regulation S under the U.S. Securities Act are used herein as defined therein):

1.      it is not an "**affiliate**" (as defined in Rule 144 under the U.S. Securities Act) of the Republic or acting on behalf of the Republic and (A) (i) is a qualified institutional buyer, (ii) is aware, and each beneficial owner of such Notes has been advised, that the sale of the Notes to it is being made in reliance on Rule 144A, and (iii) is acquiring such Notes for its own account or the account of a qualified institutional buyer or (B) it is purchasing Notes in an offshore transaction in compliance with Regulation S under the U.S. Securities Act;

2.      it acknowledges that the Notes have not been and will not be registered under the U.S. Securities Act or with any securities regulatory authority of any jurisdiction and that the Notes are being offered for resale in transactions not requiring registration under the U.S. Securities Act or with any securities regulatory authority of any other jurisdiction and, unless so registered, may not be offered, sold, pledged or otherwise transferred within the U.S. except as set forth below;

3.      it understands and agrees that if in the future it decides to resell, pledge or otherwise transfer any Notes or any beneficial interests in any Notes other than a Regulation S global note, such Notes may be resold, pledged or transferred only (A) by an initial investor (i) to the Republic, (ii) to a person whom the seller reasonably believes is a qualified institutional buyer that purchases for its own account or for the account of a qualified institutional buyer in a transaction meeting the requirements of Rule 144A under the U.S. Securities Act, (iii) in an offshore transaction meeting the requirements of Rule 903 or 904 of Regulation S under the U.S. Securities Act or (iv) pursuant to an exemption from registration under the U.S. Securities Act provided by Rule 144 under the U.S. Securities Act (which may or may not be available) (resales described in sub clauses (i) through (iv) of this clause (A), "**Safe Harbor Resales**"), or (v) pursuant to an effective registration statement pursuant to the U.S. Securities Act, or (B) by a subsequent investor, in a Safe Harbor Resale or pursuant to any other available exemption from the registration requirements under the U.S. Securities Act (provided that, as a condition to the registration of transfer of any Notes otherwise than in a Safe Harbor Resale, the Republic or the Transfer Agent may require delivery of any documents or other evidence (including but not limited to an opinion of counsel) that it, in its sole discretion, may deem necessary or appropriate to evidence compliance with such exemption), and in each of such cases, in accordance with any applicable securities laws of any state of the U.S. and any other jurisdiction;

4.      it agrees to, and each subsequent holder is required to, notify any purchaser of the Notes from it of the resale restrictions referred to in clause 3 above, if then applicable;

5.      it understands and agrees that (A) Notes initially offered in the U.S. to qualified institutional buyers will be represented by Rule 144A global notes and (B) that Notes offered outside the U.S. in reliance on Regulation S will be represented by Regulation S global notes;

6.      it understands that the Notes, other than the Regulation S Notes, will bear a legend to the following effect unless otherwise agreed to by the Republic:

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**U.S. SECURITIES ACT**") OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY OTHER JURISDICTION. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES FOR THE BENEFIT OF THE ARAB REPUBLIC OF EGYPT (THE "**REPUBLIC**") THAT THIS NOTE MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) BY AN INITIAL INVESTOR (AS DEFINED BELOW) (1) TO THE REPUBLIC, (2) SO LONG AS THIS NOTE IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE U.S. SECURITIES ACT ("**RULE 144A**"), TO A

PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A) IN ACCORDANCE WITH RULE 144A, (3) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT OR (4) PURSUANT TO AN EXEMPTION FROM REGISTRATION IN ACCORDANCE WITH RULE 144 UNDER THE U.S. SECURITIES ACT (WHICH MAY OR MAY NOT BE AVAILABLE) (RESALES DESCRIBED IN SUBCLAUSES (1) THROUGH (4) OF THIS CLAUSE (A), "**SAFE HARBOR RESALES**"), OR (5) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT PURSUANT TO THE U.S. SECURITIES ACT OR (B) BY A SUBSEQUENT INVESTOR, IN A SAFE HARBOR RESALE OR PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE U.S. SECURITIES ACT (PROVIDED THAT, AS A CONDITION TO THE REGISTRATION OF TRANSFER OF ANY NOTES OTHERWISE THAN IN A SAFE HARBOR RESALE, THE REPUBLIC OR THE TRANSFER AGENT MAY REQUIRE DELIVERY OF ANY DOCUMENTS OR OTHER EVIDENCE (INCLUDING BUT NOT LIMITED TO AN OPINION OF COUNSEL) THAT IT, IN ITS SOLE DISCRETION, MAY DEEM NECESSARY OR APPROPRIATE TO EVIDENCE COMPLIANCE WITH SUCH EXEMPTION), AND IN EACH OF SUCH CASES, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ANY OTHER JURISDICTION, AS PROVIDED IN THE FISCAL AGENCY AGREEMENT. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, REPRESENTS AND AGREES FOR THE BENEFIT OF THE REPUBLIC THAT IT WILL NOTIFY ANY PURCHASER OF THIS NOTE FROM IT OF THE RESALE RESTRICTIONS REFERRED TO ABOVE.

FOR ALL PURPOSES OF THIS NOTE, THE TERM "**INITIAL INVESTOR**" MEANS ANY PERSON WHO, IN CONNECTION WITH THE INITIAL DISTRIBUTION OF THIS NOTE, ACQUIRES SUCH NOTE FROM THE REPUBLIC OR ANY INITIAL PURCHASERS (AS SUCH TERM IS DEFINED IN THE FISCAL AGENCY AGREEMENT) PARTICIPATING IN SUCH DISTRIBUTION OR ANY AFFILIATE OF ANY OF THE FOREGOING".

7.      it acknowledges that, prior to any transfer of Notes or of beneficial interests in global notes, the holder of Notes or the holder of beneficial interests in global notes, as the case may be, may be required to provide certifications and other documentation relating to the manner of such transfer and submit such certifications and other documentation as provided in the Fiscal Agency Agreements;

8.      it understands that no representation can be made as to the availability of the exemption provided by Rule 144 under the Securities Act for resales of the Notes; and

9.      it acknowledges that the Republic and the Initial Purchasers and others will rely upon the truth and accuracy of the foregoing acknowledgments, representation and agreements and agrees that, if any of such acknowledgments, representations or warranties deemed to have been made by virtue of its purchase of Notes are no longer accurate, it shall promptly notify the Republic, and if it is acquiring any Notes as a fiduciary or agent for one or more accounts, it represents that it has sole investment discretion with respect to each such account and that it has full power to make the foregoing acknowledgments, representations and agreements on behalf of each such account.

# GENERAL INFORMATION

**Trading information**

The Notes have been accepted for clearance through the facilities of DTC, Euroclear and Clearstream Luxembourg.  The relevant trading information for the notes is set out below:

|  |  |  |
|---|---|---|
| **Regulation S Note for the 2020 Notes** | Common Code ............................ | 050526585 |
|  | ISIN ............................................ | XS0505265859 |
| **Rule 144A Note for the 2020 Notes** | CUSIP ......................................... | 038461AE9 |
|  | ISIN ............................................ | US038461AE97 |
|  | Common Code ............................ | 050540324 |
| **Regulation S Note for the 2040 Notes** | Common Code ............................ | 050547868 |
|  | ISIN ............................................ | XS0505478684 |
| **Rule 144A Note for the 2040 Notes** | CUSIP ......................................... | 038461AF6 |
|  | ISIN ............................................ | US038461AF62 |
|  | Common Code ............................ | 050575713 |

As long as the Notes are listed on the official list of the Luxembourg Stock Exchange, the Republic will maintain a Paying Agent in Luxembourg.

Estimated total expenses related to admission to trading are approximately U.S.$8,000.

**Authorizations**

The Republic has obtained all necessary consents, approvals and authorizations in connection with the issue and performance of its obligations under the Notes.  The issue of the Notes by the Republic was authorized by Law 73 and the Minister of Finance.

**Litigation**

The Republic is not involved in any governmental, legal or arbitration proceedings (including any such proceedings which are pending or threatened of which the Republic is aware) during the period covering the previous 12 months which may have or have had in the recent past a significant effect on the Republic's financial position or which are material in the context of the issue of the Notes.

**Documents available for inspection**

Copies of the following documents will, for so long as the Notes are listed on the Luxembourg Stock Exchange, be available during usual business hours on any weekday (except Saturdays and public holidays) at the offices of the Paying Agent in Luxembourg:

- the Fiscal Agency Agreement for the Notes, incorporating the respective forms of the Notes;

- the Budget Law authorizing the issuance of the Notes, translated into English;

- the Republic's 2009/10 budget.

This Prospectus is published on the website of the Luxembourg Stock Exchange: www.bourse.lu.

**Significant Change**

Save as disclosed in this Prospectus, there has been no significant adverse change in the information set out in this Prospectus under "The Economy", "External Sector", "Monetary System", "Public Finance" and "Public Sector Debt" since December 31, 2009, and there have been no recent events relevant to the evaluation of the Republic's solvency.

**The Issuer**

The address of the Issuer is: The Arab Republic of Egypt, Ministry of Finance, Ministry of Finance Towers, Emtedad Ramsis St., Nasr City, Cairo, Egypt.  The phone number of the Issuer is +20 2 2686 1600.

**Listing and Admission to Trading**

The Republic has applied to list on the official list and trade the Notes on the regulated market of the Luxembourg Stock Exchange in accordance with its rules.  The total fees and expenses in connection with the admission of the Notes to trading on the regulated market are expected to be approximately U.S.$8,000.

**Conflicts of Interests**

There are no interests of any natural or legal persons, including conflicting interests, which are material to the issue of the Notes.

**Ratings**

Egypt's long-term foreign currency debt rating has been assigned a rating of "BB+" with a stable outlook by Standard & Poor's, a rating of "BB+" with a stable outlook by Fitch and a rating of "Ba1" with a stable outlook by Moody's.  The Notes are expected to be assigned the same ratings.  These ratings are sub-investment grade.  A rating is not a recommendation to buy, sell or hold securities and may be subject to revision, suspension or withdrawal at any time by the assigning rating organization.  Any change in the rating of the Notes could adversely affect the price that a purchaser will be willing to pay for the Notes, cause trading in the Notes to be volatile or adversely affect the trading price of the Notes.

**ISSUER**

**The Arab Republic of Egypt**
Ministry of Finance
Ministry of Finance Towers
Ramsis Street Extension
Nasr City, Cairo
Egypt

| GLOBAL COORDINATOR AND JOINT LEAD MANAGER | JOINT LEAD MANAGER |
|---|---|

**Morgan Stanley & Co. International plc**
25 Cabot Square, Canary Wharf
London E14 4QA
United Kingdom

**HSBC Bank plc**
8 Canada Square
London E14 5HQ
United Kingdom

| FISCAL AGENT AND PRINCIPAL PAYING AGENT | LUXEMBOURG PAYING AGENT, TRANSFER AGENT AND REGISTRAR | PAYING AGENT AND REGISTRAR |
|---|---|---|

**The Bank of New York Mellon**
One Canada Square
London E14 5AL
United Kingdom

**The Bank of New York Mellon (Luxembourg) S.A.**
Aerogolf Center
1A, Hoehenhof
L-1736 Senningerberg
Luxembourg

**The Bank of New York Mellon**
101 Barclay Street
New York, NY 10286
U.S.A.

**LEGAL ADVISORS**
*to the Republic*
*as to United States law:*

**Dewey & LeBoeuf**
1 Minster Court
Mincing Lane
London EC3R 7YL
United Kingdom

**LEGAL ADVISORS**
*to the Joint Lead Managers*

*as to United States law:*

*as to Egyptian law:*

**Skadden, Arps, Slate, Meagher & Flom (UK) LLP**
40 Bank Street
Canary Wharf
London E14 5DS
United Kingdom

**Helmy, Hamza & Partners**
Nile City Building, North Tower
Twenty First Floor
2005C Cornich El Nil
Ramlet Boulaq, Cairo
Egypt